# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF KENTUCKY
# CENTRAL DIVISION AT FRANKFORT

*Electronically filed*

| | |
|---|---|
| **COMMONWEALTH OF KENTUCKY**<br><br>and<br><br>**STATE OF TENNESSEE**<br><br>    *Plaintiffs*<br><br>v.<br><br>**JANET YELLEN**, in her official capacity as Secretary of the Treasury,<br><br>**RICHARD K. DELMAR**, in his official capacity as Acting Inspector General of the Department of the Treasury, and<br><br>**U.S. DEPARTMENT OF THE TREASURY**,<br><br>    *Defendants* | Civil Action No. _____ |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs the Commonwealth of Kentucky and the State of Tennessee, by and through Attorney General Daniel Cameron and Attorney General and Reporter Herbert H. Slatery III, bring this action against the Defendants and state as follows:

**INTRODUCTION**

1.      This case is about federal overreach. After a year of some of the most trying economic circumstances in recent history, a bare partisan majority of Congress is telling the States that they cannot lower their citizens' tax burdens without suffering a penalty. This attempt to usurp the States' authority is unthinkable in our federal Republic.

2.      "State sovereignty is not just an end in itself: Rather, federalism secures to citizens the liberties that derive from the diffusion of sovereign power." *New York v. United States*, 505 U.S. 144, 181 (1992) (quotation marks omitted). In fact, "[t]he States exist as a refutation of [the] concept" that the "National Government [is] the ultimate, preferred mechanism for expressing the people's will." *See Alden v. Maine*, 527 U.S. 706, 759 (1999). The "genius" of our Constitution is the "idea that our citizens would have two political capacities, one state and one federal, each protected from incursion by the other." *Saenz v. Roe*, 526 U.S. 489, 504 n.17 (1999) (citation omitted).

3.      The federal legislation at issue here seeks to fundamentally remake the constitutional balance of power between the federal government and the States. And it seeks to do so under the guise of the Covid-19 crisis. "But even in a pandemic, the Constitution cannot be put away and forgotten." *Roman Catholic Diocese of Brooklyn v. Cuomo*, --- U.S. --- , 141 S. Ct. 63, 68 (2020) (per curiam). This lawsuit simply seeks

to preserve the sovereign authority that the States possess by virtue of the Constitution.

4. The Covid-19 pandemic has wreaked havoc upon the lives of Americans throughout our country. Over the past year, Congress has used the power of its purse to provide relief to Americans in multiple ways, ranging from financial assistance for individuals to aid provided to the States. Those efforts have, for the most part, been focused on the crisis at hand: Covid-19 and the economic damage it has caused to our society. Congress's most recent effort, however, took a somewhat different turn.

5. The American Rescue Plan Act of 2021 provides significant financial aid to State governments—almost $200 billion. But it comes with coercive strings attached. In particular, Congress enacted a sweeping mandate (the "Tax Mandate") that prohibits any State accepting federal financial assistance under the Act from lowering the tax burden on its citizens for the next four years. Once a State accepts financial aid under the Act—aid that might range from 20 to 40 percent of the State's total annual revenue—that State is prohibited from setting its own tax policy if doing so will cause a net decrease in tax revenue. Congress, in other words, is using the carrot of enormous financial aid to outright prohibit the States from lowering taxes on their own residents.

6. The Tax Mandate is an unprecedented power grab by the federal government. At a time when the States are focused on helping their constituents

overcome the devastating effects of the pandemic,[1] Congress chose to use the pandemic to extend its control over State sovereignty in an unprecedented way. The Tax Mandate usurps the States' sovereign authority by coercing them into making the policy choices that a bare majority of Congress prefers, and a strictly partisan majority at that, without regard for the policy preferences of the citizens of the States or the leaders they elect.

7.      Congress cannot use the Covid-19 crisis as an opportunity to handcuff the States and demand that they enact its preferred taxing policies. Unfortunately, that is precisely what Congress has done.

8.      The Plaintiff States bring suit to enjoin the Defendants from enforcing the unconstitutional Tax Mandate.

## JURISDICTION & VENUE

9.      The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because the Plaintiff States assert claims against the Defendants arising under the

---

[1] The effects reach far beyond the virus itself. Kentucky's overdose death rate—largely due to opioid abuse—has increased 43 percent during over the past year. *See* Ahmad FB, Rossen LM, Sutton P., *Provisional drug overdose death counts*, National Center for Health Statistics (2021), available at https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm (last visited Apr. 5, 2021). Schools in Jefferson County, Kentucky, have seen the number of failing students double over the past year. *See* Gabriella Borter & Brendan O'Brien, *Another danger for kids in the age of COVID: Failing grades*, Reuters (Mar. 29, 2021), available at https://www.reuters.com/article/us-health-coronavirus-usa-students-insig/another-danger-for-kids-in-the-age-of-covid-failing-grades-idUSKBN2BL1BF (last visited Apr. 5, 2021).

Constitution of the United States. The Court may grant declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202.

10.     This Court is the proper venue under 28 U.S.C. § 1391(e) because a "substantial part of the events . . . giving rise to the claim[s] occurred" in this district, the district is situated in Kentucky, the Commonwealth of Kentucky is a Plaintiff, and the Defendants are agencies of the United States or officers of the United States acting in their official capacity.

11.     Under either Local Rule 3.2(a)(3)(A) or 3.2(a)(3)(B), the Central Division of the Eastern District of Kentucky at Frankfort is the proper division for this action because a substantial part of the events giving rise to this action occurred in Franklin County, Kentucky, where Kentucky's seat of government is located, and where Attorney General Cameron holds office.

12.     The Plaintiff States have standing to challenge the Tax Mandate and seek injunctive and declaratory relief. The Tax Mandate injures the Plaintiff States by unconstitutionally intruding on their sovereign authority, by interfering with the orderly management of their fiscal affairs, and by requiring them to forgo their constitutional taxing powers or face an action to return much-needed federal funds after they have already been spent. *See Celebrezze v. U.S. Dep't of Transp.*, 766 F.2d 228, 232 (6th Cir. 1985); *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel. Barez*, 458

U.S. 592, 601 (1982). Injunctive and declaratory relief would redress the Plaintiff States' injuries.

## PARTIES

13.    Plaintiff the Commonwealth of Kentucky is a sovereign state of the United States of America. Daniel Cameron is the duly elected Attorney General of the Commonwealth of Kentucky with the constitutional, statutory, and common-law authority to bring suit on behalf of the Commonwealth and its citizens. Ky. Rev. Stat. 15.020; *Commonwealth ex rel. Beshear v. Commonwealth ex rel. Bevin*, 498 S.W.3d 355, 362 (Ky. 2016).

14.    Plaintiff the State of Tennessee is a sovereign state of the United States of America. Herbert H. Slatery III is the duly appointed Attorney General and Reporter of the State of Tennessee with the constitutional and statutory authority to bring suit on behalf of Tennessee and its citizens. Tenn. Const. art. VI, § 5; Tenn. Code Ann. §§ 8-6-109, -110.

15.    Defendant Janet Yellen is the Secretary of the Treasury. The Secretary of the Treasury is responsible for administering the funds appropriated under § 9901 of the American Rescue Plan Act of 2021, issuing regulations necessary to implement the aid disbursement, and recouping any funds used in violation of the Act's Tax Mandate. Secretary Yellen is named in her official capacity.

16.    Defendant Richard K. Delmar is the Acting Inspector General of the Department of Treasury. The Inspector General is responsible for oversight of existing coronavirus relief funds disbursed to the States and is generally responsible for informing the Secretary of the Treasury about programs administered by the

Department of Treasury and advising on the necessity for corrective action. Inspector General Delmar is named in his official capacity.

17.     Defendant U.S. Department of the Treasury is an agency of the United States and is responsible for administering the coronavirus local fiscal recovery fund created by § 9901 of the American Rescue Plan Act.

## FACTUAL BACKGROUND

### The Covid-19 pandemic wreaks havoc on the health and livelihood of Americans

18.     The United States reported its first case of Covid-19 in January 2020. Since then, more than half a million Americans have lost their lives to the virus, and countless others have been lost to suicide and drug overdoses in the wake of the pandemic's toll on the nation's communities.

19.     The damage caused by the pandemic, however, has not been limited to the toll on human life and health. Covid-19 has drastically damaged the economy. Businesses have closed and individuals have been laid off from their employment, both of which have increased the financial needs of the States and local governments that must address an ongoing crises in unemployment while continuing to provide essential services like healthcare and education to their citizens.

20.     The Plaintiff States were no exception to the financial hardship caused by Covid-19. The pandemic took a particularly heavy toll on Kentucky's employment, leaving it early on with the highest jobless rate—about 33 percent—in the nation.[2]

---

[2] *See Kentucky has nation's highest jobless rate, three estimators say*, Center for Business and Economic Research (May 11, 2020), available at

The economic uncertainty caused the Kentucky General Assembly to abandon its ordinary, two-year budgeting process in favor of a slimmed down one-year budget based on uncertain revenue projections and even more uncertain costs. And that uncertainty became reality when the State faced more than a $1 billion shortfall in 2020.[3]

21. Tennessee also suffered economic hardship caused by Covid-19. Between February 2020 and February 2021, the State lost 118,600 jobs.[4] Even with improving unemployment rates, Tennessee unemployment spiked at 15.8 percent during the height of the pandemic.[5] Since March 15, 2020, Tennessee has received 1,101,057 new claims for unemployment benefits.[6] In Fiscal Year 2021, Tennessee responded to projected budget shortfalls by enacting a zero-growth budget, freezing

---

http://cber.uky.edu/news/2020/kentucky-has-nations-highest-jobless-rate-three-estimators-say (last visited Apr. 5, 2021).

[3] *See Kentucky faces $1.1B budget shortfall due to COVID-19, Gov. Beshear says*, WDRB (June 30, 2020), available at https://www.wdrb.com/news/kentucky-faces-1-1b-budget-shortfall-due-to-covid-19-gov-beshear-says/article_25e2d446-bb12-11ea-8475-93da1d00638a.html (last visited Apr. 5, 2021).

[4] *See Unemployment in Tennessee Nears Pre-Pandemic Levels*, Tennessee Department of Labor & Workforce Development (Mar. 25, 2021), available at https://www.tn.gov/workforce/general-resources/news/2021/3/25/unemployment-in-tennessee-nears-pre-pandemic-levels.html (last visited Apr. 5, 2021).

[5] *See Tennessee Economic Analysis*, Tennessee Department of Labor & Workforce Development, (Mar. 25, 2021), available at https://www.tn.gov/content/dam/tn/workforce/documents/economicanalysis/EconomicAnalysisFeb21.pdf (last visited Apr. 5, 2021).

[6] *See Tennessee Unemployment Claims Data*, Tennessee Department of Labor & Workforce Development, (Mar. 25, 2021), https://www.tn.gov/workforce/general-resources/news/2021/3/25/tennessee-unemployment-claims-data.html (last visited Apr. 5, 2021).

hiring and equipment purchases, and implementing a 12 percent cut to executive agency budgets.[7]

22.     The States, in other words, face a formidable task. Covid-19 has left millions of people unemployed and created significant uncertainty about the long-term financial health of the States, all while putting increased pressure on the ordinary essential services that the States provide—including health care, education, unemployment, utility assistance and more. But because the States lack Congress's power to borrow and regulate money and the resulting power of the purse, and in many cases are constitutionally required to enact balanced budgets, *see, e.g.,* Ky. Const. §§ 49–50, 171; Tenn. Const. Art. II, § 24, they face an uphill battle to overcome many of these problems on their own.

## The American Rescue Plan Act

23.     President Biden signed the American Rescue Plan Act of 2021, Pub. L. No. 117-2 (2021) (the "Act") into law on March 11, 2021.[8] The Act was Congress's sixth major relief effort since the pandemic began in early 2020.[9] All told, the federal outlay

---

[7] *See* Fiscal Year 2022 Recommended Budget Presentation*, Tennessee Department of Finance and Administration*, (Jan. 2021), available at https://www.tn.gov/content/dam/tn/finance/budget/documents/overviewspresentat ions/FY22RecommendedBudget.pdf (last visited Apr. 5, 2021).

[8] The Act is available at https://www.congress.gov/bill/117th-congress/house-bill/1319/text (last visited Apr. 5, 2021).

[9] *See* Coronavirus Preparedness and Response Supplemental Appropriations Act, Pub. L. 116-123 (2020); Families First Coronavirus Response Act, Pub. L. No. 116-127 (2020); CARES Act, Pub. L. No. 116-136 (2020); Paycheck Protection Program and Health Care Enhancement Act, Pub. L. No. 116-139 (2020); Consolidated Appropriations Act, 2021, Pub. L. No. 116-260 (2020).

for Covid-19 is nearing $6 trillion.[10] The Act accounts for almost $2 trillion of that total.

24.     Part of that $2 trillion comes in the form of financial assistance to individuals. That includes payments to individuals up to $1,400 per person. It also includes a number of tax credits and reductions that lower the federal tax burden that individuals and other taxpayers might ordinarily owe. The Act, for example, temporarily increases the child tax credit and makes it fully refundable for 2021. *See id.* at § 9611. The Act also increases the maximum tax credit for dependent care by more than 50 percent. *See id.* at § 9631.

25.     In addition to the assistance provided directly to taxpayers, the Act appropriates $195.3 billion in aid for the States and the District of Columbia. *See* Pub. L. No. 117-2, § 9901 (adding § 602(b)(3) to the Social Security Act, 42 U.S.C. § 801 et seq. ("SSA")). From that $195.3 billion, the Secretary of the Treasury must evenly distribute $25.5 billion "equally among each of the 50 States and the District of Columbia." *Id.* "[T]he remainder of the amount" will then be distributed "to the 50 States and the District of Columbia" according to a formula that averages each State's unemployment rate during the last quarter of 2020. *Id.*

---

[10] *See* Megan Henney, *US Spending on COVID-19 relief poised to hit $6T with passage of Biden stimulus bill*, Fox Business (Mar. 10, 2021), available at https://www.foxbusiness.com/economy/us-spending-on-covid-relief-poised-to-hit-6t (last visited Apr. 5, 2021).

26.     Kentucky expects to receive about $2.4 billion under the formula.[11] By comparison, during the last fiscal year Kentucky collected about $11.2 billion in revenue for the General Fund.[12] So Congress's aid package for Kentucky amounts to more than *one fifth* of Kentucky's entire yearly General Fund revenue.

27.     Tennessee expects to receive about $3.7 billion under the Act. *See id.* By comparison, during the last fiscal year, Tennessee collected about $17.8 billion in revenue for the General Fund.[13] So Congress's aid package for Tennessee amounts to more than *one fifth* of Tennessee's annual general revenue.

28.     Though it varies, most of the States find themselves in a similar position. The financial aid the Act offers to the States is simply unparalleled in size.

29.     The Act imposes restrictions on how the States can use the billions of dollars in aid. In general, the funds must be used to address and respond to the various hardships caused by Covid-19. *Id.* at § 9901 (adding § 602(c)(1) to the SSA). The States, for example, may use the funds for "assistance to households, small businesses, and nonprofits," or to "provid[e] premium pay to" essential workers. *Id.*

---

[11] *See* Jared Walczak, *State Aid in American Rescue Plan Act is 116 Times States' Revenue Losses*, Tax Foundation (Mar. 3, 2021), available at https://taxfoundation.org/state-and-local-aid-american-rescue-plan/ (last visited Apr. 5, 2021).

[12] *See* Thomas B. Miller, *2019 – 20 Annual Report*, Kentucky Department of Revenue (Jan. 15, 2021), available at https://revenue.ky.gov/News/Publications/Annual%20Reports/2019-20%20Annual%20Report%20Final.pdf (last visited Apr. 5, 2021).

[13] *See* Butch Eley, *The Budget: Fiscal Year 2021-2022,* Tennessee Department of Finance and Administration (Feb. 8, 2021), available at https://www.tn.gov/content/dam/tn/finance/budget/documents/2022BudgetDocument Vol1.pdf (last visited Apr. 5, 2021).

The States can also use the money "for the provision of government services" and "to make necessary investments in water, sewer, or broadband infrastructure," among other things. *Id.*

30.    The States cannot use Covid-19 aid for unrelated purposes, including, for example, depositing the money into flagging pension funds. *Id.*

## The Tax Mandate

31.    Though Congress has passed multiple Covid-19 relief packages over the past year, the Act is unlike any that preceded it, and it imposes uniquely problematic conditions on the States that opt to receive financial aid.

32.    Under the Tax Mandate, the States accepting Covid-19 relief funds are prohibited from using the funds to "directly *or indirectly* offset a reduction in [their] net tax revenue" if that tax reduction resulted from "a change in law, regulation, or administrative interpretation." § 9901 (adding § 602(c)(2)(A) to the SSA) (emphasis added). The full provision reads as follows:

> A State or territory shall not use the funds provided under this section or transferred pursuant to section 603(c)(4) to either directly or indirectly offset a reduction in the net tax revenue of such State or territory resulting from a change in law, regulation, or administrative interpretation during the covered period that reduces any tax (by providing for a reduction in a rate, a rebate, a deduction, a credit, or otherwise) or delays the imposition of any tax or tax increase.

*Id.* In other words, Congress appears to have conditioned its Covid-19 relief funds for the States on a promise that the States will not lower taxes on their residents for four years.

33.     To enforce this provision, the Act requires the States to periodically report to the Department of the Treasury all changes to their tax revenues. § 9901 (adding § 601(d)(2)(A) to the SSA). This reporting process is designed to allow the Department of Treasury to monitor the States' tax revenues and related actions pursuant to their sovereign taxing powers. The Act also provides for recoupment of funds from any State that has failed to comply with the permitted usage of funds or violates the Acts prohibitions on usage—including the restrictions imposed by the Tax Mandate. § 9901 (adding § 602(e) to the SSA).

34.     Because the Tax Mandate is open to interpretation by post-distribution rulemaking or other administrative or executive action, the States have no assurance of what they must do to comply with the Tax Mandate before accepting funds. To that end, a State may not know until months or even years after funds are received and spent that the federal government deems the State to have violated the Tax Mandate (or an executive agency's interpretation of it).

35.     All of this is compounded by the inherent ambiguity as to what the Tax Mandate means. The plain language of the Tax Mandate prohibiting the States from "indirectly" offsetting a reduction in net tax revenue with Covid-19 funds is ambiguous, but potentially sweeping in scope. Why? "Because money is fungible." *See Ark Encounter, LLC v. Parkinson*, 152 F. Supp. 3d 880, 904 (E.D. Ky. 2016). When a State receives financial assistance for a particular purpose, it "necessarily frees up other funds for other purposes." *See id.* The result will always be "[i]ndirect benefits" for programs or activities that are unrelated to the purpose of the financial aid. *See*

*id.* And so, the Act's prohibition on "indirectly" offsetting a reduction in net tax revenue can readily be understood as prohibiting the States from enacting *any* tax relief for their citizens—regardless of whether that tax relief relates to Covid-19— because the Treasury Department might construe the State's use of its Covid-19 aid as "indirectly" offsetting those losses in revenue.

36.     In fact, this interpretation of § 9901 is how at least one Senator who voted for the relief package understood the provision. The New York Times reported that Senator Joe Manchin of West Virginia argued that the Tax Mandate was needed because "states should not be cutting taxes at a time when they need more money to combat the virus."[14] Senator Manchin is reported to have asked, "How in the world would you cut your revenue during a pandemic and still need dollars?"[15]

37.     Given the uncertainty on this issue, several States sought clarification from Secretary Yellen soon after President Biden signed the Act into law. In a letter sent on March 16, 2021, a coalition of 21 States, including Kentucky, asked Secretary Yellen to "confirm that the American Rescue Plan Act does not prohibit States from generally providing tax relief" for matters not directly related to the use of Covid-19 relief funds under the Act. [*See* 3-16-21 Letter, Exhibit A at 6].

38.     Secretary Yellen demurred. Although the Secretary stated that "the Act does not 'deny States the ability to cut taxes in any manner whatsoever,'" she failed

---

[14] *See* Alan Rappeport, *A Last-Minute Add to Stimulus Bill Could Restrict State Tax Cuts*, N.Y. Times (Mar. 12, 2021), available at https://www.nytimes.com/2021/03/12/us/politics/biden-stimulus-state-tax-cuts.html (last visited Apr. 5, 2021).
[15] *Id.*

to provide any clarity about the meaning of the Tax Mandate's prohibition on using Covid-19 relief funds to "indirectly" offset a reduction in net tax revenue. [*See* 3-23-21 Letter, Exhibit B at 1]. And in fact, while Secretary Yellen disclaimed the position that the Tax Mandate "den[ies] States the ability to cut taxes in any manner whatsoever," she also stated that the Tax Mandate *does* require the States to "replac[e] the lost revenue through other means"—suggesting that the Act does in fact prohibit the States from implementing any tax policy that has the overall effect of reducing a State's tax revenue in any respect. [*Id.*]. In short, Secretary Yellen's response only increased the confusion about the scope of the Tax Mandate.

39. The States are thus in limbo between a rock and a hard place. *See Nat'l Federation of Ind. Bus. v. Sebelius*, 567 U.S. 519, 581 (2012) (op. of Roberts, C.J.) ("*NFIB*"). The Tax Mandate imposes an ambiguous (and potentially breathtakingly broad) condition on much-needed financial relief after the States and their citizens have suffered through more than a year of a worldwide pandemic that has done untold economic damage. Accepting the funds could potentially bind the States and prohibit them from enacting policies that benefit their citizens, even when those beneficial policies are wholly unrelated to Covid-19 relief. But declining the funds out of uncertainty would be calamitous to the States' budgets and the people within their borders.

40. Yet, the power to tax and spend is a sovereign function that lies at the core of State power. *See, e.g., Lane Cnty. v. Oregon*, 74 U.S. 71, 76 (1868). The States have always retained their sovereign right to determine their own taxation and fiscal

policies. Congress's attempt with the Tax Mandate to exert control over state taxing policies is an unprecedented affront to State sovereignty that goes far beyond the purpose of a legislative act designed to provide Covid-19 relief.

41.     Consider, for example, a recent Kentucky bill aimed at revitalizing a predominantly minority area of Louisville hurt by decades of divestment. *See* 2021 Ky. H.B. No. 321 (NS). The bill—passed by the Kentucky General Assembly just days ago—creates a tax increment financing district that allows current homeowners to pay property taxes for the next two decades based on their property's assessed value this year. It also allows housing developers to defer 80 percent of their annual property taxes to offset construction costs. These policy decisions by the State to invest in and revitalize a predominantly minority community in Kentucky's largest city have nothing to do with Covid-19 relief and are a core part of its sovereign duty. Yet, "[b]ecause money is fungible," *Ark Encounter*, 152 F. Supp. 3d at 904, the Tax Mandate could be construed as prohibiting this kind of policy change if it results in a decrease in net revenue.

42.     Similarly, in Tennessee, the General Assembly has proposed a bill that would eliminate the professional privilege tax to better position the State to attract new businesses and residents, continuing Tennessee's proven record in promoting economic growth that benefits the entire State. H.B. 0987, S.B. 0184, 112th General Assembly (2021). The bill would also result in a decrease in state revenue. As of January 2, 2021, Tennessee has also completed a multi-year phase-out of the Hall Income Tax, which applied to interest and dividend income. Tenn. Code. Ann. § 67-2-

102; § 67-2-119; § 67-2-124; 2017 Tenn. Pub. Acts, ch. 181. Again, this legislation will likely result in a reduction of revenue. These policy choices have nothing to do with Covid-19 relief. Yet, "[b]ecause money is fungible," *Ark Encounter*, 152 F. Supp. 3d at 904, these actions could be construed to come within the Tax Mandate if they result in a revenue decrease.

43. Combined with the Act's claw-back and other enforcement provisions, the broad and ambiguous scope of the Tax Mandate has the likely and foreseeable effect of chilling legislative action by the States that affect tax revenue.

44. Further, because the Tax Mandate is so broad, it extends beyond Congress's goal to ensure that federal aid is limited to Covid-19 relief purposes. It potentially affects all State legislative or executive actions that reduce net tax revenues (whether intended or not), no matter how attenuated from Covid-19 those policy choices are.

**COUNT I**
**Violation of the Spending Clause – Unconstitutionally
Ambiguous Condition**

45. The States incorporate each of the preceding paragraphs.

46. The federal government is a body of "defined[] and limited" power. *See Marbury v. Madison*, 1 Cranch 137, 176 (1803) (Marshall, C.J.). "Every law enacted by Congress must be based on one or more of its powers enumerated in the Constitution." *United States v. Morrison*, 529 U.S. 598, 607 (2000).

47. One of those powers is found in the Spending Clause, which allows Congress to "provide for the . . . General Welfare of the United States." U.S. Const.

Art. I, Sec. 8, Cl. 1. Under the Spending Clause, Congress can use the purse to "further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives." *See South Dakota v. Dole*, 483 U.S. 203, 206 (1987) (citation omitted). Congress, in other words, "may attach conditions on the receipt of federal funds" when doing so will further the general welfare of the United States. *See id.*

48.     But the Spending Clause is not without limits.

49.     When Congress seeks "to condition the States' receipt of federal funds, it must do so unambiguously." *Id.* (quoting *Pennhurst State School & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)) (cleaned up). An ambiguous condition that fails to provide the recipient of federal funds with clear notice as to what strings Congress is attaching violates the Constitution.

50.     The Tax Mandate is unconstitutionally ambiguous.

51.     As explained above, the Tax Mandate does not give the States clear notice as to what it means to "directly or indirectly offset a reduction in the net tax revenue" of a State. "Because money is fungible," spending the funds on Covid-19 relief could be construed as indirectly offsetting *any* decline in the State's tax revenue because "any reimbursement, aid, or tax exemption necessarily frees up other funds for other purposes." *See Ark Encounter*, 152 F. Supp. 3d at 904.

52.     Secretary Yellen's letter addressing this issue only added to the ambiguity: she simultaneously disclaimed the broadest possible reading of the Tax Mandate while affirming that any State spending the relief funds must find ways to

"replac[e]" lost revenue from other parts of its budget if the State otherwise chooses to lower the tax burden on its citizens. [*See* Exhibit B at 1]. The Treasury Department has thus been unable to provide any clarity as to the meaning of this hopelessly ambiguous provision.

53.     Nor is it clear how the States must determine the cause of a decrease in net revenue sufficient to avoid recoupment by the federal government. The Tax Mandate prohibits using funds to offset a decrease in revenue "resulting from a change in law, regulation, or administrative interpretation." But causation is complex. A tax increase in one sector of the economy might indirectly cause a decline in tax revenue in another sector. How are States required to account for the true cause of a net decrease in revenue as they balance complex budgets and implement varying policy initiatives? The Act does not say. Or what if a State enacts a change to its tax policies intended to spur investment by lowering a specific kind of tax with the goal of increasing the overall tax base—does the State violate the Tax Mandate if its policy prediction turns out wrong and it suffers a decrease in net revenue? Or what if it takes more than four years for the State's policy prediction to prove true? The Act provides no clarity on these issues.

54.     Because the Tax Mandate imposes ambiguous conditions on the States, it is an unconstitutional exercise of Congress's power under the Spending Clause. And because no other enumerated power entitles Congress to impose this mandate on the States, the Tax Mandate is unconstitutional and must be enjoined.

## COUNT II
## Violation of the Spending Clause – Unconstitutionally
## Irrelevant Condition

55.     The States incorporate each of the proceeding paragraphs.

56.     A second limitation on Congress's spending power requires that any conditions must be related "to the federal interest in particular national projects or programs." *Dole*, 483 U.S. at 207.

57.     The purpose of the Act is to provide relief to the States (and others) because of hardships caused by Covid-19.

58.     The Act accomplishes this in multiple ways. It provides funds directly to individuals, organizations, and governments that might need assistance. It also provides relief from *federal* tax burdens, such as by temporarily increasing the dependent-care credit and making the child tax credit fully refundable. *See* Pub. L. No. 117-2, §§ 9611 & 9631.

59.     Despite recognizing that tax relief furthers the purpose of the Act, Congress has also prohibited the States from providing similar relief to their own residents. And that restriction is imposed only on States: cities and Tribal governments, for example, receive funds under the Act but are not otherwise subject to the Tax Mandate.

60.     Congress also failed to limit the scope of the Tax Mandate so as to only prohibit the States from using Covid-19 funds to *directly* offset a State's lost tax revenue. Instead, the Tax Mandate broadly prohibits the State from enacting any policy on any subject, whether or not related to Covid-19 relief, that decreases net tax

revenue because doing so might be "indirectly" offset by the use of Covid-19 funds. "Because money is fungible," *Ark Encounter*, 152 F. Supp. 3d at 904, a State can violate the Tax Mandate whenever it lowers the tax burden on its citizens regardless of whether that action relates in any way to Covid-19 relief.

61.     The broad scope of the Tax Mandate and its unequal application demonstrates that the condition is not reasonably related to providing relief to Americans from the harms caused by Covid-19.

62.     Rather, by imposing a broad ban on lowering tax revenue, the Tax Mandate seeks to restrict all sorts of initiatives and decisions that the States might make on policy issues unrelated to Covid-19.

63.     Because the Tax Mandate is not reasonably related to the purpose of the Act, it is an unconstitutional exercise of Congress's power under the Spending Clause. And because no other enumerated power entitles Congress to impose this mandate on the States, the Tax Mandate is unconstitutional and must be enjoined.

## COUNT III
### Violation of the Spending Clause – Unconstitutionally Coercive Condition

64.     The States incorporate each of the proceeding paragraphs.

65.     Congress cannot impose conditions on the receipt of federal funds that coerce States into adopting Congress's preferred policies. *Dole*, 483 U.S. at 211. Any conditions attached to federal aid must *encourage*, rather than *coerce*, the States to comply. *Id.* And when Congress offers a "financial inducement" so significant that "pressure turns into compulsion," it violates the Constitution. *Id.*

66. By enacting the Tax Mandate as a condition of the financial assistance offered to the States, Congress is coercing the States into imposing higher taxes on their residents than they might otherwise choose. This happens in two ways.

67. First, the sheer size of the financial aid is inherently coercive. For both Kentucky and Tennessee, the amount of aid offered amounts to roughly one fifth of each State's General Fund revenue from the previous fiscal year. The Supreme Court has previously held that "[t]he threatened loss of over 10 percent of a State's overall budget . . . is economic dragooning that leaves the States with no real option but to acquiesce." *NFIB*, 567 U.S. at 582 (Roberts, C.J.). The funding provided by the Act in some cases dwarfs that.

68. Second, the substantial financial assistance comes at a time of crisis. The States and their residents have been ravaged by effects of Covid-19. The States have "no real choice" but to accept the funds and the coercive restrictions that follow. *See id.* at 587. And by accepting the funds, the States must sacrifice their sovereign authority to set tax policy as they see fit because changes to their tax policy might result in a reduction of tax revenue and run afoul of the Tax Mandate.

69. Because the Act coercively imposes the Tax Mandate on the States, it is an unconstitutional exercise of Congress's power under the Spending Clause. And because no other enumerated power entitles Congress to impose this mandate on the States, the Tax Mandate is unconstitutional and must be enjoined.

## COUNT IV
### Violation of the Anti-commandeering Doctrine

70. The States incorporate each of the preceding paragraphs.

71.     The Tenth Amendment states: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

72.     "[T]he Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions." *New York*, 505 U.S. at 162. This prohibition—known as the anti-commandeering doctrine—safeguards individual liberty and promotes political accountability by preventing Congress from using the States to implement its preferred (and possibly *unpopular*) policies. *See Printz v. United States*, 521 U.S. 898, 920–24 (1997); *see also Murphy v. Nat'l Collegiate Athletic Ass'n*, --- U.S. --- , 138 S. Ct. 1461, 1477 (2018) ("[I]f a State imposes regulations only because it has been commanded to do so by Congress, responsibility is blurred.").

73.     The Constitution neither takes the power to set state tax policy from the States nor empowers the federal government to commandeer state taxing authority. The Tax Mandate violates the anti-commandeering doctrine by taking direct control over the States' authority to set their own tax policies.

74.     Under the Tax Mandate, the States are prohibited from providing tax relief to their residents, while Congress remains free to provide *federal* tax relief as it sees fit.

75.     Because the Tax Mandate commandeers the State's authority to set tax policy, it violates the Tenth Amendment and must be enjoined.

## PRAYER FOR RELIEF

WHEREFORE, the Commonwealth of Kentucky and State of Tennessee request the following relief:

A.     A declaration that the Tax Mandate in § 9901 of the American Rescue Plan Act of 2021 is unconstitutional and unenforceable;

B.     A preliminary and permanent injunction prohibiting the Defendants, or any other agent or employee of the United States acting in concert with them or otherwise, from enforcing the unconstitutional Tax Mandate against the Plaintiff States;

C.     A preliminary and permanent injunction prohibiting the Defendants, or any other agent or employee of the United States acting in concert with them or otherwise, from recouping funds under § 9901 based on a violation of the Tax Mandate; and

D.     Any other relief in law or equity to which the Plaintiff States might be entitled.

Respectfully submitted by,

**DANIEL CAMERON**
**Attorney General of Kentucky**

/s/ Brett R. Nolan
Barry L. Dunn
Victor B. Maddox
Matthew F. Kuhn
Brett R. Nolan
Office of Kentucky Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
Phone: (502) 696-5300
Barry.Dunn@ky.gov
Victor.Maddox@ky.gov
Matt.Kuhn@ky.gov
Brett.Nolan@ky.gov

*Counsel for the Commonwealth*
*of Kentucky*

**HERBERT H. SLATERY III**
**Attorney General of Tennessee**

/s/ Andrée S. Blumstein
Andrée S. Blumstein*
Sarah K. Campbell*
Brandon J. Smith*
Office of the Tennessee Attorney
General and Reporter
PO Box 20207
Nashville, TN 37202-0207
Phone: (615) 741-3491
Andree.Blumstein@ag.tn.gov
Sarah.Campbell@ag.tn.gov
Brandon.Smith@ag.tn.gov

*Counsel for the State of Tennessee*
(**pro hac vice* application forthcoming)