**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION AT FRANKFORT**

*Electronically filed*

| | |
|---|---|
| **COMMONWEALTH OF KENTUCKY** | |
| and | |
| **STATE OF TENNESSEE** | |
|     *Plaintiffs* | |
| v. | Hon. Gregory F. Van Tatenhove<br>Civil Action No. 3:21-cv-0017 |
| **JANET YELLEN**, in her official capacity as Secretary of the Treasury, *et al.*, | |
|     *Defendants* | |

---

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

---

Plaintiffs, the Commonwealth of Kentucky and the State of Tennessee, by and through Attorney General Daniel Cameron and Attorney General and Reporter Herbert H. Slatery III, move for summary judgment under Federal Rule of Civil Procedure 56 as to all of their claims. There is no genuine dispute as to any material fact, and the Plaintiffs are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................ ii

TABLE OF AUTHORITIES .......................................................... iii

INTRODUCTION ........................................................................ 1

BACKGROUND ............................................................................ 2

ARGUMENT .............................................................................. 10

   I.    The Plaintiff States Have Standing to Challenge the Tax Mandate. .......................................................................... 10

      A. The Tax Mandate intrudes on state taxing authority ..................... 10

      B. The Tax Mandate imposes administrative burdens. ........................ 16

   II.   The Tax Mandate Violates the Spending Clause. ............................. 19

      A. The Tax Mandate is unconstitutionally ambiguous. ........................ 19

      B. The Tax Mandate is not reasonably related to the federal interest in passing the American Rescue Plan Act. ........................ 28

      C. The Tax Mandate is unconstitutionally coercive. ........................... 31

   III.  The Tax Mandate violates the anticommandeering doctrine. ................................................................................. 34

   IV.  The Court should permanently enjoin the Tax Mandate. ............... 38

CONCLUSION ............................................................................ 39

# TABLE OF AUTHORITIES

## Cases

*Abbott v. Perez*,
    138 S. Ct. 2305 (2018) ...................................................................... 38

*Alaska v. U.S. Dep't of Transp.*,
    868 F.2d 441 (D.C. Cir. 1989) ........................................................ 14

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*,
    458 U.S. 592 (1982) .......................................................................... 13

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*,
    576 U.S. 787 (2015) .............................................................. 14, 15, 16

*Arizona v. Yellen*,
    No. 2:21-cv-514 (D. Ariz.) .................................................................. 6

*Ark Encounter, LLC v. Parkinson*,
    152 F. Supp. 3d 880 (E.D. Ky. 2016) ...................................... 20, 21, 30

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*,
    548 U.S. 291 (2006) .............................................................. 19, 22, 23

*Armstrong v. Exceptional Child Ctr., Inc.*,
    575 U.S. 320 (2015) .......................................................................... 27

*Assoc. of Private Sector Colls. & Univs. v. Duncan*,
    681 F.3d 427 (D.C. Cir. 2012) ........................................................ 18

*Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan*,
    501 U.S. 1301 (1991) (Scalia, J., in chambers) ............................ 11, 16

*Bennett v. Ky. Dep't of Educ.*,
    470 U.S. 656 (1985) .......................................................................... 28

*Carpenters Indus. Council v. Zinke*,
    854 F.3d 1 (D.C. Cir. 2017) ............................................................ 17

*City of Chicago v. Fulton*,
    141 S. Ct. 585 (2021) ........................................................................ 21

*Coal. to Defend Affirmative Action v. Granholm*,
    473 F.3d 237 (6th Cir. 2006) .......................................................... 39

*Conn. Nat. Bank v. Germain,*
    503 U.S. 249 (1992) .................................................... 20

*Coyle v. Smith,*
    221 U.S. 559 (1911) .............................................. 37, 38

*Cutter v. Wilkinson,*
    423 F.3d 579 (6th Cir. 2005) ...................................... 28

*Czyzewski v. Jevic Holding Corp.,*
    137 S. Ct. 973 (2017) ................................................ 17

*Danvers Motor Co. v. Ford Motor Co.,*
    432 F.3d 286 (3d Cir. 2005).......................................... 17

*Dep't of Com. v. New York,*
    139 S. Ct. 2551 (2019) ...................................... 10, 13, 17

*Dep't of Revenue v. ACF Indus., Inc.,*
    510 U.S. 332 (1994) .................................................. 35

*eBay Inc. v. MercExchange, L.L.C.,*
    547 U.S. 388 (2006) .................................................. 38

*Ex parte Young,*
    209 U.S. 123 (1908) .................................................. 27

*F.D.I.C. v. Meyer,*
    510 U.S. 471 (1994) .................................................. 39

*Forum for Acad. & Institutional Rights, Inc. v. Rumsfeld,*
    291 F. Supp. 2d 269 (D.N.J. 2003)................................. 15

*Lane Cnty. v. Oregon,*
    74 U.S. (7 Wall.) 71 (1868) ........................... 11, 26, 35, 38

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) .................................................. 10

*M'Culloch v. Maryland,*
    17 U.S. (4 Wheat.) 316 (1819) .................................... 35

*Maine v. Taylor*,
477 U.S. 131 (1986) ................................................................. 13

*Martin-Marietta Corp. v. Bendix Corp.*,
690 F.2d 558 (6th Cir. 1982) ................................................... 39

*Maryland v. King*,
567 U.S. 1301 (2012) (Roberts, C.J., in chambers) ................. 38

*Massachusetts v. E.P.A.*,
549 U.S. 497 (2007) ................................................................. 10

*Matter of Dunn*,
988 F.2d 45 (7th Cir. 1993) ..................................................... 14

*MedImmune, Inc. v. Genentech, Inc.*,
549 U.S. 118 (2007) ................................................................. 16

*Missouri v. Yellen*,
No. 4:21-cv-376 (E.D. Mo.) ....................................................... 6

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
138 S. Ct. 1461 (2018) ....................................................... 35, 36

*N.Y. Civil Liberties Union v. Grandeau*,
528 F.3d 122 (2d Cir. 2008) ..................................................... 18

*Nat'l Fed'n of Ind. Bus. v. Sebelius*,
567 U.S. 519 (2012) ........................................................... passim

*New Jersey v. E.P.A.*,
989 F.3d 1038 (D.C. Cir. 2021) ................................................ 18

*New York v. United States*,
505 U.S. 144 (1992) ........................................................... 29, 35

*Ohio v. Yellen*,
--- F. Supp. 3d ---, 2021 WL 1903908 (S.D. Ohio May 12, 2021) ........................... 26

*Ohio v. Yellen*,
No. 1:21-cv-181 (S.D. Ohio) ............................................... 6, 23

*Ohio ex rel. Celebrezze v. U.S. Dep't of Transp.*,
766 F.2d 228 (6th Cir. 1985) ................................................... 13

*Pennhurst State Sch. & Hosp. v. Halderman,*
    451 U.S. 1 (1981) ................................................................ 19, 24

*Printz v. United States,*
    521 U.S. 898 (1997) ................................................................ 35

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.,*
    547 U.S. 47 (2006) ............................................................ 10, 16

*Sabri v. United States,*
    541 U.S. 600 (2004) ................................................................ 34

*Saenz v. Roe,*
    526 U.S. 489 (1999) ................................................................ 1

*Sch. Dist. of Pontiac v. Sec'y of U.S. Dep't of Educ.,*
    584 F.3d 253 (6th Cir. 2009) (en banc) ........................... passim

*South Dakota v. Dole,*
    483 U.S. 203 (1987) ........................................................... 28, 31

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014) ........................................................... 10, 13

*Tabernacle Baptist Church, Inc. of Nicholasville v. Beshear,*
    459 F. Supp. 3d 847 (E.D. Ky. 2020) ..................................... 1

*Tex. Off. of Pub. Util. Couns. v. F.C.C.,*
    183 F.3d 393 (5th Cir. 1999) ................................................ 14

*Texas v. United States,*
    787 F.3d 733 (5th Cir. 2015) ........................................... 13, 16

*Texas v. United States,*
    809 F.3d 134 (5th Cir. 2015) ...................................... 13, 15, 17

*Va. Dep't of Educ. v. Riley,*
    106 F.3d 559 (4th Cir. 1997) (en banc) ........................... 27, 28

*Wallace v. ConAgra Foods, Inc.,*
    747 F.3d 1025 (8th Cir. 2014) ............................................. 17

*West Virginia v. U.S. Dep't of Treasury,*
    No. 7:21-cv-465 (N.D. Ala.) ..................................... 6, 21, 23

*Wyoming ex rel. Crank v. United States*,
539 F.3d 1236 (10th Cir. 2008) ........................................................ 13

*Yates v. United States*,
574 U.S. 528 (2015) ........................................................................... 22

**Statutes and Constitutional Provisions**

2021 Ky. Acts ch. 171 ............................................................................. 8

2021 Ky. Acts ch. 194 ............................................................................. 8

2021 Ky. Acts ch. 195 ............................................................................. 8

2021 Ky. Acts ch. 196 ....................................................................... 8, 32

2021 Ky. Acts ch. 203 ......................................................................... 8, 9

42 U.S.C. § 802(b)(3) ............................................................................. 3

42 U.S.C. § 802(c)(1) .............................................................. 4, 8, 29, 30

42 U.S.C. § 802(c)(1)(C) ................................................................. 23, 24

42 U.S.C. § 802(c)(2)(A) .............................................................. passim

42 U.S.C. § 802(c)(2)(B) ......................................................................... 4

42 U.S.C. § 802(d)(1) ............................................................................. 8

American Rescue Plan Act of 2021, Pub. L. No. 117-2 ............... 2, 3, 30, 36

Tax Cuts and Jobs Act of 2017, Pub. L. No. 115-97, 131 Stat. 2054 ......... 37

U.S. Const. art. I, § 8, cl. 1 ................................................................... 27

**Other Authorities**

The Federalist No. 45 (J. Madison) .................................................. 1, 36

**Regulations**

31 C.F.R. § 35.3 ............................................................................... 7, 24

31 C.F.R. § 35.8 .................................................................................. 6

31 C.F.R. § 35.8(b) .......................................................................... 7, 24

31 C.F.R. § 35.8(b)(4) ........................................................................ 7

31 C.F.R. § 35.10 ............................................................................... 6

31 C.F.R. Part 35 ............................................................................... 6

86 Fed. Reg. 26,786 (May 17, 2021) ............................................. 6, 37

# INTRODUCTION

*"If the federal government is to have collectors of revenue, the State governments will have theirs also."*

The Federalist No. 45 (J. Madison).

America is an admittedly unique Nation. Not content to divide power between the branches of a single government, the compromise of America divided power between *governments themselves*—"one state and one federal, each protected from incursion by the other." *Saenz v. Roe*, 526 U.S. 489, 504 n.17 (1999) (citation omitted). That compromise left the federal government with supreme but limited authority. And it reserved for the States "numerous and indefinite" powers that "extend to all the objects which, in the ordinary course of affairs, concern the lives, liberties, and properties of the people." The Federalist No. 45 (J. Madison). Preserving the boundaries between these two governments makes this Nation what it is.

In a single sentence, the American Rescue Plan Act of 2021 threatens to undo this balance. Covid-19 has "[swept] the world, ravage[d] our economy and threaten[ed] our health." *Tabernacle Baptist Church, Inc. of Nicholasville v. Beshear*, 459 F. Supp. 3d 847, 850 (E.D. Ky. 2020). It is a crisis like no other, and one that Congress has spent nearly $6 trillion of taxpayer money to fight. Yet Congress's latest attempt at providing Covid-19 relief goes well beyond just spending money. The Rescue Plan, which took effect in early March of this year, offers the States nearly $200 billion in financial aid that they need. But—no doubt aware of that need—Congress also attached an unprecedented set of strings to the money. It conditioned each

1

State's ability to receive that money on an agreement that it will not provide its citizens with tax relief for the next several years. Although disguised as a "condition" on how a State "uses" its federal funds, the Tax Mandate is no such thing. It is a federal attempt to dictate state tax policies, regardless of how the State ultimately spends its Rescue Plan funds.

The Tax Mandate is unconstitutional. It violates the limits on Congress's power to spend under Article I, and it violates the Constitution's prohibition against commandeering. The Court should declare it void and enjoin the Defendants from enforcing it.

## BACKGROUND

### The American Rescue Plan Act

President Biden signed the American Rescue Plan Act of 2021, Pub. L. No. 117-2 into law on March 11, 2021.[1] The ostensible purpose of the Rescue Plan is in its name—to *rescue* those harmed by the Covid-19 pandemic. This was Congress's sixth major relief effort since the pandemic began in early 2020. All told, the federal outlay for Covid-19 is nearing $6 trillion. And the Rescue Plan accounts for almost $2 trillion of that total. [*See* R. 23-1, ¶ 23].

The Rescue Plan works in several ways. Part of the financial assistance went directly to individuals through direct payments (up to $1,400 per person). *See id.* § 9601. The Rescue Plan also provides financial relief through tax credits and reductions that lower the federal tax burden an individual or taxpayer might ordinarily

---

[1] The Rescue Plan is available at https://www.congress.gov/bill/117th-congress/house-bill/1319/text (last visited June 23, 2021).

owe. The Rescue Plan, for example, temporarily increases the child tax credit and makes it fully refundable for 2021. *See id.* § 9611. The Rescue Plan also significantly increases the maximum tax credit for dependent care. *See id.* § 9631. In this way, the Rescue Plan acknowledges what is obvious: tax decreases and direct subsidies are two sides of the same coin for providing relief to struggling taxpayers.

In addition to the assistance provided directly to taxpayers, the Rescue Plan appropriates $195.3 billion in aid for the States (and the District of Columbia). 42 U.S.C. § 802(b)(3). From that $195.3 billion, the Secretary of the Treasury must distribute $25.5 billion "equally among each of the 50 States and the District of Columbia" and a lesser additional amount specifically "to the District of Columbia." *Id.* "[T]he remainder of the amount" is then distributed "to each of the 50 States and the District of Columbia" according to a formula that averages each State's unemployment rate during the last quarter of 2020. *Id.*

The Rescue Plan places four general conditions on how the funds must be spent. The States must use the funds:

> (A) to respond to the public health emergency with respect to [Covid-19] or its negative economic impacts, including assistance to households, small businesses, and nonprofits, or aid to impacted industries such as tourism, travel, and hospitality;
>
> (B) to respond to workers performing essential work during the [Covid-19] public health emergency by providing premium pay to eligible workers of the State . . . that are performing such essential work, or by providing grants to eligible employers that have eligible workers who perform essential work;
>
> (C) for the provision of government services to the extent of the reduction in revenue of such State . . . due to the [Covid-19] public health emergency relative to revenues collected in the most recent full fiscal year of the State . . . ; or

(D) to make necessary investments in water, sewer, or broadband infrastructure.

*Id.* § 802(c)(1). On top of that, the Rescue Plan prohibits the States from using funds "for deposit into any pension fund." *Id.* § 802(c)(2)(B).

**The Tax Mandate**

Though Congress has passed multiple Covid-19 relief packages over the past year, the Rescue Plan is unlike any that preceded it. That's because Congress attached a unique restriction that purports to limit the States' ability to lower taxes on their own residents.

Under the Tax Mandate, States accepting relief funds are prohibited from using the funds to "directly or indirectly offset a reduction in [their] net tax revenue" if that tax reduction resulted from "a change in law, regulation, or administrative interpretation." 42 U.S.C. § 802(c)(2)(A). The full provision reads as follows:

> A State or territory shall not use the funds provided under this section or transferred pursuant to section 803(c)(4) to either directly or indirectly offset a reduction in the net tax revenue of such State or territory resulting from a change in law, regulation, or administrative interpretation during the covered period that reduces any tax (by providing for a reduction in a rate, a rebate, a deduction, a credit, or otherwise) or delays the imposition of any tax or tax increase.

*Id.*

So what does it mean to "use the funds" to "directly or indirectly offset a reduction in the net tax revenue of" a State? The law provides little clarification. It does not explain how broadly the word "indirectly" must be read. Nor does it provide any clarification as to how the States must measure "a reduction in net tax revenue."

Although potentially sweeping in scope, the Tax Mandate provides few clues to what it actually means.

That's why several States sought clarification from Treasury Secretary Yellen soon after President Biden signed the Rescue Plan into law. In a letter sent on March 16, 2021, a coalition of 21 States, including Kentucky, asked Secretary Yellen to "confirm that the American Rescue Plan Act does not prohibit States from generally providing tax relief" for matters not directly related to the use of Covid-19 relief funds. [R. 23-1 at 6]. Secretary Yellen, however, demurred. Although she stated that "the Act does not 'deny States the ability to cut taxes in any manner whatsoever,'" she failed to provide any clarity about the meaning of the Tax Mandate's prohibition on using Covid-19 relief funds to "indirectly" offset a reduction in net tax revenue. [R. 23-2 at 1–2]. And in fact, while Secretary Yellen disclaimed the position that the Tax Mandate "den[ies] States the ability to cut taxes in any manner whatsoever," she also stated that the Tax Mandate *does* require the States to "replac[e] the lost revenue through other means"—suggesting that the Rescue Plan does in fact prohibit the States from implementing any tax relief that has the overall effect of reducing a State's net revenue. [*Id.*]. In short, Secretary Yellen's response only increased the confusion about the scope of the Tax Mandate, putting the States in an impossible position. *Cf. Nat'l Fed'n of Ind. Bus. v. Sebelius*, 567 U.S. 519, 581 (2012) (op. of Roberts, C.J.) ("*NFIB*").

### Litigation and the Interim Rule

After Secretary Yellen failed to provide any clarity about the scope of the Tax Mandate (or perhaps worse, vaguely suggested that the law stretches as broadly as feared), several States filed suit. *See, e.g.*, *Ohio v. Yellen*, No. 1:21-cv-181 (S.D. Ohio filed Mar. 17, 2021); *Arizona v. Yellen*, No. 2:21-cv-514 (D. Ariz. filed Mar. 25, 2021); *Missouri v. Yellen*, No. 4:21-cv-376 (E.D. Mo. filed Mar. 29, 2021); *West Virginia v. U.S. Dep't of Treasury*, No. 7:21-cv-465 (N.D. Ala. filed Mar. 31, 2021). The Treasury defendants responded—at least initially—by pushing back against the broadest possible reading of the Tax Mandate. They insisted that it does not prevent the States from enacting tax reforms that lower the tax burdens on their citizens, but instead emphasized that the law prohibits the States from *using* the federal funds in a particular way. *See, e.g.*, *Ohio v. Yellen*, No. 1:21-cv-181, Dkt. 29 at 28 (S.D. Ohio) (arguing that the Tax Mandate only prevents States from "employing federal funds to finance state tax cuts"); *West Virginia v. U.S. Dep't of Treasury*, No. 7:21-cv-465, Dkt. 54 at 26 (N.D. Ala) (same). What exactly that looks like, however, remains unclear.

Soon after the briefing started in those cases, Treasury published its Interim Final Rule detailing how it interprets and intends to apply the Tax Mandate. *See* Coronavirus State and Local Fiscal Recovery Funds, 86 Fed. Reg. 26,786 (May 17, 2021) (codified at 31 C.F.R. Part 35). The gist of the Interim Rule is as follows: If a State accepts Rescue Plan funds, it must annually calculate the value of any changes in State law that might reduce the State's tax revenue. 31 C.F.R. §§ 35.8, 35.10. If the net loss in revenue is greater than one percent of the State's revenue during the

last fiscal year before the pandemic (adjusted for inflation), the State must identify if and how the State has offset its revenue in other ways—either through changes in State law that increase revenue or through spending cuts elsewhere in the budget. *Id.* §§ 35.3, 35.8(b). That itself involves a complicated process, including requiring the States to decipher whether a spending cut occurred in the same "Departments, agencies, or authorities in which the State" is (or is not) using funds. *Id.* § 35.8(b)(4)(ii). The long and short of the Interim Rule is that, subject to a few confusing limits, Treasury is now interpreting the Tax Mandate precisely as feared: as a broad ban on the States lowering their taxes *at all.*

Of course, the Interim Rule is not the law itself. And this suit is about the statute that Congress enacted, not the executive branch's attempt to clean it up. Moreover, federal agencies are able to change their interpretations of federal statutes, so the States have no way of knowing whether the Treasury Department will change its view of what the Tax Mandate requires in future years.

Thus, even after the Interim Rule, the States are still stuck between a rock and a hard place. The Tax Mandate imposes an ambiguous and potentially sweeping condition on much-needed relief funds. Accepting the funds and the accompanying conditions will limit the range of permissible tax policies the States may enact in the coming years, likely prohibiting them from enacting tax relief that would benefit their citizens. But declining the funds to avoid that outcome would have an immediate harmful effect on the States' fiscal outlooks and the people within their borders.

Given that reality, declining the funds is not a realistic option. Kentucky has already submitted its certification to receive Rescue Plan funds. [Exhibit A, Kentucky Submission Confirmation]. And Tennessee intends to submit the required certification to receive its funds in the coming weeks, *see* 42 U.S.C. § 802(d)(1), without conceding that the Tax Mandate is a valid funding condition and expressly reserving its right to challenge that condition. [Exhibit B, Niknejad Decl., ¶ 5].

**Kentucky and Tennessee**

Kentucky's allotment under the Rescue Plan is about $2.1 billion. Before receiving the funds, Kentucky's General Assembly earmarked more than $1 billion of that total to address its unemployment crisis, to invest in infrastructure improvements, and to mitigate against other effects of Covid-19. *See* 2021 Ky. Acts ch. 171, § 3; 2021 Ky. Acts ch. 194, §§ 11, 15, 16, 17; 2021 Ky. Acts ch. 195, § 1; 2021 Ky. Acts ch. 196, §§ 4, 6. Each of these uses falls squarely within the text and purpose of the Rescue Plan. *See* 42 U.S.C. § 802(c)(1).

Yet because Kentucky has *also* made efforts to provide tax relief for reasons unrelated to Covid-19, it faces the looming possibility that the Treasury Department could seek recoupment of the funds that Kentucky spends. Kentucky, for example, recently enacted a law aimed at revitalizing a predominantly minority area of Louisville hurt by decades of divestment. *See* 2021 Ky. Acts ch. 203. The law creates a tax increment financing district that provides incentives for new development and gives current homeowners a state tax credit to offset any increase in property taxes for the next two decades. *Id.* §§ 5, 8. These policy decisions by the State to invest in and

revitalize a predominantly minority community in Kentucky's largest city have nothing to do with Covid-19 relief and are a core part of its sovereignty. But these policy decisions could also cause a net reduction in tax revenue, subjecting Kentucky to the Tax Mandate.

Tennessee faces similar difficulties. The State has a long history of cutting taxes and spending to spur economic growth. [Exhibit B, Niknejad Decl., ¶ 6]. In the last decade, Tennessee has enacted dozens of tax cuts, the fiscal impact of which likely exceeds $800 million in budgeted revenue reductions. [*Id.*]. Those tax-relief efforts include reducing the sales tax rate on groceries, repealing the inheritance tax, and removing 15 different categories of licensed professions from burdensome professional privilege taxes. [*Id.*, ¶¶ 7–8]. Tennessee has also considered other kinds of tax relief—such as a complete phase out of the professional privilege tax—but the Covid-19 pandemic delayed action on those proposals. [*Id.* ¶ 9].

The Tax Mandate threatens to stall Tennessee's efforts even longer. Tennessee is eligible to receive about $3.725 billion in Rescue Plan funds. [*Id.*, ¶ 5]. But because of the ambiguous and potentially sweeping reach of the Tax Mandate, the risk of an enforcement action after spending Rescue Plan funds means the State must necessarily defer, slow, or reconsider some of its taxing decisions for several years. [*Id.*, ¶ 14]. Put simply, the Tax Mandate will limit the State's ability to enact desirable tax cuts that are necessary to ensure long-term economic growth, [*id.*, ¶ 15], even when those tax cuts have nothing to do with Covid-19 or how Tennessee otherwise spent its Rescue Plan funds.

## ARGUMENT

### I.     The Plaintiff States Have Standing to Challenge the Tax Mandate.

To establish Article III standing, a plaintiff must have an injury in fact that is traceable to the challenged action of the defendants and redressable by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Only one plaintiff must have standing for a court to reach the merits. *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006). Future injuries are sufficient for Article III standing "if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2565 (2019) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). And because Kentucky and Tennessee are not "private individual[s]" but rather "sovereign State[s]" asserting their sovereign interests, they are "entitled to special solicitude in [the Court's] standing analysis." *Massachusetts v. E.P.A.*, 549 U.S. 497, 518–20 (2007).

Kentucky and Tennessee have standing to challenge the Tax Mandate under at least two theories. First, the Tax Mandate intrudes on their sovereign authority to set tax policy. Second, the States must spend resources to comply with the Tax Mandate. Both injuries are traceable to the Defendants' enforcement of the Tax Mandate and can be redressed by declaring the Tax Mandate unconstitutional and enjoining its enforcement.

### A.     The Tax Mandate intrudes on state taxing authority.

The sovereign authority to set tax policy "is indispensable" to a State's very "existence." *Lane Cnty. v. Oregon*, 74 U.S. (7 Wall.) 71, 76 (1868). "It is an essential

function of government," and "[t]here is nothing in the Constitution which contemplates or authorizes any direct abridgment of this power by national legislation." *Id.* at 76–77. Unsurprisingly, any "unlawful interference with state tax collection" irreparably harms a State, not merely by creating the risk of non-collection, but also by interfering "with the State's orderly management of its fiscal affairs." *Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan*, 501 U.S. 1301, 1304 (1991) (Scalia, J., in chambers). In short, States are entitled to make taxing decisions based on their own views of sound public policy and without being forced to consider whether their policy choices align with the views of federal policymakers.

The Tax Mandate narrows the range of permissible tax policies States may enact, which is an injury to their sovereignty on its own. It intrudes on Kentucky's and Tennessee's constitutional taxing powers by imposing a new federal constraint on their taxing decisions. No longer may the States set taxes based solely on their own views of sound policy. Instead, they must now consider whether their desired polices run afoul of an unconstitutionally ambiguous, irrelevant, coercive, and commandeering federal funding condition.

Moreover, the Tax Mandate will likely prevent Tennessee from pursuing some of its preferred tax policies in the coming years, and it will in all events introduce needless complexity, delay, and confusion into the State's legislative process. Tennessee has a long history of pursuing pro-growth tax cuts and corresponding decreases in spending. Since 2011, the State has enacted dozens of tax cuts that account for an estimated $800 million or more in budgeted revenue reductions. [Exhibit B, Niknejad

Decl., ¶¶ 6–8]. Just last year, Tennessee's Governor proposed additional tax cuts, including a complete phase out of the State's professional privilege tax. [*Id.*, ¶ 9]. Consideration of that proposal was deferred because of the pandemic, but there remains interest in pursuing it in the coming years. [*Id.*]. And Tennessee enacted numerous tax cuts in its most recent legislative session, including a sales tax holiday for the food and restaurant industry that is estimated to reduce state tax revenues by about $50 million. [*Id.*, ¶¶ 10–11].

The State has every reason to expect that additional tax cuts will be needed in the next few years. Indeed, Tennessee has determined that, "[t]o maintain its positive economic trajectory coming out of the pandemic, Tennessee will have to continue its longstanding track record of reducing taxes and spending while also using [Rescue Plan] Funds to offset one-time expenses." [*Id.*, ¶ 13].

But now, because of the Tax Mandate, Tennessee "must necessarily defer, slow, or reconsider some of its taxing decisions" in the coming years. [*Id.*, ¶ 14]. Although the State cannot predict with certainty the precise nature of the tax cuts its leaders will likely pursue, one thing is certain: Instead of making those decisions based on its leaders' views of sound policy, Tennessee must now consider whether its desired policies will run afoul of the federal Tax Mandate. [*Id.*, ¶¶ 14–17]. As the Governor's Policy Director explains, the State's "deliberative process" regarding tax cut and spending decisions "will now need to be shaped around an analysis of the permissibility or impermissibility of any proposed change in tax policy under the Tax Mandate," rather than simply deciding what is best for Tennessee. [*Id.*, ¶ 15]. Moreover,

Tennessee's desire to continue its history of pro-growth tax cuts, [*id.*, ¶¶ 6–13], combined with the Tax Mandate's ambiguous and potentially sweeping scope, *see* pp. 19–28, *infra*, together create at least "a substantial risk" that the State will be forced to forego or delay certain tax policies it would otherwise pursue immediately. *Dep't of Com.*, 139 S. Ct. at 2565 (quoting *Susan B. Anthony List*, 573 U.S. at 158).

This kind of intrusion on a State's lawmaking authority is an Article III injury. *Texas v. United States*, 787 F.3d 733 (5th Cir. 2015) ("[B]eing pressured to change state law constitutes an injury."); *see also Texas v. United States*, 809 F.3d 134, 153–54 (5th Cir. 2015), *aff'd*, 136 S. Ct. 2271 (2016). Indeed, both the Supreme Court and the Sixth Circuit have long recognized that interference with a State's sovereign "power to create and enforce a legal code, both civil and criminal," is sufficient for State standing. *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982); *see also Maine v. Taylor*, 477 U.S. 131, 137 (1986) ("[A] State clearly has a legitimate interest in the continued enforceability of its own statutes."); *Ohio ex rel. Celebrezze v. U.S. Dep't of Transp.*, 766 F.2d 228, 232–33 (6th Cir. 1985) (Ohio had standing to challenge federal policy statement that state law was preempted). Other circuits have recognized the same principle. *See, e.g.*, *Wyoming ex rel. Crank v. United States*, 539 F.3d 1236, 1241–42 (10th Cir. 2008) (federal preemption of state law was an Article III injury); *Matter of Dunn*, 988 F.2d 45, 46–47 (7th Cir. 1993) (same); *Alaska v. U.S. Dep't of Transp.*, 868 F.2d 441, 443–44 (D.C. Cir. 1989) (same).

The most recent Supreme Court decision clearly applying this principle is *Arizona State Legislature v. Arizona Independent Redistricting Commission*, 576 U.S.

787 (2015). The Court held that the Arizona Legislature had standing to challenge a law that intruded on its claimed constitutional authority over redistricting. *Id.* at 800–01. That was true regardless of whether the Arizona Legislature in fact possessed the constitutional authority it claimed (a merits question, not a standing one) and regardless of whether it could identify "some specific legislative act that would have taken effect but for" the challenged law. *Id.* (quotation marks omitted). Invasion of the state legislature's asserted "constitutionally guarded role" over redistricting was an Article III injury by itself. *Id.* at 800; *see also id.* at 793 (loss of "authority to draw congressional districts" was an injury); *Tex. Off. of Pub. Util. Couns. v. F.C.C.*, 183 F.3d 393, 449 (5th Cir. 1999) (States had standing to challenge federal agency's assertion of authority over an aspect of telecommunications regulation that the States believed they controlled).

A similar analysis applies here. To receive their Rescue Plan funds, Kentucky and Tennessee must surrender at least *some* of their preexisting authority to set state tax policy free from federal constraints. Regardless of whether this Court agrees about the scope of their claimed authority over tax policy (a merits question), losing their "prerogative" to cut taxes as much as they wish injures the States. *See Arizona State Legislature*, 576 U.S. at 800. And that remains true even if the States do not identify "some specific" tax cut they would have enacted "but for" the Tax Mandate. *See id.* (quotation marks omitted). Under *Arizona State Legislature*, States "asserting

institutional injury to their lawmaking authority" have standing. *Texas*, 809 F.3d at 154.[2]

That this federal intrusion on State taxing authority takes the form of a funding condition does not change the analysis. In analogous funding contexts, recipients of government funds have standing to challenge allegedly unconstitutional conditions on the receipt of those funds regardless of whether the government has actually withheld or revoked the funds. *See, e.g.*, *Forum for Acad. & Institutional Rights, Inc. v. Rumsfeld*, 291 F. Supp. 2d 269, 286 (D.N.J. 2003) ("The relevant injury for standing purposes is the government-induced abandonment of the schools' non-discrimination policies and not, as the Government urges, an actual loss of funding."), *rev'd and remanded*, 390 F.3d 219, 228 n.7 (3d Cir. 2004) (agreeing that the plaintiff had standing "for the reasons [the district court] provided"), *rev'd and remanded*, 547 U.S. 47, 52 n.2 (2006) (agreeing with lower courts that the plaintiff had standing). The same reasoning applies in this Spending Clause context: forcing the States to choose between abandoning their constitutional taxing powers or risking the loss of federal funds "is a dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate." *Sch. Dist. of Pontiac v. Sec'y of U.S. Dep't of Educ.*, 584 F.3d 253, 278 (6th Cir. 2009) (en banc) (Sutton, J., concurring) (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 129 (2007)). Put differently, a State's "forced choice" between financial hardship and foregoing its preferred policies "is itself an injury." *Texas*, 787 F.3d at

---

[2] Moreover, Tennessee has shown that the Tax Mandate creates at least a substantial risk that the State will in fact forego or delay enacting certain tax policies that it would otherwise pursue immediately. *See* pp. 11–13, *supra*.

749; *cf. Forum for Acad. & Institutional Rights*, 547 U.S. at 52–53 & n.2 (plaintiff had standing to challenge allegedly unconstitutional condition that forced it to choose between exercising its constitutional rights and losing federal funding).

In sum, the Tax Mandate injures Kentucky and Tennessee by requiring them to surrender a portion of their lawmaking authority over state taxation to receive needed relief funds. By requiring the States to attempt compliance with a hopelessly ambiguous funding condition, the Tax Mandate will disrupt the States' budgetary and legislative processes. [Exhibit B, Niknejad Decl., ¶¶ 14, 17 (explaining that the Tax Mandate will "present an immediate disruption to the State's normal budget process" and "introduce complexity, delay, and confusion into the State's legislative process")]. Those injuries to the States' sovereign interests are traceable to the Defendants' enforcement of the Tax Mandate, and they can be redressed by a judgment declaring the Tax Mandate unconstitutional and enjoining the Defendants from enforcing it. *Cf. Arizona State Legislature*, 576 U.S. at 800. If this Court enters such a judgment, Kentucky and Tennessee will again be free to set taxes based on their own views of sound policy rather than those of federal policymakers, without disruption to the "orderly management of [their] fiscal affairs." *Barnes*, 501 U.S. at 1304 (Scalia, J., in chambers). And they will again be free to consider and adopt the full range of tax policies they are constitutionally entitled to enact.

### B. The Tax Mandate imposes administrative burdens.

In addition to the sovereignty injury, the Tax Mandate also inflicts a classic pocketbook injury on Kentucky and Tennessee. Economic harm is a "paradigmatic" injury in fact. *Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286, 291 (3d Cir. 2005)

16

(Alito, J.). Indeed, a loss of mere pennies is a concrete injury. *See, e.g.*, *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017) ("For standing purposes, a loss of even a small amount of money is ordinarily an injury." (quotation marks omitted)); *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017) (Kavanaugh, J.) ("A dollar of economic harm is still an injury-in-fact for standing purposes."); *Wallace v. ConAgra Foods, Inc.*, 747 F.3d 1025, 1029 (8th Cir. 2014) (holding that a loss of "only a few pennies" was a "concrete, non-speculative injury").

States, no less than private parties, may rely on economic injuries to satisfy the injury-in-fact requirement. For example, in *Department of Commerce v. New York*, the Supreme Court held that States had standing to challenge the federal government's inclusion of a citizenship question on the Census because they had shown that including the question would cause them to "lose out on federal funds." 139 S. Ct. at 2565. And the Fifth Circuit held that Texas had standing to challenge the Deferred Action for Parents of Americans program because it would "enable beneficiaries to apply for driver's licenses," which would cost the State money. *Texas*, 809 F.3d at 152–53.

The Tax Mandate will cause the Plaintiff States concrete financial injury. To comply with the funding conditions and reporting requirements imposed by the Tax Mandate, Tennessee must develop and implement additional processes to identify all tax policy changes that "reduce[] any tax . . . or delay[] the imposition of any tax or tax increase," 42 U.S.C. § 802(c)(2)(A), and to attempt to ensure that Rescue Plan

funds are not directly or indirectly used to offset a net reduction in tax revenue, [Exhibit C, Eley Decl., ¶¶ 5–6, 8–9]. The State will also have to spend resources compiling and reporting information about all modifications to the State's revenue sources during the covered period to aid the Treasury Department in its enforcement of the unconstitutional Tax Mandate. [*Id.* ¶ 7]. These tasks will necessitate either the reallocation of existing state personnel, to the detriment of other important state functions, or the hiring of additional staff. [*Id.* ¶¶ 6, 8].

It is well settled that increased administrative burdens and compliance costs of this nature constitute an injury in fact sufficient to confer standing. *See Sch. Dist. of Pontiac*, 584 F.3d at 261–262 (plurality op.) (school districts had standing because they had to spend "state and local funds" to comply with challenged federal law); *New Jersey v. E.P.A.*, 989 F.3d 1038, 1046–47 (D.C. Cir. 2021) (holding that "exacerbated administrative costs and burdens" were sufficient "to establish standing"); *Assoc. of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 458 (D.C. Cir. 2012) (plaintiffs had standing because they would face "greater compliance costs" under challenged regulations (quotation marks omitted)); *N.Y. Civil Liberties Union v. Grandeau*, 528 F.3d 122, 131 (2d Cir. 2008) (plaintiff had standing to challenge reporting requirements that "greatly increased its administrative burden"). These costs are directly traceable to the Tax Mandate and will be redressed by a judgment declaring the Tax Mandate unconstitutional and enjoining its enforcement. The Plaintiff States therefore have standing to challenge the Tax Mandate.

## II.   The Tax Mandate Violates the Spending Clause.

### A.   The Tax Mandate is unconstitutionally ambiguous.

When Congress attaches conditions on spending, it must state those conditions "unambiguously." *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (citations omitted). The basic theory is this: "'Legislation enacted pursuant to the spending power is much in the nature of a contract,' and therefore, to be bound by 'federally imposed conditions,' recipients of federal funds must accept them 'voluntarily and knowingly.'" *Id.* (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981) (alterations adopted)). That means Congress must make it clear that conditions apply, *see Pennhurst*, 451 U.S. at 17, and it must state those conditions with language that allows the States "to ascertain" what they are, *see Arlington*, 548 U.S. at 296 (citations omitted).

What makes a condition "unambiguous"? To answer that question, the Court must consider whether the language would be clear "from the perspective of a state official who is engaged in the process of deciding whether the State should accept [the] funds and the obligations that accompany those funds." *Sch. Dist. of Pontiac*, 584 F.3d at 271 (plurality op.) (citing *Arlington*, 548 U.S. at 295). Ordinary principles of interpretation apply to that inquiry. The Court must "begin with the text" and "presume that a legislature says in a statute what it means and means in a statute what it says there." *Arlington*, 548 U.S. at 296 (quoting *Conn. Nat. Bank v. Germain*, 503 U.S. 249, 253–54 (1992)). But if the text allows for more than one plausible interpretation, the spending condition is unconstitutionally ambiguous. *See Sch. Dist. of Pontiac*, 584 F.3d at 284–85 (Sutton, J., concurring) ("A State . . . must identify a

*plausible* alternative interpretation of the law consistent with its theory of ambiguity.").

**1.** The Tax Mandate suffers from two fatal ambiguities. It is unclear from the text and structure of the law, first, what it means to "indirectly offset" a loss in tax revenue, and second, how States should measure a "net reduction in tax revenue" in the first place. Resolving these questions is critical to know how the Tax Mandate operates. Yet on both counts, the Tax Mandate leaves the States guessing.

*The indirect offset.* The Tax Mandate prohibits States from using Rescue Plan funds to "directly or indirectly offset" a reduction in their net tax revenue. 42 U.S.C. § 802(c)(2)(A). The first part of that restriction is straightforward. A State would likely offset a tax cut *directly* if it lowered its taxes, made no changes to its budget, and then deposited its Rescue Plan funds into the state treasury to make up for the shortfall. But what does it mean for a State to "use" federal funds to "indirectly offset" a tax cut? The sweeping potential of that language leaves open too many possibilities to settle on a clear answer.

Start with the broadest reading of "indirectly." It is plausible to read the Tax Mandate as prohibiting States from enacting tax relief during the covered period *no matter what the States spend the money on*. That's "[b]ecause money is fungible." *See Ark Encounter, LLC v. Parkinson*, 152 F. Supp. 3d 880, 904 (E.D. Ky. 2016). A dollar spent here is always a dollar that cannot be spent somewhere else. And so an influx of additional cash into the State's treasury will "necessarily free[] up other funds for other purposes," providing "[i]ndirect benefits" to virtually every part of a State's

budget. *See id.* The result of that reasoning here? By prohibiting States from indirectly offsetting net tax reductions, the Tax Mandate may just be an outright ban on States lowering their taxes regardless of how the States actually spend their federal funds.

Yet it is far from clear that the Tax Mandate should be read so broadly. One potential problem with that interpretation is that it may well render the word "use" superfluous. The Tax Mandate provides that a State "*shall not use* the funds . . . to either directly or indirectly offset a reduction in the net tax revenue of such State." 42 U.S.C. § 802(c)(2)(A) (emphasis added). That language suggests it matters *how* a State spends its Rescue Plan funds, not just whether the State cuts taxes. In fact, that is precisely how Treasury initially interpreted the statute in other litigation. *See, e.g.*, *West Virginia v. U.S. Dep't of Treasury*, No. 7:21-cv-465, Dkt. 54 at 26 (N.D. Ala.) ("The term 'use' connotes 'volitional' 'active employment' of federal funds."). But, as explained above, a broad interpretation that takes into account the fungibility of money makes a State's particular "use" of Rescue Plan funds irrelevant. All that matters is whether a State spends the money, not how it uses it. And so adopting that broad reading would turn the phrase "shall not use" into surplusage. *See City of Chicago v. Fulton*, 141 S. Ct. 585, 591 (2021) ("The canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme.") (quoting *Yates v. United States*, 574 U.S. 528, 543 (2015) (plurality op.)).

Nor can the States find much comfort in a narrower interpretation. What does it mean to indirectly offset a decrease in revenue if the phrase does not broadly prohibit tax cuts of any kind? Are States limited to reducing revenue that would have been earmarked for particular services? Are revenue reductions related to a State's restricted funds permissible, but revenue reductions from the general fund proscribed? The word "indirectly" gives no hint to the States that may help them decide whether or how to spend their Rescue Plan funds.

The result? Either the Tax Mandate applies so broadly that—contrary to the language suggesting otherwise—it does not matter how States use the Rescue Plan funds because *all* uses are prohibited if the State cuts taxes. Or the Tax Mandate is limited in some way that only Treasury can decide as it enforces the law against the States. Neither construction is clear or unambiguous; neither passes constitutional muster. And "from the perspective of a state official who is engaged in the process of deciding whether the State should accept [the] funds," both leave too many questions to know with certainty what the Tax Mandate means. *See Arlington*, 548 U.S. at 296.

Perhaps this is why Secretary Yellen called this "a hard question to answer."[3] She's not wrong. And that might explain why Treasury's litigation position in other cases seems to contradict its interpretation of the statute in the Interim Rule.[4] If Treasury itself cannot settle on the meaning of this phrase, how is the law clear

---

[3] *See* Crapo: States Need Maximum Flexibility for COVID Relief Funds, at 2:54–3:29 (Mar. 24, 2021), available at https://www.youtube.com/watch?v=2O2tLSoeP94 (last visited June 23, 2021).
[4] *See, e.g.*, *Ohio v. Yellen*, 1:21-cv-181, Dkt. 29 at 28 (S.D. Ohio); *West Virginia v. U.S. Dep't of Treasury*, 7:21-cv-465, Dkt. 54 at 26 (N.D. Ala).

enough for the States to "decid[e] whether" to "accept [the] funds and the obligations" that accompany them? *See Arlington*, 548 U.S. at 296; *see also Sch. Dist. of Pontiac*, 584 F.3d at 277 (plurality op.) (finding evidence of ambiguity in the fact that the agency had changed positions on the meaning of the statute). The short answer is that it's not.

*The reduction in net tax revenue.* Even if the phrase "indirectly offset" had a clear meaning, the phrase "reduction in the net tax revenue" does not. The problem has several layers but boils down to this: A State can only reduce its tax revenue relative to a baseline, but the Tax Mandate never says what that starting point is. And while there are multiple possibilities, picking one would require the States (or this Court) to simply guess.

One could imagine, for example, that the Tax Mandate prohibits the States from cutting taxes in any given year relative to the year prior. Presumably, most States craft budget and revenue bills from the vantage point of their most recent effort. But there's some reason to doubt that is what Congress intended. Elsewhere in the law, the States are permitted to use Rescue Plan funds to make up for losses in revenue caused by the pandemic. *See* 42 U.S.C. § 802(c)(1)(C). That provision specifies that States are to judge their losses in revenue "relative to revenues collected in the most recent full fiscal year." *Id.* No similar provision exists in the Tax Mandate, suggesting that Congress might have had something different in mind. *See Pennhurst*, 451 U.S. at 17–18 ("[I]n those instances where Congress has intended the

States to fund certain entitlements as a condition of receiving federal funds, it has proved capable of saying so explicitly.").

Treasury's Interim Rule gives another possible answer. Under the Interim Rule, States must evaluate revenue losses relative to the last fiscal year that ended before the pandemic. 31 C.F.R. §§ 35.3, 35.8(b). That arguably makes some sense from a policy perspective—that was the last year the States collected revenue before the pandemic might have caused a reduction, and so it avoids a messy debate over whether relative revenue losses were caused by a change in law or Covid-19. But what in the statute makes this interpretation unambiguously clear? The question under the Spending Clause is not whether an agency can come up with a reasonable interpretation of an ambiguous condition. The question is whether that interpretation is the clear, unambiguous meaning of the law Congress passed. *See Sch. Dist. of Pontiac*, 584 F.3d at 277 (plurality op.).

Nor is establishing the baseline the only issue. Suppose, for example, that in Year 1 after accepting Rescue Plan funds, the State increases its tax revenue by $10 million relative to its last pre-pandemic fiscal year, but then in Year 2 decreases its tax revenue by $5 million relative to that same year. The net effect is an *increase* in $5 million, spread out over two years instead of one. Can Treasury nevertheless recoup $5 million from the State for having collected too little in Year 2? Because the Tax Mandate provides no clarity as to how States should understand what amounts to a "reduction" in tax revenue, it's plausible that Treasury might answer this question just about any way it chooses. And that, ultimately, is the problem. The issue is

not whether it makes sense to adopt Treasury's Interim Rule—it's whether the statute unambiguously compels that interpretation. It does not.

Making matters worse, the Tax Mandate says nothing about when the reduction in net tax revenue must occur for the State to "indirectly offset" it with Rescue Plan funds. The Tax Mandate covers any reduction in revenue caused by the State changing its law "during the covered period." 42 U.S.C. § 802(c)(2)(A). But it does not limit the *effect* of those changes—that is, the actual reduction in revenue—to the same period. So suppose that a State spends all of its Rescue Plan funds during the covered period and, in the last month, eliminates its income tax for the next fiscal year. Could an enterprising Treasury Secretary in the spring of 2025 view the State's decision as some kind of gamesmanship and initiate a recoupment action against the State for the revenue loss after the covered period ends? After all, Congress limited the period in which the Tax Mandate applies to changes in state law, but it did not similarly limit the period in which to measure revenue reductions, leaving open the possibility of never-ending oversight for any tax policies enacted during the covered period.

One final point: What should the States make of the fact that tax policies are often predictive, and those predictions might take time to play out? If a State enacts tax reform with the goal of keeping revenue neutral, will it be punished for making a bad prediction? Or what if the State's prediction is correct, but it takes several years to materialize? Can Treasury recoup funds from the State because one fiscal year saw a dip in revenue even though the next three years saw an increase?

The ambiguity inherent in the Tax Mandate amplifies what is already a coercive intrusion into State sovereignty. By prohibiting the States from enacting tax policies that cause an ill-defined effect, Congress is freezing out the States from legislating in an area that is central to their historical and guaranteed sovereignty. *See Lane Cnty.*, 74 U.S. at 76–77. The federal government perhaps hopes that the States will simply idle along for the next four years (or perhaps longer) on tax reform for fear of losing billions of dollars in federal funding. That fear is itself the constitutional problem. The States should not be made to guess about the meaning of a law that places conditions on their receipt of billions of dollars in taxpayer money.

\* \* \*

Perhaps all this is why a district court in Ohio considering a similar challenge to the Tax Mandate recently called the ambiguity question "not . . . particularly close." *Ohio v. Yellen*, --- F. Supp. 3d ---, 2021 WL 1903908, at \*1 (S.D. Ohio May 12, 2021). Like the Ohio district court, the Plaintiff States here, "[d]espite poring over this statutory language, . . . cannot fathom what it would mean to 'indirectly offset a reduction in the net tax revenue' of a State, by a 'change in law . . . that reduces any tax." *See id.* at \*12 (second alteration in original). And for that simple reason, the Tax Mandate is unconstitutional.

**2.** Nor can Treasury wave away the ambiguities in the Tax Mandate with its Interim Rule—or any rule for that matter. When Congress imposes conditions on federal funds, the Spending Clause requires that "Congress spell[] them out clearly in the text of the law." *Sch. Dist. of Pontiac*, 584 F.3d at 284 (Sutton, J., concurring). It

is, after all, Congress—not the President—that wields the power of the purse. *See* U.S. Const. art. I, § 8, cl. 1. No amount of executive-branch cleanup can avoid this constitutional requirement. *See Va. Dep't of Educ. v. Riley*, 106 F.3d 559, 567 (4th Cir. 1997) (en banc) (per curiam) ("The Department of Justice argues . . . that in the event of ambiguity in the IDEA provision at issue, we defer to a reasonable interpretation by the agency, as if we were interpreting a statute which has no implications for the balance of power between the Federal Government and the States. We do not." (footnote omitted)).[5]

That conclusion follows from the nature of a Spending Clause challenge. In this context, ambiguity is not a question about whether an agency's interpretation is permissible, or even what the best reading of the statute might be. If a statutory condition on spending is ambiguous, *it is unconstitutional*. And an unconstitutional statute is unenforceable. *See Ex parte Young*, 209 U.S. 123, 155–56 (1908). So to say that an agency can cure an ambiguous spending condition is to say that an agency can enforce an unconstitutional statute. But obviously the executive branch can do no such thing. *See, e.g.*, *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015). The Interim Rule cannot resuscitate the fatally ambiguous Tax Mandate. *See Riley*, 106 F.3d at 567. Any other approach would make the constitutional limits on the Spending Clause a dead letter, as the executive branch could write around virtually any ambiguous statute.

---

[5] In *Riley*, a majority of the en banc court adopted Judge Luttig's dissent at the panel stage, *see* 106 F.3d at 560–61, and then reproduced that dissent at the end of the en banc court's per curiam opinion, *id.* at 561.

**B.    The Tax Mandate is not reasonably related to the federal inter-est in passing the American Rescue Plan Act.**

Even if the Tax Mandate is not unconstitutionally ambiguous, it violates the requirement that spending conditions be reasonably "related to a federal interest." *Cutter v. Wilkinson*, 423 F.3d 579, 586 (6th Cir. 2005) (citing *South Dakota v. Dole*, 483 U.S. 203, 207–08 (1987)). That's because a ban on using Rescue Plan funds to "indirectly offset" tax cuts (broadly construed) bears no relation to the purpose of the law. Instead, the Tax Mandate uses State governments to enact federal policy, re-gardless of whether the States use their funds to provide Covid-19 relief to their citi-zens.

When Congress provides funds to the States through its Spending Clause Power, any conditions on those funds must have a "nexus" to the federal government's interest. *Id.* at 587. In most cases, that requirement is easily met. For example, Con-gress can condition new funding for education on an agreement that the States will not reduce the level of education-related funding they already spend. *Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 659 (1985). Likewise, Congress can condition funding for the States' prison systems on a commitment to "allow inmates greater freedom of religion" because doing so "promote[s] [inmate] rehabilitation." *Cutter*, 423 F.3d at 586–87. The key is that the conditions are "related to" the federal government's over-all interest that gives rise to the legislation in the first place. *See New York v. United States*, 505 U.S. 144, 172 (1992) (explaining that "*both* the conditions and the pay-ments embody Congress' efforts to address the pressing problem of radioactive waste

disposal" (emphasis added)). And while this might be a relatively low bar, it is one that the federal government must meet.

The purpose of the Rescue Plan is to provide relief to the States (and their citizens) from hardships caused by Covid-19. Yet the Tax Mandate does nothing to further that interest. It does not require the States to spend their money on Covid-19 relief—that requirement already exists in other parts of the law. *See* 42 U.S.C. § 802(c)(1). Nor does it prohibit the States from spending their money in a way that runs counter to this federal interest. Instead, the Tax Mandate (broadly interpreted) proscribes certain State tax policies *regardless* of how the States spend their money.

Do not be fooled: The Tax Mandate is not a restriction on how States *use* the federal funds. Those restrictions are provided elsewhere in the law. Congress spelled out four areas in which the States can spend their Rescue Plan funds, and each of those categories contains its own restrictions. *See id.* The Tax Mandate, on the other hand, has nothing to do with how States use the federal money or whether they spend it on Covid-19 relief at all. Rather, all the Tax Mandate does is prevent the States from lowering their tax revenue without regard to how States disburse the Rescue Plan funds. For example, under the Tax Mandate a State could take its existing revenue and increase the salaries of its highest-ranking officials, but it *cannot* provide tax credits to frontline workers who have put their lives on the line over the past year. How does that relate to the purpose of the Rescue Plan or the federal interest at stake? It does not. And that's because the Tax Mandate is not about how States use their federal funds, and it is not about ensuring that States provide Covid-19 relief to

their citizens. It is about prohibiting States from providing tax relief to their citizens, even when that relief mirrors what the Rescue Plan itself offers.

That last point is worth highlighting. The Rescue Plan increases several federal tax credits and makes others fully refundable. *See* American Rescue Plan Act §§ 9611, 9631. And yet, the Tax Mandate prevents States from doing the same. Whatever the minimum nexus between a federal interest and a spending condition might be, it cannot be that Congress can reasonably forbid the States from doing precisely what Congress has done *in the same law*.

Consider the problem this way: What if Congress attached the Tax Mandate—without changing a single word—to every spending bill going forward? The Tax Mandate itself does not tell the States how to spend their Rescue Plan funds (that's taken care of in other provisions). *See* 42 U.S.C. § 802(c)(1). So Congress could easily include a verbatim copy of the Tax Mandate in virtually any future spending bill no matter its subject. A law providing funding for education could also prohibit the States from using those funds to "indirectly offset" a reduction in net tax revenue. The same for funding new highways or investments in opportunity zones. "Because money is fungible," the effect of the Tax Mandate does not depend on the subject matter of the law. *See Ark Encounter*, 152 F. Supp. 3d at 904. All funds could be said to "indirectly offset" a reduction in state tax revenue, so Congress could use any spending bill to achieve the same effect of prohibiting the States from lowering their taxes. Such an indiscriminate prohibition is not reasonably related to the purpose of the Rescue Plan.

**C.      The Tax Mandate is unconstitutionally coercive.**

The Tax Mandate also violates the Spending Clause because it is unconstitutionally coercive.

Congress cannot use an offer of federal funds to coerce the States into adopting the federal government's preferred policies. *Dole*, 483 U.S. at 211. Conditions attached to spending grants must *encourage*, rather than *compel*, the States to comply. *Id.* at 211–12. And while the Supreme Court has not "fix[ed] a line" as to when "financial inducement offered by Congress" is "so coercive as to pass the point at which 'pressure turns into compulsion,'" it has given a few guideposts. *NFIB*, 567 U.S. at 580, 585 (op. of Roberts, C.J.) (quoting *Dole*, 483 U.S. at 211).

For example, the threat of withholding a small percentage of highway funding was not enough to coerce the States into adopting the federal government's preferred legal drinking age. *Dole*, 483 U.S. at 211–12. But a threat to withdraw Medicaid funding equal to 10 percent of a State's total budget easily crossed the line. *NFIB*, 567 U.S. at 582, 585 (op. of Roberts, C.J.) ("It is enough for today that wherever that line may be, this statute is surely beyond it."). As the Chief Justice explained, an offer that significant is "much more than 'relatively mild encouragement'—it is a gun to the head." *Id.* at 581. No State could reasonably turn down funding when doing so meant the State must give up such a large portion of its budget. *Id.* at 582.

The Tax Mandate is similarly coercive for two reasons. First, the "sheer size" of the Rescue Plan is inherently coercive. *Id.* at 683 (dissenting op.). For both Kentucky and Tennessee, the aid amounts to roughly one fifth of each State's General

Fund revenue from the previous fiscal year.[6] And those funds are needed to repair the damage caused by Covid-19. Kentucky, for example, has earmarked some of its Rescue Plan funds to repay the debt it accumulated for extended unemployment services during the pandemic. *See* 2021 Ky. Acts ch. 196, § 6. The Rescue Plan offers extraordinary sums of money in a time of need, and the federal government knows that "refusing to accede to the conditions set out in the [law] is not a realistic option" for the States. *See NFIB*, 567 U.S. at 681 (dissenting op.). And that point leads to the second. No one can look past the context here. Congress has offered the States billions of dollars in relief to rescue Americans from a once-in-a-century pandemic. Even if the dollar amount alone were not enough to make this offer coercive, the dire circumstances "surely" do. *See id.* at 585 (op. of Roberts, C.J.). "Congress may not simply 'conscript state [agencies] into the national bureaucratic army,' and that is what it is attempting to do with the [Tax Mandate]." *Id.* (citation omitted) (first alteration in original).

In considering the coercive nature of this offer, it is important that the Court not mistake this issue as one in which Congress has attached conditions on how the States *use* a particular bucket of funding. For all the reasons explained above, that's not what the Tax Mandate is. *See* pp. 29–30, *supra*. If the Tax Mandate is broadly construed, it does not tell States how to use their Rescue Plan funds. Rather, the Tax

---

[6] *Compare* [Exhibit B, Niknejad Decl., ¶ 5] (about $3.725 billion in Rescue Plan funds), *with* Governor Bill Lee, State of Tennessee, *The Budget: Fiscal Year 2021-2022* A-62 (2021), available at https://www.tn.gov/content/dam/tn/finance/budget/documents/2022BudgetDocumentVol1.pdf (last visited June 23, 2021) (about $18.1 billion in estimated total state revenues for Fiscal Year 2020-2021).

Mandate is an independent obligation of the States to adopt the federal government's preferred tax policies, regardless of how the States end up using the Rescue Plan funds. This point matters when the Court considers how coercive the offer is. Congress has more freedom to impose strict conditions on how States *use* federal funds than when telling States that they must adopt independent policies if they accept the spending grant. *See NFIB*, 567 U.S. at 580 (op. of Roberts, C.J.). When spending "conditions are properly viewed as a means of pressuring the States to accept policy changes," the Court must scrutinize whether Congress is improperly leveraging its offer against the States. *Id.*

This point was at the heart of the Spending Clause problem in *NFIB*. There, Congress created an expanded Medicaid program that the States could choose to opt out of. *Id.* at 581. But if they did, the federal government could withhold *all* of the States' Medicaid funding, not just the new funding offered as part of the expansion. *Id.* The government argued that because Medicaid is a single federal program, all Congress did was tell the States how to use their Medicaid dollars—a much less coercive act than leveraging spending to force the States to adopt new policies. *Id.* at 582–83. But the Supreme Court did not bite. Even though "Congress styled" the condition as simply a restriction on how Medicaid dollars must be spent, the reality was that Congress was leveraging a significant part of the States' budget to force the States into adopting *new* policies by expanding Medicaid. *See id.* ("The Medicaid expansion, however, accomplishes a shift in kind, not merely degree."). That Congress

styled the conditions as a mere restriction on how funds are used was "irrelevant" to the analysis. *Id.* at 582.

The same point applies here. Even though Congress "styled" the Tax Mandate as a restriction on how the States use their Rescue Plan funds, it is nothing of the sort. Instead, Congress is wielding an offer of billions of dollars in necessary relief funds to coerce the States into adopting the preferred tax policies of the federal government. It is unconstitutional for the same reason that the spending conditions were unconstitutional in *NFIB*.

Put simply, it is hard to see the Tax Mandate as anything more than "a means for bringing federal economic might to bear on a State's own choices of public policy." *See Sabri v. United States*, 541 U.S. 600, 608 (2004). At some point the sovereignty of the States just cannot be for sale. Yet the States can no more refuse the Rescue Plan funds than a man dying of thirst could refuse a glass of water. And that's why States like Kentucky and Tennessee have either *already* requested their funds without waiting for the result of this suit or intend to do so in short order. Even with the unconstitutional invasion of the States' sovereignty attached to the funds, the States are compelled to accept the offer—and that's what makes the Tax Mandate an unconstitutional exercise of congressional power.

## III. The Tax Mandate violates the anticommandeering doctrine.

The anticommandeering doctrine is "the expression of a fundamental structural decision incorporated into the Constitution, *i.e.*, the decision to withhold from Congress the power to issue orders directly to the States." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1475 (2018). The Tenth Amendment confirms this

principle by expressly providing that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

In its basic form, the anticommandeering doctrine prohibits Congress from "requir[ing] the States to govern according to Congress' instructions." *New York*, 505 U.S. at 162. The doctrine safeguards individual liberty and promotes political accountability by preventing Congress from using the States to implement its preferred (and possibly *unpopular*) policies. *Printz v. United States*, 521 U.S. 898, 920–25, 929–30 (1997); *see also Murphy*, 138 S. Ct. at 1477 ("[I]f a State imposes regulations only because it has been commanded to do so by Congress, responsibility is blurred.").

Few powers of government are as central to sovereignty as the power to tax—or just as importantly, the power *not* to tax. *Lane Cnty.*, 74 U.S. at 76; *see also Dep't of Revenue v. ACF Indus., Inc.*, 510 U.S. 332, 345 (1994). The ability to control the taxing policy of a State is nothing short of the "power to destroy." *M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 431 (1819). That's why, for example, when James Madison sought to persuade the States that the Constitution would not make the federal government too powerful, he used *tax collectors* as an example to contrast the relative strength of each government. *See* The Federalist No. 45 (J. Madison) ("Should it happen, however, that separate collectors of internal revenue should be appointed under the federal government, the influence of the whole number would not bear a comparison with that of the multitude of State officers in the opposite scale."). While Madison's prediction about the size of the federal government might have proved wrong,

his emphasis on revenue collection was right: power over taxation is core to maintaining a sovereign government.

There is no doubt that Congress is using the Tax Mandate to "blur[]" the lines of political accountability on an issue of supreme importance. *See Murphy*, 138 S. Ct. at 1477. Taxes touch on every part of political life. By prohibiting the States from offering tax relief to their citizens, Congress is handcuffing local governments and leaving them unable to respond to electoral pressures that drive a healthy democracy. Yet when a State's taxes are too high, it is the State—not Congress—that will face the voters. And *that* is a central problem that the anticommandeering doctrine exists to prevent. *See id.*

But the Tax Mandate compounds the problem even more. Congress has not only coerced the States into adopting higher tax policies than they might otherwise do, it has done so while *lowering* the federal tax burden it levies. *See, e.g.,* American Rescue Plan Act § 9611 (temporarily increasing the child tax credit and making it fully refundable); *id.* § 9631 (increasing the maximum tax credit for dependent care). So with one hand, Congress has extended favorable federal tax relief to its constituents (for which Congress can then take political credit). And with the other hand, Congress has prohibited the States from providing similar relief (for which Congress can deflect the blame). This unprecedented commandeering of State power is thus doubly problematic: it blurs political accountability for unpopular policy choices and

leaves the federal government with the political spoils that the States might otherwise earn. No theory of federalism and State sovereignty could allow for such a result.[7]

One final point: It must be the case that there are some features of State sovereignty that the federal government cannot intrude on, regardless of whether Congress does so with its Spending Clause power or not. The federal government, for example, cannot order a State to relocate its capitol, even if it has attempted to do so as part of a bargain to admit that State into the union. *Coyle v. Smith*, 221 U.S. 559, 565–67 (1911). As the Court explained, "[t]he power to locate its own seat of government, and to determine when and how it shall be changed from one place to another, and to appropriate its own public funds for that purpose, are essentially and peculiarly state powers." *Id.* at 565. Surely the power to tax one's citizens—or to *not* tax them—is of similar importance to state sovereignty. *See Lane Cnty.*, 74 U.S. at 76. Thus, whether Congress has couched the Tax Mandate as a spending condition or not, it amounts to an unlawful commandeering in violation of the Tenth Amendment.

---

[7] The federal regulations implementing the Tax Mandate further compound this problem. "Treasury has determined" that State income tax changes "that simply conform with *recent* changes in Federal law" (such as changes in federal taxation under the Paycheck Protection Program) "are permissible under" the Tax Mandate. Coronavirus State and Local Fiscal Recovery Funds, 86 Fed. Reg. 26,786, 26,808 (May 17, 2021) (emphasis added). This determination implies that Treasury will permit States to conform to recent tax policy changes enacted by the current administration but not "non-recent" tax policy changes enacted by prior administrations that States may now wish to belatedly conform to, such as changes in the Tax Cuts and Jobs Act of 2017, Pub. L. No. 115-97, 131 Stat. 2054. This disparate treatment of state decisions to conform to federal tax law is further evidence that the federal government is commandeering state tax policy through the Tax Mandate in an effort to achieve its desired policy goals.

## IV. The Court should permanently enjoin the Tax Mandate.

A plaintiff is entitled to a permanent injunction if: (1) the plaintiff has suffered "an irreparable injury"; (2) "the remedies available at law . . . are inadequate to compensate for that injury;" (3) "a remedy in equity is warranted" in light of "the balance of hardships between the plaintiff and defendant"; and (4) "the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). All four factors are present here.

First, the Tax Mandate causes irreparable injury because it intrudes on the States' lawmaking authority. *See* pp. 10–16, *supra*; *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018) (explaining that "the inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State"). That kind of constitutional injury always amounts to irreparable harm. *Cf. Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). Second, the "remedies available at law" are "inadequate" precisely because of the nature of the injury. *See eBay*, 547 U.S. at 391. Kentucky and Tennessee cannot restore their sovereign right to control their own taxing policies or be free from unconstitutional Spending Clause conditions through a damages award. *See Abbott*, 138 S. Ct. at 2324 & n.17. And that's particularly true given the Plaintiff States cannot sue the federal government for money damages, anyway. *See F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994). Third, the balance of hardships favors the Plaintiff States because the Tax Mandate unconstitutionally intrudes on their sovereignty and the federal government has no legitimate interest in enforcing an unconstitutional law. *See Martin-Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 568 (6th Cir. 1982). And fourth, the public interest favors an injunction here because "the public interest

lies in a correct application of the federal constitutional . . . provisions upon which the [Plaintiff States] have brought this claim." *See Coal. to Defend Affirmative Action v. Granholm*, 473 F.3d 237, 252 (6th Cir. 2006) (quotation marks omitted).

## CONCLUSION

The Court should grant summary judgment to the Plaintiff States and enter a judgment declaring the Tax Mandate unconstitutional and enjoining the Defendants from taking any steps to enforce the Tax Mandate against the Plaintiff States.


Respectfully submitted by,


**DANIEL CAMERON**
**Attorney General of Kentucky**

/s/ Brett R. Nolan
Barry L. Dunn
Victor B. Maddox
Matthew F. Kuhn
Brett R. Nolan
Office of Kentucky Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
Phone: (502) 696-5300
Barry.Dunn@ky.gov
Victor.Maddox@ky.gov
Matt.Kuhn@ky.gov
Brett.Nolan@ky.gov

*Counsel for the Commonwealth*
*of Kentucky*

**HERBERT H. SLATERY III**
**Attorney General of Tennessee**

/s/ Andrée S. Blumstein (w/ permission)
Andrée S. Blumstein*
Sarah K. Campbell*
Brandon J. Smith*
Office of the Tennessee Attorney General and Reporter
PO Box 20207
Nashville, TN 37202-0207
Phone: (615) 741-3491
Andree.Blumstein@ag.tn.gov
Sarah.Campbell@ag.tn.gov
Brandon.Smith@ag.tn.gov
*admitted pro hac vice*

*Counsel for the State of Tennessee*

**CERTIFICATE OF SERVICE**

I certify that I filed the above document using the Court's CM/ECF system on June 23, 2021, which electronically served a copy to all counsel of record.

/s/ Brett R. Nolan