## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF KENTUCKY
## CENTRAL DIVISION AT FRANKFORT

COMMONWEALTH OF KENTUCKY AND STATE OF TENNESSEE,

    *Plaintiffs*,

    v.

JANET YELLEN, in her official capacity as Secretary of the Treasury; RICHARD K. DELMAR, in his official capacity as acting inspector general of the Department of the Treasury; and U.S. DEPARTMENT OF THE TREASURY,

    *Defendants*.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. 3:21-cv-00017-GFVT

## BRIEF FOR *AMICI CURIAE*
## CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA
## AND NATIONAL FEDERATION OF INDEPENDENT BUSINESS SMALL
## BUSINESS LEGAL CENTER

PAUL D. CLEMENT
ERIN E. MURPHY
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue NW
Washington, DC 20004
(202) 389-5000
paul.clement@kirkland.com

*Counsel for Amici Curiae*
*Chamber of Commerce of the*
*United States of America and*
*National Federation of*
*Independent Business Small*
*Business Legal Center*

July 12, 2021

## CORPORATE DISCLOSURE STATEMENT

The Chamber of Commerce of the United States of America is a nonprofit, tax-exempt organization incorporated in the District of Columbia. The National Federation of Independent Business Small Business Legal Center is a 501(c)(3) public interest law firm and is affiliated with the National Federation of Independent Business, a 501(c)(6) business association. Neither the Chamber of Commerce of the United States of America nor the National Federation of Independent Business has a parent corporation, nor does any publicly held corporation own 10% or more of their stock. No publicly held corporation or its affiliate that is not a party to this case or appearing as *amici curiae* has a substantial financial interest in the outcome of this litigation by reason of insurance, a franchise agreement, or an indemnity agreement.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ......................................................... i

TABLE OF AUTHORITIES ...................................................................................... iii

STATEMENT OF INTEREST ................................................................................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT ...................................... 2

ARGUMENT ........................................................................................................... 5

I.    The Tax Mandate Is An Unconstitutional Incursion On A Core Attribute Of State Sovereignty And An Impermissibly Coercive Condition On Federal Funds ........................................................................... 8

II.    Left Standing, The Tax Mandate Will Have Dire Consequences ................. 17

CONCLUSION ...................................................................................................... 24

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*,
548 U.S. 291 (2006)........................................................21

*Billy F. Hawk, Jr., GST Non-Exempt Marital Tr. v. Commissioner*,
924 F.3d 821 (6th Cir. 2019).............................................6

*Bode v. Barrett*,
344 U.S. 583 (1953)..........................................................8

*Bond v. United States*,
564 U.S. 211 (2011).......................................................9, 10

*City of Phila. v. Sessions*,
280 F.Supp.3d 579 (E.D. Pa. 2017) ..............................23

*Coyle v. Smith*,
221 U.S. 559 (1911)........................................................10

*Dep't of Revenue v. ACF Indus., Inc.*,
510 U.S. 332 (1994)..........................................................8

*Dows v. City of Chi.*,
78 U.S. (11 Wall.) 108 (1870)......................................8, 17

*Free Enter. Fund v. PCAOB*,
561 U.S. 477 (2010)........................................................11

*Gibbons v. Ogden*,
22 U.S. (9 Wheat.) 1 (1824)...............................................8

*In re Fair Fin. Co.*,
834 F.3d 651 (6th Cir. 2016)..............................................6

*M'Culloch v. Maryland*,
17 U.S. (4 Wheat.) 316 (1819)............................................8

*Meoli v. Huntington Nat'l Bank*,
848 F.3d 716 (6th Cir. 2017)..............................................6

*Mertens v. Hewitt Assocs.*,
  508 U.S. 248 (1993).................................................................................6

*Mich. Bell Tel. Co. v. Engler*,
  257 F.3d 587 (6th Cir. 2001)...................................................................22

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
  567 U.S. 519 (2012)....................................................................... 3, 13, 14

*New York v. United States*,
  505 U.S. 144 (1992)...............................................................................13

*Ohio v. Yellen*,
  ___ F.Supp.3d ___, 2021 WL 2712220
  (S.D. Ohio July 1, 2021).............................................................. *passim*

*Plaut v. Spendthrift Farm, Inc.*,
  514 U.S. 211 (1995)...............................................................................11

*Providence Bank v. Billings*,
  29 U.S. (4 Pet.) 514 (1830).............................................................. 8, 9, 12

*Sch. Dist. of Pontiac v. Sec'y of U.S. Dep't of Educ.*,
  584 F.3d 253 (6th Cir. 2009)............................................................ 21, 22

*South Dakota v. Dole*,
  483 U.S. 203, 207 (1987)........................................................................21

*Steward Mach. Co. v. Davis*,
  301 U.S. 548 (1937)........................................................................ 13, 14

**Constitutional Provisions**

U.S. Const. Art. I, §10.................................................................................8

U.S. Const. Art. I, §8...................................................................................8

U.S. Const. Art. I, §9...................................................................................8

U.S. Const. Amend. XVI .........................................................................8, 9

**Legislative Materials**

*Coronavirus State and Local Fiscal Recovery Funds*,
86 Fed. Reg. 26,786 (May 17, 2021) ........................................................ *passim*

H.B. 1023, 93rd Gen. Assemb., Reg. Sess. (Ark. 2021) ..........................................19

H.B. 114, 156th Gen. Assemb., Reg. Sess. (Ga. 2021) ............................................19

H.B. 227, 2021 Leg., Reg. Sess. (Ala. 2021) ...........................................................19

H.B. 279, 67th Leg., Reg. Sess. (Mont. 2021) .........................................................19

H.B. 2960, 58th Leg., Reg. Sess. (Okla. 2021) ........................................................18

H.B. 429, 101st Gen. Assemb., 1st Reg. Sess. (Mo. 2021) .....................................19

Pub. L. No. 117-2, §9901 ........................................................................ 3, 5, 6, 23

S.B. 1, 55th Leg., 1st Sess. (N.M. 2021) .......................................................... 18, 19

S.B. 2500, 2021 Leg., Reg. Sess. (N.Y. 2021) ........................................................22

S.B. 496, 442d Gen. Assemb., Reg. Sess. (Md. 2021) ............................................18

**Other Authorities**

Alex Sherman,
*Five Charts That Show How COVID-19 Stopped
the U.S. Economy In Its Tracks*, CNBC (Mar. 11, 2021),
https://cnb.cx/3cZ97O0......................................................................................15

Anne Sraders & Lance Lambert,
*Nearly 100,000 Establishments That Temporarily Shut Down
Due to the Pandemic Are Now Out of Business*,
Fortune (Sept. 28, 2020), https://bit.ly/3t6dpci .................................................16

Anshu Siripurapu & Jonathan Masters,
*How COVID-19 Is Harming State and City Budgets*,
Council on Foreign Relations (Mar. 19, 2021),
https://on.cfr.org/3f9vjqm .................................................................................16

Comment from Almy, Rep. Susan,
    *Coronavirus State and Local Fiscal Recovery Funds*,
    Regulations.gov (June 29, 2021), https://bit.ly/3Ae135X .................................20

Complaint,
    *Arizona v. Yellen*, No. 2:21-cv-00514-DJH
    (filed Mar. 25, 2021) ...........................................................................14

Congressional Rsch. Serv.,
    *Global Economic Effects of COVID-19*
    (June 17, 2021), https://bit.ly/3AitAqJ ................................................16

Erin Huffer & Aravind Boddupalli,
    *The Leisure & Hospitality Sector Has an Employment Crisis—
    and It Might Be Getting Worse*, Urb. Wire (July 20, 2020),
    https://urbn.is/397ptlz ........................................................................15

*How the COVID-19 Pandemic is Transforming State Budgets*,
    Urb. Inst. (June 25, 2021), https://urbn.is/3jsU9ni ..............................14

Jack M. Mintz,
    *Tax Policy and Fiscal Sustainability Post-Covid*,
    BloombergTax.com (Feb. 2, 2021), https://bit.ly/3641G47 ..............18

Jared Walczak,
    *Four Questions Treasury Must Answer About the
    State Tax Cut Prohibition in the American Rescue Plan Act*,
    Tax Found. (Mar. 18, 2021), https://bit.ly/3cYu0YB..........................14

Linda Gandee,
    *Avon to Receive Almost $4.6 Million From the
    American Rescue Plan Act of 2021*,
    Cleveland.com (June 14, 2021), https://bit.ly/2TiSwy1 ......................21

Lucy Dadayan,
    *COVID-19 Pandemic Could Slash 2020-21
    State Revenues by $200 Billion*, Tax Pol'y Ctr.
    (July 1, 2020), https://tpc.io/2NKE8M5 ............................................16

Malea Martin,
  *As Cities Await Finalized American Rescue Plan Act Guidelines,*
  *Some Funding Decisions Remain in Limbo*, Santa Maria Sun
  (June 16, 2021), https://bit.ly/3qHcn5S ............................................................21

Michael Ettlinger & Jordan Hensley,
  *Covid-19 Economic Crisis: By State*,
  Univ. of N.H. Carsey Sch. of Pub. Pol'y (June 29, 2021),
  https://bit.ly/3dBzklI ................................................................................... 15, 16

Nat'l Restaurant Ass'n,
  *49 States and DC Added Restaurant Jobs in May 2021*
  (June 24, 2021), https://bit.ly/3hn5jHA ...........................................................15

Nat'l Restaurant Ass'n,
  *Restaurant Employment Fell for the Third Consecutive Month*
  (Feb. 5, 2021), https://bit.ly/31b0pG3 ............................................................15

Nat'l Restaurant Ass'n,
  *Restaurant Sales Fell to Their Lowest Level Since June*
  (Jan. 15, 2021), https://bit.ly/3d5gVwu ...........................................................15

NFIB Res. Ctr.,
  *Covid-19 Small Business Survey (18)*
  (June 30, 2021), https://bit.ly/3yMg4KD .........................................................15

NFIB Res. Ctr.,
  *Covid-19 Small Business Survey (17)*
  (Apr. 28, 2021), https://bit.ly/3ycOcyO...........................................................15

Office of Gov. Gavin Newsom,
  *Governor Newsom Signs Legislative Package Providing*
  *Urgent Relief to Californians Experiencing Pandemic Hardship*
  (Feb. 23, 2021), https://bit.ly/2Q6wXOU.........................................................18

Office of Gov. Larry Hogan,
  *The RELIEF Act of 2021*, https://bit.ly/2O6yoMG...........................................19

Patrick Gleason,
  *How Senator Joe Manchin's Move To Block Tax Relief in His Own*
  *State Costs All U.S. Taxpayers*, Forbes (Mar. 16, 2021),
  https://bit.ly/31vV782 .......................................................................................23

Paul Davidson,
*Vaccines Could Help Steady Economy; Yet Pandemic Isn't Over,*
*Effects Are Likely to Linger*, USA Today (Dec. 31, 2020) ................................16

Press Release,
*President Biden Announces American Rescue Plan*,
White House (Jan. 20, 2021), https://bit.ly/3f4S5Qe ........................................23

Stacey Barchenger,
*States Have Billions of Dollars from the American Rescue Plan.*
*Now They Have to Spend It*, NorthJersey.com (May 5, 2021),
https://njersy.co/3jvHOi5 ............................................................................ 16, 20

*State-by-State Job Loss: COVID-19 Continues to Devastate Hotel*
*Industry*, Am. Hotel & Lodging Ass'n (Feb. 2021),
https://bit.ly/3uG0H47 ................................................................................15

U.S. Bureau of Labor Statistics,
*All Employees, Total Nonfarm [PAYEMS]*, retrieved from FRED,
Fed. Rsrv. Bank of St. Louis (July 8, 2021),
https://bit.ly/3dPMhbQ ................................................................................16

**STATEMENT OF INTEREST**

Founded in 1912, the Chamber of Commerce of the United States of America (the "Chamber") is the world's largest business federation. It represents approximately 300,000 members and indirectly represents the interests of more than 3 million companies and professional organizations of every size, in every economic sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members by participating as a litigant or *amicus curiae* in cases involving issues of concern to American businesses, such as this one.

The National Federation of Independent Business ("NFIB") is the Nation's leading small business association. Its membership spans the spectrum of business operations, ranging from sole proprietor enterprises to firms with hundreds of employees. Founded in 1943 as a nonprofit, nonpartisan organization, NFIB's mission is to promote and protect the right of its members to own, operate, and grow their businesses. The NFIB Small Business Legal Center is a nonprofit, public interest law firm established to provide legal resources and be the voice for small businesses in the Nation's courts through representation on issues of public interest affecting small businesses. To fulfill its role as the voice for small business, the Legal Center frequently files *amicus* briefs in cases that will impact small businesses.

*Amici* have a strong interest in this case, as the tax mandate poses a grave threat both to structural principles of federalism and separation of powers that have well-served the Nation and to the economic vitality of U.S. businesses. *Amici* are concerned that the tax mandate will hobble States that seek to ease tax burdens on businesses of all sizes and industries that have been substantially harmed at no fault of their own, but due to closures and other restrictions imposed on them due to the pandemic. The tax mandate will undoubtedly stifle innovation in the States by limiting their options to support economic activity, which are critical to their businesses' economic recovery and to the well-being of businesses and their employees. For these reasons and others described below, *amici* respectfully urge this Court to grant the plaintiff States' motion for summary judgment and enjoin the defendants from enforcing the tax mandate.[1]

## INTRODUCTION AND SUMMARY OF ARGUMENT

The novel tax mandate at the heart of this case is unprecedented and unconstitutional. Never before in the history of the Republic has the federal government conditioned the receipt of federal funds on a State's surrender of its power to control its own tax policies. It is beyond question that Congress cannot dictate state tax policy directly, and such an intrusion into core matters of state

---

[1] No counsel for any party authored this brief in whole or in part, and no entity or person, aside from *amici curiae*, their members, and their counsel, made any monetary contribution toward the preparation or submission of this brief.

sovereignty is ultra vires even as a condition on federal funds. Congress has resisted the temptation to impose such a condition for over two centuries, not out of uncharacteristic self-restraint, but because the power to impose such conditions is lacking. But at bare minimum, Congress cannot coerce States into surrendering such a core aspect of sovereignty with an offer they cannot refuse—a massive federal relief package ultimately funded by taxpayers.

In the American Rescue Plan Act of 2021 (ARPA), Congress has made $195.3 billion in taxpayer dollars—i.e., money collected from the States' citizens—available to States if and only if States agree not to pass any laws or take any administrative actions that decrease their net revenue, whether that decrease comes through tax credits, rebates, reductions in tax rates, or new or expanded deductions. Pub. L. No. 117-2, §9901(b)(3)(A). And under the recent interim final rule promulgated by the Treasury Department, the net revenue baseline is measured for the next three years against a State's revenues in 2019. *See Coronavirus State and Local Fiscal Recovery Funds*, 86 Fed. Reg. 26,786 at 26,808 (May 17, 2021) (codified at 31 C.F.R. pt. 35). For most States, the massive amount of funds available under ARPA—nearly 20% of state government revenues nationwide—eclipses even the extraordinary volume of Medicaid funding held to be coercive under *National Federation of Independent Business v. Sebelius* ("*NFIB*"), 567 U.S. 519, 581-82, 588 (2012). And the coercion is even more acute here given that the entire point of ARPA

3

is to help alleviate the effects of a once-in-a-lifetime global pandemic that has left some States and many of their residents in financial ruin. The notion that a State could refuse such a massive amount of federal relief money raised from its own taxpaying citizenry in these extraordinary times is fanciful. In effect, then, Congress has commandeered the tax power of the States—something that Congress plainly lacks the power to do.

Unless and until this Court enjoins it, the mandate will continue to imperil States' efforts to implement revenue-related measures to foster a healthy business community and promote recovery from the economic devastation caused by COVID-19—devastation that disproportionately harmed certain industries and carried particularly harsh effects for small businesses of all kinds. Accordingly, many States have recently enacted legislation to help businesses, and the economy as a whole, recover. These measures, which include new tax deductions and credits for restaurants and small businesses, reductions in corporate tax rates, and fee waivers for eating and drinking establishments, are designed to jump-start recovery but may subject the States to a Treasury recoupment action if they correspond to a short-term revenue decrease. Even the possibility of such adverse action will constrain State policymaking now and in future legislative sessions. There can be no question that the States, their citizens, and the businesses operated within them will suffer irreparable injury, while any contrary federal interest is minimal, if not

entirely ultra vires. The Court should permanently enjoin this unprecedented and patently unconstitutional prohibition.

## ARGUMENT

ARPA offers approximately $195 billion to States in an effort to aid the States' and their residents' financial recovery from the COVID-19 pandemic. Like most spending power legislation, the Act expressly enumerates the purposes to which States may put those funds. States may use the money to: (a) "respond to the public health emergency with respect to [COVID-19] or its negative economic impacts, including assistance to households, small businesses, and nonprofits, or aid to impacted industries such as tourism, travel, and hospitality"; (b) "respond to workers performing essential work" during the pandemic by providing premium pay or grants; (c) provide government services "to the extent of the reduction" in local revenue "due to [COVID-19] relative to revenues collected in the most recent full fiscal year … prior to the emergency"; and (d) "make necessary investments in water, sewer, or broadband infrastructure." Pub. L. No. 117-2, §9901(c)(1)(A)-(D).

In addition to those conditions, the Act includes a section titled "further restriction" on the "use of funds." *Id.* §9901(c)(2) (capitalization altered). One such restriction provides:

> A State or territory shall not use the funds provided under this section or transferred pursuant to section 603(c)(4) to either directly or indirectly offset a reduction in the net tax revenue of such State or territory resulting from a change in law, regulation, or administrative

5

interpretation during the covered period that reduces any tax (by providing for a reduction in a rate, a rebate, a deduction, a credit, or otherwise) or delays the imposition of any tax or tax increase.

*Id*. §9901(c)(2)(A).  If a State violates that prohibition, it must repay the funds in "an amount equal to the amount of funds used in violation" of the Act.  *Id*. §9901(e).  The Act also prohibits States from using the funds for "deposit into any pension fund."  *Id*. §9901(c)(2)(B).

By its terms, the tax mandate is breathtakingly broad.  Courts routinely recognize that statutory definitions covering "direct and indirect" activity are exceedingly broad.  *See, e.g.*, *Billy F. Hawk, Jr., GST Non-Exempt Marital Tr. v. Commissioner*, 924 F.3d 821, 827 (6th Cir. 2019); *Meoli v. Huntington Nat'l Bank*, 848 F.3d 716, 728 n.6 (6th Cir. 2017); *In re Fair Fin. Co.*, 834 F.3d 651, 666 (6th Cir. 2016).  And courts ordinarily "will not read the statute to render [a] modifier superfluous."  *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 258 (1993).  As the U.S. District Court for the Southern District of Ohio noted earlier this month in its order enjoining enforcement of the tax mandate against Ohio, "[b]ased on the Tax Mandate's language, the Secretary could deem essentially *any* reduction in the rate of any one or more state taxes—even if other tax rates were increased—to be a 'change in [tax] laws' that results in an "indirect[] offset [of] a reduction in [Ohio's] net tax revenues.'"  *Ohio v. Yellen*, ___ F.Supp.3d ___, 2021 WL 2712220, at *14 (S.D. Ohio July 1, 2021) (alterations and emphasis in original) (citation omitted).

6

By its terms, the tax mandate would also appear to preclude any state revenue official from adopting any pro-taxpayer interpretation of a disputed provision. The prohibition even goes so far as to forbid a State to delay the imposition of a tax or tax increase, even as a hardship allowance for the crippling financial consequences of the pandemic.

To be sure, Treasury has purported to limit the scope of the tax mandate, including by allowing States to replace revenue reductions with spending cuts in "areas not being replaced by" ARPA money. *Coronavirus State and Local Fiscal Recovery Funds*, 86 Fed. Reg. at 26,808. But setting aside whether Treasury can cure constitutional infirmities in the statute, *see* Pltfs.' Mot. for Summ. J. 7, it is hard to see how Treasury's interpretation can be squared with ARPA's plain text (not to mention the fungible nature of money). And the interim rule ultimately creates more problems than it solves. Among other things, the rule dictates that States may not decrease their net tax revenues relative to their revenues in 2019—a baselines the agency imposes all the way through 2024. And the rule requires the States to provide a detailed accounting of their tax measures to ensure compliance with the mandate. That level of micromanaging a core sovereign function is unprecedented in the extreme. The only proper judicial course is to enjoin the provision.

I.   **The Tax Mandate Is An Unconstitutional Incursion On A Core Attribute Of State Sovereignty And An Impermissibly Coercive Condition On Federal Funds.**

1.   The power to tax or not to tax lies at the absolute core of sovereignty. Misguided taxes spurred the revolution that produced our Republic.  Our founding document includes multiple specifications of what both federal and state governments can and cannot tax.  U.S. Const. Art. I, §8, cl. 1; *id*. Art. I, §9, cl. 1, 4, 5; *id*. Art. I, §10, cl. 2; *id*. Amend. XVI.  And our earliest and greatest judicial decisions recognize that "the power to tax involves the power to destroy." *M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 431 (1819).

It is no surprise that the Supreme Court has recognized that the power to tax is "central to state sovereignty," *Dep't of Revenue v. ACF Indus., Inc.*, 510 U.S. 332, 345 (1994), and "indispensable to [the States'] existence," *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 199 (1824); *see also, e.g.*, *Bode v. Barrett*, 344 U.S. 583, 585 (1953); *Ohio*, 2021 WL 2712220, at *19.   Indeed, the "power of self government … cannot exist distinct from the power of taxation," *Providence Bank v. Billings*, 29 U.S. (4 Pet.) 514, 546, 548 (1830), which is the principal way in which a State "obtain[s] the means to carry on [its] respective government[]," *Dows v. City of Chi.*, 78 U.S. (11 Wall.) 108, 110 (1870).  Thus, it has been settled law from the earliest days of the Republic that a State "alone" may, "within its own jurisdiction," "judge and determine how, in what manner, and upon what objects that power shall

be exercised." *Billings*, 29 U.S. at 544. Simply put, it is difficult to conceive of a greater threat to the "integrity, dignity, and residual sovereignty of the States," *Bond v. United States*, 564 U.S. 211, 221 (2011), than the loss of their sovereign right to decide whether and how much to tax their citizens.

If anything, that core attribute of state sovereignty has taken on even greater importance in the wake of the Sixteenth Amendment, which empowers the federal government to tax the income of the States' citizenry. *See* U.S. Const. Amend. XVI. Taxing citizens is a zero-sum game. No matter how many sovereigns tax them, citizens cannot be taxed more than 100%, and they begin avoiding taxable activity at far lower rates. That makes the States' power to set their own tax policy in the shadow of the Sixteenth Amendment critical not only to their ability to sustain their own governments, but also to serve as a check on the federal government's own taxing power. States may not be able to stop the federal government from taxing the income their citizens produce. But at least States can try to alleviate the burden on their citizens by reducing their own reliance on tax revenues, especially when the federal government uses the tax revenues it collects from their citizenry to insert itself into functions traditionally left to the States (or even more perversely, redistributes federal tax revenues to States to spend on matters of traditional state concern). The States' ability to play this safety-valve role is critical to preserving

the framers' vision that a system of dual-sovereignty would enhance, rather than threaten, individual liberty. *See Bond*, 564 U.S. at 221.

Those bedrock tenets of federalism should suffice to resolve this case. Some matters are simply too close to the core of state sovereignty for the federal government to dictate their terms, even if those terms are framed as conditions. *See, e.g.*, *Coyle v. Smith*, 221 U.S. 559, 577 (1911) (holding unconstitutional effort to prevent Oklahoma from relocating its capitol as a condition of its admission to the Union). Just as it is not for the federal government to decide where a State should locate its capitol, it is not for the federal government to decide whether a State should lower or raise taxes. That Congress has purported to do so here as a condition on the receipt of federal funds (or, more aptly, federal tax revenues collected from the States' own citizens) makes no difference. As *Coyle* recognizes, some conditions reach so deeply into the core of state sovereignty that they are simply ultra vires even as conditions on funds.

That is clearly true of this unprecedented effort to dictate state tax policy. If the power to tax is indeed the power to destroy, then the federal government has no more business dictating what state governments may and may not tax than States have in taxing federal instrumentalities. If Congress determined that state income taxes were an impediment to federal-income-tax collection, it could not force States out of the income-tax enterprise, either directly or indirectly as a condition of a

tranche of federal funds. Indeed, where the Constitution puts certain revenue sources off-limits to States, it does so directly, as with Article I, Section 10's express prohibition on state taxes on imports and exports without Congress' consent. The idea that Congress itself could add another clause to Article I, Section 10, either directly or as a condition of federal funding, should be a non-starter. That likely explains why Congress has never before taken the extraordinary step of trying to dictate the States' taxing policy—itself a sure sign that Congress lacks the power to do so. *Cf. Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 230 (1995) (Congress' "prolonged reticence would be amazing if such interference were not understood to be constitutionally proscribed"); *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 505 (2010) ("Perhaps the most telling indication of the severe constitutional problem … is the lack of historical precedent.").

The intrusive effects of the tax mandate became even more apparent when the Secretary promulgated an interim final rule purporting to add post hoc clarity to the statute. *See Coronavirus State and Local Fiscal Recovery Funds*, 86 Fed. Reg. 26,786. Far from clarifying or narrowing the sweep of the tax mandate, the rule only highlights the extent of its intrusion on a core area of state sovereignty. The rule requires each State to perform a multi-step assessment every year of how the amount of funds received under ARPA compares to any reductions in the State's tax revenue. Each State must also "provide to the Secretary periodic reports providing *detailed*

11

*accounting* of the uses of funds, *all modifications* to a State or Territory's tax revenue sources, and such *other information* as the Secretary may require." *Id.* at 26,821 (emphasis added). And "the Secretary may request other additional information as may be necessary or appropriate." *Id.* In short, the rule confirms that the tax mandate gives the federal government unprecedented authority to micromanage the taxing power of the States.

The burdensome system of "accounting" is not the only way in which the interim final rule exacerbates the constitutional problems with the tax mandate. The rule requires States to measure a "reduction" in net tax revenue by reference to the 2019 fiscal year. Although Treasury justifies this requirement by describing 2019 as the "last full fiscal year prior to the COVID-19 public health emergency," the rule does not take account of all the many things that could transpire between 2021 and 2024 that make freezing in amber the 2019 fiscal year an especially burdensome and intrusive requirement. And tying recoupment to the year 2019 forces States to look to the past rather than the future in gauging their policy priorities. Thus, even if a State projects that a tax cut will increase its revenue in the long run, the State must weigh that benefit against the risk that one year's revenue will dip below the 2019 level and subject the State to a potential recoupment action. In short, the tax mandate and the interim final rule install Treasury in a supervisory capacity that is foreign to our system of federalism. *See Billings*, 29 U.S. at 544.

2.  On top of all that, ARPA's tax mandate suffers from the additional infirmity that it is impermissibly coercive.  As the Supreme Court reaffirmed in *NFIB*, when Congress offers federal funds to States on the condition that they enact or refrain from enacting certain policies, the condition is permissible only if the offer is voluntary not just in theory, but in fact.  *See* 567 U.S. at 577.  This remains true regardless of whether the condition is framed as a grant or a withdrawal of funds.  In either instance, the limitation is critical because, "[n]o matter how powerful the federal interest involved, the Constitution simply does not give Congress the authority to require the States to regulate."  *New York v. United States*, 505 U.S. 144, 178 (1992).  By effectively circumventing that rule, efforts to use the power of the federal purse to coerce States to do Congress' bidding "undermine the status of the States as independent sovereigns in our federal system."  *NFIB*, 567 U.S. at 577.  It is thus incumbent on courts to carefully "scrutinize" spending legislation to ensure that Congress is "not using financial inducements to exert a 'power akin to undue influence'" on the States.  *Id.* (quoting *Steward Mach. Co. v. Davis*, 301 U.S. 548, 590 (1937)).  Federal "pressure turns into compulsion" when States no longer have a "legitimate choice whether to accept the federal conditions in exchange for federal funds."  *Id.* at 577, 643.

There can be no serious question that ARPA is coercive.   In *NFIB*, the threatened "loss of over 10 percent of a State's overall budget" was "surely beyond"

the constitutional line. *Id*. at 582, 585. Here, the $195.3 billion available to States and the District of Columbia eclipses that by any measure. It is equivalent to a whopping *20%* of the annual state tax collections of state governments—including plaintiff States Kentucky and Tennessee, which each will receive amounts equal to roughly one fifth of their respective general fund revenues for the preceding year. *See* Pltfs.'Mot. for Summ. J. 31-32.[2] For some States, the impact is even greater. The money available to Arizona, for instance, is equivalent to about 40% of its general fund budget. *See* Complaint ¶11, *Arizona v. Yellen*, No. 2:21-cv-00514-DJH (filed Mar. 25, 2021). And in Mississippi, it is nearly 30% of its 2021 budget.[3] As in *NFIB*, the sheer amount of money at issue "leaves the States with no real option but to acquiesce." 567 U.S. at 582.

Numbers alone do not tell the whole story. Over the past year, the COVID-19 pandemic has forced the whole world to endure extreme economic hardship. Entire industries shut down for months on end, while others operated with reduced hours and customer capacities, all under the pressure of supply chain constraints. Thousands of Americans lost their jobs, had to forgo higher education, and have been crushed by medical bills related to COVID-19 treatments.

---

[2] Jared Walczak, *Four Questions Treasury Must Answer About the State Tax Cut Prohibition in the American Rescue Plan Act*, Tax Found. (Mar. 18, 2021), https://bit.ly/3cYu0YB.

[3] *How the COVID-19 Pandemic is Transforming State Budgets*, Urb. Inst. (June 25, 2021), https://urbn.is/3jsU9ni.

*Amici* have witnessed firsthand the economic devastation of the pandemic. Small businesses, in particular, have faced unprecedented economic hardship. In surveys of small business owners, 81% of participants reported losing sales opportunities because of a labor shortage.[4] More than half had employees take pandemic-related sick leave or family leave; 87% of those businesses reported at least some of that leave was paid leave.[5] The hospitality industry was also ravaged: At the beginning of this year, foodservice sales were down $240 billion from expected levels in 2020.[6] Nearly a third of all restaurant and hospitality workers lost their jobs in the first few months of the pandemic,[7] and many have yet to return.[8]

---

[4] *See* NFIB Res. Ctr., *Covid-19 Small Business Survey (18)* at 10 (June 30, 2021), https://bit.ly/3yMg4KD.

[5] *See* NFIB Res. Ctr., *Covid-19 Small Business Survey (17)* at 8-9 (Apr. 28, 2021), https://bit.ly/3ycOcyO.

[6] *See* Nat'l Restaurant Ass'n, *Restaurant Sales Fell to Their Lowest Level Since June* (Jan. 15, 2021), https://bit.ly/3d5gVwu; *see also* Alex Sherman, *Five Charts That Show How COVID-19 Stopped the U.S. Economy In Its Tracks*, CNBC (Mar. 11, 2021), https://cnb.cx/3cZ97O0.

[7] Erin Huffer & Aravind Boddupalli, *The Leisure & Hospitality Sector Has an Employment Crisis—and It Might Be Getting Worse*, Urb. Wire (July 20, 2020), https://urbn.is/397ptlz.

[8] *See* Nat'l Restaurant Ass'n, *49 States and DC Added Restaurant Jobs in May 2021* (June 24, 2021), https://bit.ly/3hn5jHA (restaurant employment in all but four states remains below its pre-pandemic level); Nat'l Restaurant Ass'n, *Restaurant Employment Fell for the Third Consecutive Month* (Feb. 5, 2021), https://bit.ly/31b0pG3 (nearly 450,000 restaurant jobs lost in the three months preceding February 2021); *State-by-State Job Loss: COVID-19 Continues to Devastate Hotel Industry*, Am. Hotel & Lodging Ass'n (Feb. 2021), https://bit.ly/3uG0H47 (hospitality industry unemployment rate 300% higher than rest of economy); Michael Ettlinger & Jordan Hensley, *Covid-19 Economic Crisis: By State*, Univ. of N.H. Carsey Sch. of Pub. Pol'y (June 29, 2021), https://bit.ly/3dBzklI (nationwide employment in the accommodation and food services industry is down 13.9% since last year).

More than 100,000 businesses of all stripes have permanently shuttered their doors,[9] and the country has lost more jobs since February 2020 than were lost during the Great Recession of December 2007 to June 2009.[10]

These economic hardships not only impact States' residents, but have a direct impact on States' budgets, many of which have faced dwindling tax revenues alongside rising healthcare costs and record unemployment claims.[11] Indeed, the pandemic was projected to slash state revenues by as much as $200 billion—nearly the exact same amount of money available under the Act.[12] Even in ordinary times, to refuse such a massive influx of tax dollars would be unthinkable; in these extraordinary times, to do so would border on unconscionable. The tax mandate

---

[9] Anne Sraders & Lance Lambert, *Nearly 100,000 Establishments That Temporarily Shut Down Due to the Pandemic Are Now Out of Business*, Fortune (Sept. 28, 2020), https://bit.ly/3t6dpci; Paul Davidson, *Vaccines Could Help Steady Economy; Yet Pandemic Isn't Over, Effects Are Likely to Linger*, USA Today at 3B (Dec. 31, 2020).

[10] Michael Ettlinger & Jordan Hensley, *supra* n.8; *see also* Congressional Rsch. Serv., *Global Economic Effects of COVID-19* at Fig. 19 (June 17, 2021), https://bit.ly/3AitAqJ (in none of sixteen measured sectors has the number of jobs lost in April 2020 been fully recovered); U.S. Bureau of Labor Statistics, *All Employees, Total Nonfarm [PAYEMS]*, retrieved from FRED, Fed. Rsrv. Bank of St. Louis (July 8, 2021), https://bit.ly/3dPMhbQ (total nonfarm employment in the United States is still more than 6.7 million jobs below its February 2020 level).

[11] *See* Anshu Siripurapu & Jonathan Masters, *How COVID-19 Is Harming State and City Budgets*, Council on Foreign Relations (Mar. 19, 2021), https://on.cfr.org/3f9vjqm; *see also* Stacey Barchenger, *States Have Billions of Dollars from the American Rescue Plan. Now They Have to Spend It*, NorthJersey.com (May 5, 2021), https://njersy.co/3jvHOi5 (reporting that the government of Maryland intends to spend more than 25% of its ARPA funds "to refill the state's unemployment trust fund and stabilize unemployment insurance tax rates").

[12] *See* Lucy Dadayan, *COVID-19 Pandemic Could Slash 2020-21 State Revenues by $200 Billion*, Tax Pol'y Ctr. (July 1, 2020), https://tpc.io/2NKE8M5.

thus should be seen—and rejected—as exactly what it is: an unconstitutional effort to strip States of their core sovereign right to determine their own tax policy.

## II.    Left Standing, The Tax Mandate Will Have Dire Consequences.

Not only is the tax mandate unconstitutional; its effective ban on *any* tax measure that reduces a State's net revenues also creates ongoing hardships for state and local governments, as well as businesses and citizens who rely on tax relief or other changes in tax policy to promote economic growth—especially in times like these.  As the Supreme Court has long recognized, any "delay" in a State's ability to enforce its tax policies "may derange the operations of government," causing "serious detriment to the public." *Dows*, 78 U.S. at 110.  That is as true today as it was 150 years ago.  If anything, the threat is even more pronounced at this critical juncture in our Nation's history because many of the policies States are pursuing or wish to pursue are designed to reduce the financial strain of the pandemic within their respective borders.  Indeed, many State legislatures recently passed measures specifically aimed at reducing tax burdens on businesses; many of these laws were designed to bolster small businesses and industries that have suffered substantial harm as the result of government-mandated closures and other restrictions.  The ability to reduce the tax burdens of these businesses is a critical tool for the States in

their efforts to restore economic vitality within their borders,[13] but to the extent those measures or others like them contribute to a reduction in net tax revenue, the States' ARPA funds may be in jeopardy.

For example, New Mexico recently passed a bill establishing a gross receipts tax deduction for food and beverage establishments, which were hit particularly hard by pandemic-related closures and restrictions. S.B. 1, 55th Leg., 1st Sess. (N.M. 2021). Maryland recently passed its own sweeping COVID-19 relief bill that, among other things, supports small businesses with a sales tax credit of up to $3,000 per month—a nearly $200 million commitment. S.B. 496, 442d Gen. Assemb., Reg. Sess. (Md. 2021). In May, Oklahoma reduced its corporate income tax rate by 2%. H.B. 2960, 58th Leg., Reg. Sess. (Okla. 2021). And California's recent relief law includes $2.1 billion for grants to small businesses impacted by the pandemic, as well as fee waivers for the nearly 60,000 restaurants and bars licensed throughout the State. *See* Office of Gov. Gavin Newsom, *Governor Newsom Signs Legislative Package Providing Urgent Relief to Californians Experiencing Pandemic Hardship* (Feb. 23, 2021), https://bit.ly/2Q6wXOU.

---

[13] *See* Jack M. Mintz, *Tax Policy and Fiscal Sustainability Post-Covid*, BloombergTax.com (Feb. 2, 2021), https://bit.ly/3641G47 (noting that "[c]urrent tax policy is supportive of households and businesses through deferrals or tax reductions as governments continue to deal with health restrictions," and a "first priority is to support private investment and improve productivity with corporate and personal tax rate reductions").

The States' efforts also reach far beyond the business community. New Mexico recently passed a $600 income tax rebate to families and individuals who receive the State's Working Families tax credit. S.B. 1, 55th Leg., 1st Sess. (N.M. 2021). And Maryland's relief law provides direct stimulus payments to low-income residents—a total of $178 million in relief to 400,000 Marylanders.[14] In addition, many States have recently enacted tax measures that have nothing to do with COVID-19 relief, but that are manifestly in the public interest. For instance, in their most recent legislative sessions, Georgia and Missouri extended tax credits for families who adopt a child out of foster care. *See* H.B. 114, 156th Gen. Assemb., Reg. Sess. (Ga. 2021); H.B. 429, 101st Gen. Assemb., 1st Reg. Sess. (Mo. 2021). Alabama established tax deductions for residents who purchase storm shelters to protect their families from tornadoes. *See* H.B. 227, 2021 Leg., Reg. Sess. (Ala. 2021). Montana increased its current education tax credit for families. *See* H.B. 279, 67th Leg., Reg. Sess. (Mont. 2021). And Arkansas enacted an exemption from taxation for sales at certain school events. H.B. 1023, 93rd Gen. Assemb., Reg. Sess. (Ark. 2021). Given its most natural construction, the tax mandate may implicate all of these measures.

To be sure, the federal government has tried to assure States that the mandate need not be read so broadly, and has purported to fix any ambiguity in the statutory

---

[14] *See* Office of Gov. Larry Hogan, The RELIEF Act of 2021, https://bit.ly/2O6yoMG.

language through the interim final rule.  But state and local officials remain unsure as to how they may permissibly exercise their own sovereign tax powers without risking a federal objection and recoupment action.  In a public comment submitted to the Treasury in late June, leadership on New Hampshire's House Ways and Means Committee indicated that the committee is "struggling with the implications of the tax provisions in ARPA."[15]  The State faces special confusion over the interaction of New Hampshire's "distinctive version of the corporate income tax" with the rule's carve-out for "income tax changes … that simply conform with recent changes in Federal law."[16]  And "questions about major timing issues" remain, regarding the measurement and collection of recoupment amounts.[17]  The Speaker of the House in Iowa has expressed similar hesitation, remarking that the State is being "cautious" with its policies to ensure that it is "not using" ARPA funds "in a way they're not intended."[18]  And in California, a local regulator expressed his confusion over ARPA, observing, "When we first got the ARPA, we were told it was going to be, 'You can use it for whatever you want … And then when we got the guidance we realized that

---

[15] Comment from Almy, Rep. Susan, *Coronavirus State and Local Fiscal Recovery Funds*, Regulations.gov (June 29, 2021), https://bit.ly/3Ae135X; 86 Fed. Reg. at 26,808.

[16] 86 Fed. Reg. at 26,808.

[17] Comment from Almy, Rep. Susan, *supra* n.15.

[18] Stacey Barchenger, *supra* n.11.

that's not really the case."[19]  The local mayor was similarly confused, declaring that the interim rule "unfortunately" created "more confusion" "instead of clarity."[20] Indeed, some governments have needed to enlist additional resources simply to try to interpret how they can spend the money.  In Ohio, local administrators told reporters last month that they were "waiting for a couple of law firms to come out with their interpretations" of the Treasury guidelines and that they were "expecting some seminars on the topic."[21]

The lack of clarity alone is a fatal problem, as Congress must impose any conditions on the States' receipt of federal funds "unambiguously[,] enabl[ing] the States to exercise their choice knowingly, cognizant of the consequences of their participation."  *South Dakota v. Dole*, 483 U.S. 203, 207 (1987); *see also Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006).[22]  But even setting

---

[19] Malea Martin, *As Cities Await Finalized American Rescue Plan Act Guidelines, Some Funding Decisions Remain in Limbo*, Santa Maria Sun (June 16, 2021), https://bit.ly/3qHcn5S.

[20] *Id.*

[21] Linda Gandee, *Avon to Receive Almost $4.6 Million From the American Rescue Plan Act of 2021*, Cleveland.com (June 14, 2021), https://bit.ly/2TiSwy1.

[22] The requirement that Congress legislate unambiguously "derives largely from analogy to contract law": "the legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of th[at] contract." *Ohio*, 2021 WL 2712220, at *12 (quoting *Sch. Dist. of Pontiac v. Sec'y of U.S. Dep't of Educ.*, 584 F.3d 253, 276-77 (6th Cir. 2009) (en banc) (opinion of Cole, J.) (alteration in original)).  As the Southern District of Ohio explained when enjoining the mandate, under those standards, the "ambiguity at issue here is a particularly troubling type of ambiguity," as it "may disincentivize [the State legislature] from considering *any* reduction in rates as to *any* state tax." *Id.* at *12, *15.  "That is the type of federal invasion of state sovereignty that Spending Clause jurisprudence disfavors." *Id.* at 15.

21

aside the ambiguity problem—which, far from curing, the interim rule compounds—States do not have time to wait for Treasury to engage in trial and error over the meaning of the statute. States are confronted with pressing public policy issues now. For example, Alabama's storm-shelter law has taken on increased importance after a tornado devastated part of the State earlier this year. And New York's new "return-to-work" tax credit of $5,000 per new employee for restaurant owners seeks to directly address the staffing difficulties in the restaurant industry. S.B. 2500, 2021 Leg., Reg. Sess. (N.Y. 2021). These States and many others need a clear understanding of what limits the federal government has purported to put on how they can exercise their sovereign prerogative to reduce taxes.

It is difficult to see how the federal government has any legitimate interest in prohibiting States from lowering the tax burden on their residents, businesses, and entrepreneurs. "Congress may not impose conditions 'unrelated to the federal interest' in enacting spending legislation." *See Ohio*, 2021 WL 2712220, at *11 (quoting *Sch. Dist. of Pontiac*, 584 F.3d at 284 (Sutton, J., concurring)). And the public has no interest in enforcing an unconstitutional statute. *See Mich. Bell Tel. Co. v. Engler*, 257 F.3d 587, 600 (6th Cir. 2001). To the contrary, "issuing the requested injunction will promote the public interest" because "the limitations on Congress's ability to use its Spending Clause authority to make funding offers to the

States are designed to protect this country's dual-sovereign structure, which in turn is meant to promote individual liberty." *Ohio*, 2021 WL 2712220, at *21.

But even assuming some countervailing federal interest may exist, the balance of equities would plainly weigh in favor of injunctive relief. The tax mandate was an eleventh-hour addition to the bill, with no formal legislative history to speak of.[23] Congress did not even bother to explain why it chose to rush in where two centuries of previous Congresses feared to tread. The whole point of ARPA is to provide economic relief to critical sectors of American society that were hit especially hard by the pandemic. *See* Pub. L. No. 117-2, §9901(c)(1)(A); Press Release, *President Biden Announces American Rescue Plan*, White House (Jan. 20, 2021), https://bit.ly/3f4S5Qe. Tax relief is an obvious means of achieving that policy objective, yet Congress placed it off limits. *Cf. City of Phila. v. Sessions*, 280 F.Supp.3d 579, 657 (E.D. Pa. 2017) (finding it meaningful that requiring the city to forgo funds would prevent the city from addressing the opioid epidemic, which the Trump Administration had described as "a major public health crisis"). And that is to say nothing of how Congress could possibly have an interest in halting myriad non-COVID-19-related tax measures that undoubtedly will benefit Americans and

---

[23]    *See* Patrick Gleason, *How Senator Joe Manchin's Move To Block Tax Relief in His Own State Costs All U.S. Taxpayers*, Forbes (Mar. 16, 2021), https://bit.ly/31vV782.

American businesses at a time when they need it most. In short, even assuming there are some equities on the other side of the ledger, the balance is not even close.

## CONCLUSION

For the reasons set forth above, this Court should grant Plaintiffs' motion for summary judgment.

Respectfully submitted,

s/Paul D. Clement
PAUL D. CLEMENT
ERIN E. MURPHY
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue NW
Washington, DC 20004
(202) 389-5000
paul.clement@kirkland.com

*Counsel for Amici Curiae Chamber of Commerce of the United States of America and National Federation of Independent Business Small Business Legal Center*

July 12, 2021

**CERTIFICATE OF SERVICE**

I hereby certify that on this 12th day of July, 2021, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Eastern District of Kentucky using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


s/Paul D. Clement
Paul D. Clement