## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## CENTRAL DIVISION AT FRANKFORT

*Electronically filed*

**COMMONWEALTH OF KENTUCKY**

and

**STATE OF TENNESSEE**

    *Plaintiffs*

v.

**JANET YELLEN**, in her official capacity as Secretary of the Treasury, *et al.*,

    *Defendants*

Hon. Gregory F. Van Tatenhove
Civil Action No. 3:21-cv-0017

---

## PLAINTIFFS' COMBINED REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO DEFENDANTS' MOTION TO DISMISS OR FOR SUMMARY JUDGMENT

---

Plaintiffs, the Commonwealth of Kentucky and the State of Tennessee, by and through Attorney General Daniel Cameron and Attorney General and Reporter Herbert H. Slatery III, submit the following combined reply in support of their motion for summary judgment and response to the Defendants' motion to dismiss or for summary judgment.

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................. ii

TABLE OF AUTHORITIES ........................................................................... iii

ARGUMENT .................................................................................................. 1

    I.     The Plaintiff States have standing to challenge the Tax Mandate. ......................................................................................... 1

        A. The Tax Mandate intrudes on state taxing authority ....................... 1

        B. The Tax Mandate imposes administrative burdens. .......................... 7

        C. The States may bring a preenforcement challenge. ......................... 10

        D. This case is ripe. ............................................................................ 12

    II.    The Tax Mandate Violates the Spending Clause. ............................. 13

        A. The Tax Mandate is unconstitutionally ambiguous. ........................ 14

        B. The Tax Mandate is not reasonably related to the federal interest in passing the Rescue Plan. ................................................ 20

        C. The Tax Mandate is unconstitutionally coercive. ............................ 23

    III.   The Tax Mandate violates the anticommandeering doctrine. ......................................................................................... 26

    IV.   The Court should permanently enjoin the Tax Mandate. ................ 27

CONCLUSION ............................................................................................. 29

# TABLE OF AUTHORITIES

**Cases**

*Abbott v. Perez,*
    138 S. Ct. 2305 (2018) ........................................................................... 29

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.,*
    141 S. Ct. 2320 (2021) (Mem.) (Kavanaugh, J., concurring) ................................ 19

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n,*
    576 U.S. 787 (2015) ............................................................................... 5

*Arizona v. Yellen,*
    No. 21-cv-514, 2021 WL 3089103 (D. Ariz. July 22, 2021) ...................................... 3

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy,*
    548 U.S. 291 (2006) .................................................................... 14, 17, 18

*Babbitt v. United Farm Workers Nat. Union,*
    442 U.S. 289 (1979) ......................................................................... 11, 12

*Baptist Mem'l Hosp. - Golden Triangle, Inc. v. Azar,*
    956 F.3d 689 (5th Cir. 2020) ..................................................................... 19

*Bell v. New Jersey,*
    461 U.S. 773 (1983) ........................................................................ 3, 11

*Bennett v. Kentucky Dep't of Educ.,*
    470 U.S. 656 (1985) ......................................................................... 11, 22

*Bennett v. New Jersey,*
    470 U.S. 632 (1985) ............................................................................ 11

*Blum v. Bacon,*
    457 U.S. 132 (1982) ............................................................................ 18

*Bond v. United States,*
    564 U.S. 211 (2011) ............................................................................. 6

*California v. Texas,*
    141 S. Ct. 2104 (2021) ...................................................................... 1, 8, 9

*Carter v. Welles-Bowen Realty, Inc.,*
    736 F.3d 722 (6th Cir. 2013) ................................................................. 19, 20

*Children's Hosp. Ass'n of Tex. v. Azar,*
  933 F.3d 764 (D.C. Cir. 2019) ............................................................ 19

*City of Chicago v. Fulton,*
  141 S. Ct. 585 (2021) .......................................................................... 15

*City of Cleveland v. Ohio,*
  508 F.3d 827 (6th Cir. 2007) .............................................................. 18

*City of Los Angeles v. Barr,*
  929 F.3d 1163 (9th Cir. 2019) ............................................................ 19

*Coyle v. Smith,*
  221 U.S. 559 (1911) ...................................................................... 26, 27

*Dep't of Com. v. New York,*
  139 S. Ct. 2551 (2019) .......................................................................... 9

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) .............................................................................. 3

*FDA v. Brown & Williamson Tobacco Corp.,*
  529 U.S. 120 (2000) ............................................................................ 20

*Harris v. Olszewski,*
  442 F.3d 456 (6th Cir. 2006) .............................................................. 18

*Honeycutt v. United States,*
  137 S. Ct. 1626 (2017) ........................................................................ 15

*Irving Indep. Sch. Dist. v. Tatro,*
  468 U.S. 883 (1984) ............................................................................ 18

*Japan Whaling Ass'n v. Am. Cetacean Soc.,*
  478 U.S. 221 (1986) .............................................................................. 6

*King v. Burwell,*
  576 U.S. 473 (2015) ............................................................................ 20

*Layne Cnty. v. Oregon,*
  74 U.S. (7 Wall) 71 (1868) .................................................................. 27

iv

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992) ..................................................................... 1, 12

*M'Culloch v. Maryland,*
   17 U.S. (4 Wheat.) 316 (1819) ................................................. 27

*Martin-Marietta Corp. v. Bendix Corp.,*
   690 F.2d 558 (6th Cir. 1982) ................................................. 28

*Massachusetts ex rel. Exec. Off. of Health & Hum. Servs. v. Sebelius,*
   701 F. Supp. 2d 182 (D. Mass. 2010) ..................................... 11

*Massachusetts v. E.P.A.,*
   549 U.S. 497 (2007) ..................................................................... 5

*Massachusetts v. Mellon,*
   262 U.S. 447 (1923) ............................................................ 4, 5, 6

*Missouri v. Yellen,*
   No. 4:21-cv-376, 2021 WL 1889867 (E.D. Mo. May 11, 2021) ................................... 2

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
   567 U.S. 519 (2012) ......................................................... passim

*New York v. United States,*
   505 U.S. 144 (1992) ........................................................ 5, 12, 18

*Ohio v. Yellen,*
   No. 1:12-cv-181, 2021 WL 1903908 (S.D. Ohio May 12, 2021) ............................... 29

*Ohio v. Yellen,*
   No. 1:21-cv-181, 2021 WL 2712220 (S.D. Ohio July 1, 2021) ...................... passim

*Parker v. District of Columbia,*
   478 F.3d 370 (D.C. Cir. 2007) ................................................... 3

*Pennsylvania ex rel. Shapp v. Kleppe,*
   533 F.2d 668 (D.C. Cir. 1976) ................................................... 5

*Pennsylvania v. West Virginia,*
   262 U.S. 553 (1923) ................................................................... 6

*Petit v. U.S. Dep't of Educ.,*
   675 F.3d 769 (D.C. Cir. 2012) ................................................. 19

*Planned Parenthood of Greater Ohio v. Hodges,*
   917 F.3d 908 (6th Cir. 2019) (en banc) ................................................................ 12

*Rimini St., Inc. v. Oracle USA, Inc.,*
   139 S. Ct. 873 (2019) ............................................................................................ 15

*Sabri v. United States,*
   541 U.S. 600 (2004) .............................................................................................. 24

*Sch. Dist. of Pontiac v. Sec'y of U.S. Dep't of Educ.,*
   584 F.3d 253 (6th Cir. 2009) (en banc) ................................................... 11, 17, 29

*Sierra v. City of Hallandale Beach,*
   996 F.3d 1110 (11th Cir. 2021) .............................................................................. 5

*Snider v. Creasy,*
   728 F.2d 369 (6th Cir. 1984) ................................................................................ 18

*South Dakota v. Dole,*
   483 U.S. 203 (1987) .......................................................................................... 5, 12

*Susan B. Anthony List v. Driehaus,*
   573 U.S. 149 (2014) ....................................................................................... passim

*TransUnion LLC v. Ramirez,*
   141 S. Ct. 2190 (2021) ............................................................................................ 8

*United States v. Miami Univ.,*
   294 F.3d 797 (6th Cir. 2002) ................................................................................ 18

*United States v. Supreme Court of New Mexico,*
   839 F.3d 888 (10th Cir. 2016) .............................................................................. 12

*Va. Dep't of Educ. v. Riley,*
   106 F.3d 559 (4th Cir. 1997) (en banc) (per curiam) ............................................ 19

*Virginia v. Am. Booksellers Ass'n,*
   484 U.S. 383 (1988) ....................................................................................... passim

*West Virginia v. U.S. Dep't of Treasury,*
   No. 7:21-cv-465, 2021 WL 2952863 (N.D. Ala. July 14, 2021) ............................ 10

*Westside Mothers v. Olszewski*,
    454 F.3d 532 (6th Cir. 2006) ................................................................ 18

*Whitman v. Am. Trucking Ass'ns.*,
    531 U.S. 457 (2001) ........................................................................... 20

*Zivotofsky ex rel. Zivotofsky v. Clinton*,
    566 U.S. 189 (2012) ............................................................................. 6

## Statutes

20 U.S.C. § 1415(i)(3)(B) ......................................................................... 18

42 U.S.C. § 802(c)(1)(C) .......................................................................... 16

42 U.S.C. § 802(c)(2)(A) ...................................................................... 8, 20

42 U.S.C. § 802(d)(2) ................................................................................ 9

42 U.S.C. § 802(e) .................................................................................... 1

## Other Authorities

Anthony J. Bellia Jr., *Article III and the Cause of Action*,
    89 Iowa L. Rev. 777 (2004) ..................................................................... 6

Maurice Finkelstein, *Judicial Self-Limitation*,
    37 Harv. L. Rev. 338 (1924) .................................................................... 6

Richard A. Epstein, *Standing and Spending–The Role of
    Legal and Equitable Principles*, 4 Chap. L. Rev. 1 (2001) ......................... 6

The Federalist No. 32 (A. Hamilton) ........................................................ 29

The Federalist No. 45 (J. Madison) .......................................................... 29

## Rules

Fed. R. Civ. P. 56(e)(2) ............................................................................. 1

**Regulations**

31 C.F.R. § 35.1 ............................................................................................ 9

31 C.F.R. § 35.3, 35.8(b)(2) ........................................................................ 9

31 C.F.R. § 35.3, 35.8(b)(3) ........................................................................ 9

31 C.F.R. § 35.4(c) ...................................................................................... 9

31 C.F.R. § 35.6 .......................................................................................... 7

31 C.F.R. § 35.6(b)(10) ............................................................................... 7

86 Fed. Reg. 26,786 (May 17, 2021) ............................................. 7, 8, 9, 12

## ARGUMENT

### I.   The Plaintiff States have standing to challenge the Tax Mandate.

For the most part, the Defendants do not dispute that intrusion on state taxing authority and increased administrative burdens count as Article III injuries. Instead, they mainly argue that the Tax Mandate (as interpreted by Treasury) does not inflict those injuries, or that any such injuries are not imminent because Treasury has not yet tried to enforce the Tax Mandate.

Those arguments misunderstand the relevant inquiries. The States are injured by having to comply with the Tax Mandate. Complying with the Tax Mandate will at least "arguably" limit their authority over state tax policy, *see Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 162–63 (2014), and it will certainly cost them time and money. And unlike in *California v. Texas*, 141 S. Ct. 2104 (2021), noncompliance is not an option because the Tax Mandate is backed with a credible threat of enforcement: recoupment under 42 U.S.C. § 802(e). This is a classic case for preenforcement review, and the Defendants' contrary arguments lack merit.[1]

### A.   The Tax Mandate intrudes on state taxing authority.

The Defendants all but concede that the States would be injured if the Tax Mandate intruded on their taxing authority. [Defs.' Mot. at 13 (agreeing that a State's

---

[1] The States satisfied their burden to allege standing in their complaint and to support those allegations with evidence. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); [Am. Comp., R. 23, ¶ 12; Niknejad Decl., R. 25-2, ¶¶ 1–17; Eley Decl., R. 25-3 ¶¶ 1–10]. The Defendants have not disputed those allegations or evidence, instead arguing only that they are legally insufficient to establish standing. [Defs.' Mot. 8–15]. Accordingly, this Court should accept the States' evidence as undisputed. *See* Fed. R. Civ. P. 56(e)(2).

1

loss of lawmaking "authority" is a "concrete injur[y]"); *id.* at 14 (agreeing that States should be free to set tax policy without federal interference)]. But they argue that the Tax Mandate has not done so because it merely restricts how States *use* federal funds, without otherwise "narrow[ing] any state policymaking options." [*Id.* at 14; *see also id.* at 13 n.3]. Apart from that argument, the Defendants offer no basis to distinguish the many cases holding that intrusion on a State's lawmaking authority is an Article III injury. [*Id.* at 12–14].

The notion that the Tax Mandate merely restricts the *use* of federal funds is suspect for all the reasons explained in the States' motion for summary judgment. [Pls.' Mot. at 20–21, 29–30]. But more importantly, all that matters for standing purposes is whether the Tax Mandate at least "arguably proscribe[s]" desired state tax policies. *Susan B. Anthony List*, 573 U.S. at 162–63 (cleaned up); *see also Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392 (1988) (assuming the plaintiffs' "interpretation of the statute [was] correct" for purposes of assessing their standing to challenge the statute). There is plainly a reasonable *argument* that the Tax Mandate proscribes some state tax policies, [Pls.' Mot. at 20–21, 29–30; Amici Br., R. 34, at 3, 6–7], including policies that Tennessee wants to pursue, [Pls.' Mot. at 11–13, 15 n.2]. That is all precedent requires. *Susan B. Anthony List*, 573 U.S. at 163. *Contra Missouri v. Yellen*, No. 4:21-cv-376, 2021 WL 1889867, at *4 (E.D. Mo. May 11, 2021) (uncritically adopting the Defendants' reading of the Tax Mandate and failing to consider whether the Tax Mandate at least "arguably" restricts state tax policy).

Even if the Tax Mandate did not proscribe desired state tax policies, it still disrupts the States' budgetary and legislative processes. [Pls.' Mot. at 16]. That harm also counts as an Article III injury. *See Ohio v. Yellen*, No. 1:21-cv-181, 2021 WL 2712220, at *7–8 (S.D. Ohio July 1, 2021) (holding that interference with Ohio's budgetary and legislative processes was sufficient to preserve a live case or controversy); *Arizona v. Yellen*, No. 21-cv-514, 2021 WL 3089103, at *4 (D. Ariz. July 22, 2021) (agreeing that this injury "makes sense" but concluding that Arizona (unlike Tennessee, [Niknejad Decl., R. 25-2, ¶¶ 13–17]) "offered no concrete facts" to substantiate the injury). And the harm exists right now. [Niknejad Decl., R. 25-2, ¶¶ 13–17]. The Defendants do not contend otherwise. Indeed, they have nothing to say about this injury.

The decisions the Defendants cite to suggest that funding conditions never implicate state sovereignty are inapposite. In *Bell v. New Jersey*, 461 U.S. 773 (1983), the funding conditions were "admittedly valid," which meant "the State had no sovereign right to retain funds without complying with those conditions." *Id.* at 791. But the opposite conclusion follows if, as the States claim, a funding condition is constitutionally *invalid*. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 577–78 (2012) (op. of Roberts, C.J.) ("*NFIB*"). And importantly, "a federal court must assume *arguendo* the merits of [a plaintiff's] legal claim" when assessing standing. *Parker v. District of Columbia*, 478 F.3d 370, 377 (D.C. Cir. 2007), *aff'd sub nom. District of Columbia v. Heller*, 554 U.S. 570 (2008). *Contra Arizona*, 2021 WL 3089103, at *2–4

3

(erroneously conflating standing with the merits when analyzing injuries based on harm to state sovereignty and compliance costs).

*Massachusetts v. Mellon*, 262 U.S. 447 (1923), is similarly inapposite. There, Massachusetts challenged Spending Clause legislation that offered federal funds to States that agreed to implement a federal health program for mothers and infants. *Id.* at 479. Massachusetts did not challenge any specific funding condition in the law. *Id.* at 479–80. It instead claimed that the entire law was "a usurpation of power not granted to Congress by the Constitution—an attempted exercise of the power of local self-government reserved to the states by the Tenth Amendment." *Id.* at 479. In other words, Massachusetts claimed that Congress was attempting to regulate indirectly (through the Spending Clause) matters it could not regulate directly under its enumerated powers, thereby invading the sovereign province of the States. *See id.* at 479–80; 482–83. The Supreme Court rejected that claim as nonjusticiable. *Id.* at 484–85. But *Mellon* does not preclude standing here for at least four reasons.

First, the Spending Clause legislation in *Mellon* did not require Massachusetts to surrender any of its lawmaking authority as a condition of accepting federal funds. It merely required funding recipients to help implement a federal health program— that is, to "share . . . the field of state power" with Congress. *Id.* at 485. Massachusetts remained free to enact whatever laws it wished to address maternal and infant health without risking the loss of funds. By contrast, the Tax Mandate narrows the range of permissible tax policies that funding recipients may enact, which infringes on state lawmaking authority.

4

Second, the Supreme Court has since limited *Mellon* to its facts because it is "hard to reconcile" with later decisions where States had standing based on injuries to their sovereign interests. *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 802 n.10 (2015) (collecting decisions) (citation omitted); *see also Massachusetts v. E.P.A.*, 549 U.S. 497, 520 n.17 (2007). Relatedly, the Court has adjudicated multiple post-*Mellon* Spending Clause challenges brought by States to vindicate their sovereign authority under the Constitution, with no suggestion that the States lacked standing. *See, e.g.*, *NFIB*, 567 U.S. at 540, 542 (States claimed that federal law invaded their Tenth Amendment powers); *New York v. United States*, 505 U.S. 144, 154, 171–73 (1992) (same); *South Dakota v. Dole*, 483 U.S. 203, 205–06 (1987).

Third, the Supreme Court's narrowing of *Mellon* over time makes sense because *Mellon* predates modern standing doctrine. Today, Article III standing is entirely distinct from the merits. *See, e.g.*, *Ariz. State Legislature*, 576 U.S. at 800. But "*Mellon* was decided in a far different era when standing was limited to the vindication of 'legal rights.'" *Pennsylvania ex rel. Shapp v. Kleppe*, 533 F.2d 668, 682 (D.C. Cir. 1976) (Lumbard, J., dissenting); *see also Sierra v. City of Hallandale Beach*, 996 F.3d 1110, 1123–26, 1131–32 (11th Cir. 2021) (Newsom, J., concurring). For that reason, *Mellon* unsurprisingly conflated standing (as the term is now understood) with the merits: because Spending Clause legislation is generally constitutional (subject to certain limits), the Court concluded that "the powers of the State are not invaded" (as a general matter) by Spending Clause statutes. 262 U.S. at 480; *see also* Anthony

5

J. Bellia Jr., *Article III and the Cause of Action*, 89 Iowa L. Rev. 777, 826 (2004) (explaining that *Mellon* "is illustrative" of the earlier era in which standing was not "distinct from" the merits). But the fact that *Mellon* couched its merits conclusion in jurisdictional terms in 1923 does not preclude States today from enforcing the "limits on Congress's power under the Spending Clause." *E.g.*, *NFIB*, 567 U.S. at 576 (op. of Roberts, C.J.); *cf. Bond v. United States*, 564 U.S. 211, 217–20 (2011) (rejecting language in an earlier decision as "neither controlling nor instructive on the issue of standing as that term is now defined and applied" because the earlier decision, like *Mellon*, "conflat[ed]" standing with the merits).

Fourth, and finally, *Mellon* also conflated standing with the political question doctrine. 262 U.S. at 483; *see also* Richard A. Epstein, *Standing and Spending–The Role of Legal and Equitable Principles*, 4 Chap. L. Rev. 1, 32 (2001) (*Mellon* "confuses standing with political question"). Contemporaneous observers understood *Mellon* as an application of the political question doctrine, not standing. *See* Maurice Finkelstein, *Judicial Self-Limitation*, 37 Harv. L. Rev. 338, 360 (1924) (explaining that *Mellon* involved "a political question with which the court cannot interfere"); *Pennsylvania v. West Virginia*, 262 U.S. 553, 609 (1923) (same). But the Supreme Court has since clarified that the political question doctrine occupies a "narrow" field, *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 195 (2012), and that "not every matter touching on politics is a political question," *Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221, 229 (1986). Deciding whether a funding condition is constitutional "is a familiar judicial exercise," *Zivotofsky*, 566 U.S. at 196, as the Supreme Court's

Spending Clause cases make clear, *e.g.*, *NFIB*, 567 U.S. at 576–85 (op. of Roberts, C.J.) (collecting cases). Such cases do not present political questions, so *Mellon* poses no barrier to reaching the merits here.

### B.     The Tax Mandate imposes administrative burdens.

The Defendants' assertion that the States "identify no immediate monetary benefit that would result from enjoining" the Tax Mandate is puzzling. [Defs.' Mot. at 13 n.4]. The States presented undisputed evidence that complying with the Tax Mandate will cost them time and money. [Pls.' Mot. at 17–18; Eley Decl., R. 25-3, ¶¶ 5–10]. Enjoining the Tax Mandate would save the States time and money because they would no longer have to comply with it. The detailed declaration the States submitted, [Eley Decl., R. 25-3, ¶¶ 5–10], refutes the assertion that they "have not substantiated" their compliance costs. [Defs.' Mot. at 15].[2]

Unable to factually contest the States' pocketbook injury, the Defendants ask this Court to hold that compliance costs do not count as an Article III injury in Spending Clause cases. [Defs.' Mot. at 14]. But there is no Spending Clause exception to the law of Article III standing. *Cf. TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2207 n.3

---

[2] The Interim Final Rule (but not the statute) permits States to use Rescue Plan funds for certain "[a]dministrative costs associated with [their] COVID-19 public health emergency assistance programs . . . that are not federally funded." 31 C.F.R. § 35.6(b)(10). But that provision does not cover the administrative costs necessary to comply with the Tax Mandate itself. [*See* Eley Decl., R. 25-3, ¶¶ 5–10]. The Defendants are incorrect to suggest otherwise. [Defs.' Mot at 15 (citing 86 Fed. Reg. 26,786, 26,822 (May 17, 2021) (codified at 31 C.F.R. § 35.6))].

Moreover, the idea that the Tax Mandate will not impose compliance costs, [*see id.*], is belied by Treasury's own calculations in the Interim Final Rule, which forthrightly estimates the time and expense necessary for certain compliance activities as required by the Paperwork Reduction Act. 86 Fed. Reg. at 26,818.

(2021) (rejecting a novel approach to standing in favor of established doctrine). Lost time and money injure Spending Clause plaintiffs just like every other plaintiff. *See id.* at 2204 (describing "monetary harms" as among the "most obvious" Article III injuries). The cases the Defendants cite do not say otherwise. Nor do those cases identify administrative enforcement proceedings as the exclusive forum for "addressing a State's challenge to grant conditions." [Defs.' Mot. at 14].

The States' pocketbook injury satisfies the traceability requirement of standing for two independent reasons. [*Contra id.*]. First, some of the compliance costs are traceable directly to the challenged provision, 42 U.S.C. § 802(c)(2)(A). *Cf. California*, 141 S. Ct. at 2119. As Tennessee's Commissioner of Finance and Administration explained, it will cost the State time and money to attempt compliance with that provision's ambiguous prohibition against using Rescue Plan funds to "directly or indirectly offset a reduction in the net tax revenue"—costs the State would not incur but for the Tax Mandate. [Eley Decl., R. 25-3, ¶¶ 5–6, 10].

Second, the compliance costs arising from other statutory and regulatory provisions implementing the Tax Mandate are still traceable to the Defendants' "allegedly unlawful conduct." *California*, 141 S. Ct. at 2113. The allegedly unlawful conduct here is the enforcement of an unconstitutional statute, which includes regulatory action implementing that statute. *See* 31 C.F.R. § 35.1 (explaining that the Interim Final Rule "implements" the Tax Mandate). And unlike in *California v. Texas*, the costly reporting and calculation requirements imposed by other provisions of the chal-

8

lenged statute and its implementing regulations "would not operate without" the allegedly unconstitutional provision. 141 S. Ct. at 2119. Without the Tax Mandate, there would be no reason for the States to report "all modifications to [their] tax revenue sources" to Treasury, 42 U.S.C. § 802(d)(2); 31 C.F.R. § 35.4(c), or to annually adjust their "baseline" tax revenues for inflation "using the Bureau of Economic Analysis's Implicit Price Deflator for the gross domestic product of the United States," 31 C.F.R. §§ 35.3, 35.8(b)(2)–(3); [*see* Eley Decl., R. 25-3, ¶¶ 3–4, 7, 9]. Treasury expressly imposed these requirements "[t]o facilitate the implementation of" the Tax Mandate. 86 Fed. Reg. 26,786, 26,810 (May 17, 2021); *see also id.* at 26,807. Thus, these statutory and regulatory requirements do not "operate independently" of the Tax Mandate and may be considered in assessing standing. *California*, 141 S. Ct. at 2119–20.

One final point on financial harm. When a State claims that government action will inflict financial harm, the State need not show that it intends to engage in conduct "arguably affected with a constitutional interest" but "arguably proscribed by the statute" to have standing. *Susan B. Anthony List*, 573 U.S. at 161–62 (cleaned up). Instead, a State need only show that "there is a substantial risk that the [financial] harm will occur" and that a ruling in its favor "would redress that harm." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2565 (2019) (cleaned up) (holding that States had standing based on likelihood of future financial harm without analyzing the first two *Susan B. Anthony List* factors). As explained below, the States plainly have standing under *Susan B. Anthony List*. But they also independently have standing under *Department of Commerce* based on the financial harm the Tax Mandate inflicts,

9

a harm that would be redressed if this Court declares the Tax Mandate unconstitutional and enjoins its enforcement.

### C.    The States may bring a preenforcement challenge.

As should be clear by now, the States easily satisfy the test for preenforcement challenges. They have shown an intention to engage in conduct that is arguably protected by the Constitution and arguably proscribed by the Tax Mandate, and that there is a credible threat of enforcement. *Susan B. Anthony List*, 573 U.S. at 161–67.

The Defendants do not dispute that the States' authority over tax policy is at least arguably protected by the Constitution or that the States intend to exercise that authority. They argue only that the Tax Mandate does not intrude on that authority. [Defs.' Mot. at 8–9]. But as discussed, what matters is whether the Tax Mandate at least "arguably" intrudes on state taxing authority. *Susan B. Anthony List*, 573 U.S. at 162–63. The question is plainly "arguable," as shown by the decisions of two other district courts concluding that the Tax Mandate does just that. *See West Virginia v. U.S. Dep't of Treasury*, No. 7:21-cv-465, 2021 WL 2952863, at *7 (N.D. Ala. July 14, 2021) (concluding that the Tax Mandate intrudes on state taxing authority "based on a plain reading of the . . . Tax Mandate"); *Ohio*, 2021 WL 2712220, at *7–8 (concluding that the Tax Mandate interferes with Ohio's ability "to exercise its sovereign taxing power"); *id.* at *15 (concluding that "essentially any reduction in the rate of any one or more state taxes" could implicate the Tax Mandate). Moreover, the Court must assume that the States' "interpretation of the [Tax Mandate] is correct" for purposes of assessing standing. *Am. Booksellers Ass'n*, 484 U.S. at 392. *Contra Missouri*, 2021

10

WL 1889867, at *4 (failing to do this). The States satisfy the first two requirements under *Susan B. Anthony List*.

The States also satisfy the third requirement: a credible threat of enforcement. *Susan B. Anthony List*, 573 U.S. at 164–67. "Most obviously," *id.* at 164, the federal government has a history of enforcing federal funding conditions against the States, *see, e.g.*, *Bennett v. Kentucky Dep't of Educ.*, 470 U.S. 656, 658 (1985); *Bennett v. New Jersey*, 470 U.S. 632, 636 (1985); *Bell*, 461 U.S. at 775–77; *Sch. Dist. of Pontiac v. Sec'y of U.S. Dep't of Educ.*, 584 F.3d 253, 278 (6th Cir. 2009) (en banc) (Sutton, J., concurring); *Massachusetts ex rel. Exec. Off. of Health & Hum. Servs. v. Sebelius*, 701 F. Supp. 2d 182, 184 (D. Mass. 2010). True, Treasury has not yet enforced the Tax Mandate, but that is only because the law is brand new and the States are just beginning to receive their Rescue Plan funds. Treasury "has not suggested that the newly enacted law will not be enforced, and [there is] no reason to assume otherwise." *Am. Booksellers Ass'n*, 484 U.S. at 393; *see also Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 302 (1979) (plaintiffs had standing even though the challenged law "ha[d] not yet been applied" to their conduct). To the contrary, Treasury has vigorously defended the law in litigation and has promulgated an extensive regulation detailing how it intends to enforce the law, including through recoupment proceedings. 86 Fed. Reg. at 26,807–12. For these reasons, the prospect of future enforcement is not "imaginary or wholly speculative." *Susan B. Anthony List*, 573 U.S. at 160 (quoting *Babbitt*, 442 U.S. at 302). The States are "not without some reason" to fear

enforcement of the Tax Mandate, which is all Article III requires. *Babbitt*, 442 U.S. at 302.

A contrary conclusion would be in tension with the Supreme Court's repeated merits adjudications of States' preenforcement challenges to Spending Clause legislation. *See, e.g.*, *NFIB*, 567 U.S. at 540, 542; *New York*, 505 U.S. at 154, 171–73; *South Dakota*, 483 U.S. at 205–06. It would also clash with the settled principle that recipients of government funds have standing to bring preenforcement challenges to allegedly unconstitutional conditions on the receipt of those funds. [Pls.' Mot. at 15–16]; *see also Planned Parenthood of Greater Ohio v. Hodges*, 917 F.3d 908, 910–11, 916–17 (6th Cir. 2019) (en banc) (deciding preenforcement challenge to state funding condition with no suggestion that the plaintiffs lacked standing). And finally, denying the States standing would be difficult to square with the principle that a plaintiff who is the "object of" the challenged government action almost always has standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992); *cf. Am. Booksellers Ass'n*, 484 U.S. at 392 (observing that the challenged law was "aimed directly at" the plaintiffs).

**D.    This case is ripe.**

"The requirements of standing and constitutional ripeness overlap; if an injury is sufficiently imminent to establish standing, the constitutional requirements of the ripeness doctrine will necessarily be satisfied." *United States v. Supreme Court of New Mexico*, 839 F.3d 888, 903 (10th Cir. 2016) (cleaned up). Because the States have standing, this case is also ripe under Article III.

Prudential ripeness also poses no barrier to review. To begin, the Supreme Court has cast doubt on "the continuing vitality of the prudential ripeness doctrine."

*Susan B. Anthony List*, 573 U.S. at 167. Declaring a case nonjusticiable for "pruden-tial" rather than constitutional reasons, the Court explained, "is in some tension with our recent reaffirmation of the principle that a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging." *Id.* (cleaned up). And re-gardless, the prudential ripeness factors of "fitness" and "hardship" are "easily satis-fied here." *Id.*

The States' challenge to the Tax Mandate is fit for review because it turns on issues that are "purely legal, and will not be clarified by further factual development." *Id.* (citation omitted); [*see also* Joint Mot. for Scheduling Order, R. 24 at 1 ("The par-ties agree that this matter turns on the resolution of several legal issues and can likely be resolved without discovery.")]. "And denying prompt judicial review would impose a substantial hardship on [the States], forcing them to choose between re-fraining from [the exercise of their sovereign taxing powers] on the one hand, or [ex-ercising those powers] and risking [a costly recoupment action] on the other." *Susan B. Anthony List*, 573 U.S. at 167–68. States must make budgeting decisions well in advance of each fiscal year. [*See* Niknejad Decl., R. 25-2, ¶¶ 14, 16–17]. The Tax Man-date creates an "immediate disruption" to that process. [*Id.*]. Delaying review would require the States "to take significant and costly compliance measures," *Am. Booksellers Ass'n*, 484 U.S. at 392, and would further disrupt their budgetary and legislative processes, [Pls.' Mot. at 16].

## II.    The Tax Mandate Violates the Spending Clause.

Congress must abide by three general rules when attaching conditions to fed-eral funds sent to the States. The Tax Mandate runs afoul of all three.

###### A.     The Tax Mandate is unconstitutionally ambiguous.

**1.** The Tax Mandate is unconstitutional because it "fails to put the State[s] on 'clear notice' of [their] obligations." *Ohio*, 2021 WL 2712220, at *12 (quoting *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006)). The primary culprits are the phrases "indirectly offset" and "reduction in the net tax revenue." [Pls.' Mot. at 20–26]; *see also Ohio*, 2021 WL 2712220, at *13–15. As the Plaintiff States explained in their motion, neither the text nor structure of the Rescue Plan gives any insight into what those phrases mean. [Pls.' Mot. at 20–26]. Yet the meaning of each phrase is critical for any "state official" to "clearly understand . . . the obligations of" the Tax Mandate before making public policy choices that might implicate its terms. *See Arlington*, 548 U.S. at 296.

In response, the Defendants brush off the ambiguities in the Tax Mandate by simply reciting its language and declaring it clear. The Defendants, for example, contend that "[b]y its plain terms, the offset provision applies only when a State uses Rescue Plan funds to 'offset' a reduction in 'net' tax revenue resulting from changes in state law." [Defs.' Mot. at 18]. The Defendants also assert that "the offset provision's language simply ensures that States are not employing federal funds to finance state tax cuts that decrease net tax revenue." [*Id.* at 19]. But these declarations do nothing more than recite the Tax Mandate's ambiguous language. At no point do the Defendants wrestle with the ambiguity of the phrases "indirectly offset" or "reduction in the net tax revenue," nor do they offer a definition of either phrase.

14

In fact, the Defendants' only effort at addressing these phrases is a two-sentence declaration that the meaning of the word "indirectly" is irrelevant to "the statutory meaning" of the Tax Mandate. [Defs.' Mot. at 18–19]. How that can be is perplexing. Courts must give effect to every word in a statute. *See City of Chicago v. Fulton*, 141 S. Ct. 585, 591 (2021). And so for the States to have clear notice of the Tax Mandate's requirements, they must have clear notice about what an "indirect[] offset" is.[3] Yet the Defendants do not even *try* to define this phrase at all.

Worse still, the Defendants ignore entirely the "interpretative problems" raised by the phrase "reduction in the net tax revenue." *See Ohio*, 2021 WL 271220, at *13. The Plaintiff States identified several difficulties with this statutory language that make it impossible for a state official to know what it means. [Pls.' Mot. at 23–26]. One district court recently observed similar problems, *see Ohio*, 2021 WL 271220, at *13–14, which boil down to the Tax Mandate's failure to identify the "starting point" for measuring a reduction in tax revenue, [Pls.' Mot. at 23]. There are several plausible ways to define this phrase, but none are discernable from the text or structure of the Rescue Plan. And not for lack of know-how: elsewhere in the Rescue Plan, Congress addressed a similar issue and provided clear notice about how States should

---

[3] The Defendants make a confusing claim that because the word "indirectly" is an adverb it "cannot 'alter the meaning of the word' [offset]." [Defs.' Mot. at 19 (quoting *Rimini St., Inc. v. Oracle USA, Inc.*, 139 S. Ct. 873, 878 (2019)]. While it is true that an adverb does not change the meaning of the verb it modifies, it still modifies that verb. *See Honeycutt v. United States*, 137 S. Ct. 1626, 1633 (2017). So unless the Defendants contend that adverbs can never have a statutory purpose, the question remains how exactly the word "indirectly" modifies the verb "offset." *See id.* (explaining that "[t]he adverbs 'directly' and 'indirectly' modify . . . the verb" at issue).

measure relative changes in their expenditures from year to year. *See* 42 U.S.C. § 802(c)(1)(C); [*see also* Pls.' Mot. at 23]. The Tax Mandate offers no similar guidance.

The Defendants dismiss these ambiguities by defining other words in the Tax Mandate that the Plaintiff States never challenged. As proof that the Tax Mandate is clear, the Defendants define the words "use" and "offset." [Defs.' Mot. at 18]. But the Plaintiff States never argued that the constitutional problems in this case lie in the ambiguity of those words.

The closest the Defendants come to explaining the meaning of one ambiguous phrase is when they provide an example of what amounts to an "indirect[] offset" under the statute. [*Id.* at 19]. To be sure, the Defendants do not propose any sort of definition of the phrase. Instead, they give a single example of an indirect offset under the Tax Mandate and leave it to the reader to extrapolate some sort of unambiguous meaning. [*Id.*]. But "[m]erely providing a single example of an 'indirect offset,' without more, does little to establish the outer contours of the phrase." *Ohio*, 2021 WL 271220, at *15. And in fact, "[i]t is far more important for [the Plaintiff States] to know what the [Treasury] Secretary would *not* count as such an offset," rather than know a single example of something that *would* count. *Id.*

The bottom line is that the Defendants have failed to give a clear definition for the terms in the Tax Mandate that the Plaintiff States contend are ambiguous. That's because neither the text nor structure of the statute provide any basis for doing so.

**2.** The Defendants try to avoid the ambiguity issues by arguing that the Spending Clause does not require Congress to state the conditions attached to federal funds

16

with any kind of clarity. [Defs.' Mot. at 27–30]. Rather, the Defendants contend, so long as Congress makes clear that a condition *exists*, it is free to leave the details of that condition to the implementing agency. [*Id.* at 29]. And so, the argument goes, the Tax Mandate survives constitutional scrutiny because it gives the States clear notice that they must not use Rescue Plan funds to indirectly offset a reduction in the net tax revenue caused by a change in state law—even if no one understands what that restriction means.

The Defendants are wrong. "[W]hen Congress attaches conditions to a State's acceptance of federal funds, *the conditions* must be set out unambiguously." *Arlington*, 548 U.S. at 296 (emphasis added) (cleaned up). The question is not just whether a condition exists. "Rather, the question is 'whether . . . a state official would clearly understand *the obligations*' attendant in accepting the [funds]." *Ohio*, 2021 WL 2712220, at \*12 (quoting *Sch. Dist. of Pontiac*, 584 F.3d at 277 (plurality op.)). Congress cannot escape the limits of the Spending Clause by declaring that a condition exists and leaving it to the executive branch to explain what that condition is.

In fact, it's hard to make sense of *Arlington* if the Defendants are right. At issue in *Arlington* was whether States must "compensate . . . parents for expert fees" if the parents prevail in a challenge under the Individuals with Disabilities Education Act ("IDEA"). 548 U.S. at 296. No one questioned the existence of a condition—the IDEA plainly required the States to award various costs to prevailing parents. *See id.* at 297 ("[I]n any action or proceeding brought under this section, the court, in its discretion, may award reasonable attorneys' fees as part of the costs." (quoting 20

U.S.C. § 1415(i)(3)(B))). The question the Supreme Court faced was whether the term "costs" included expert fees, and if so, whether it unambiguously did. *Id.* at 296–97, 304. If the Defendants are correct that the terms of a condition need not be clear, *Arlington*'s discussion of constitutional ambiguity would make no sense. *Cf. New York*, 505 at 172 ("The conditions imposed are unambiguous; the Act informs the States exactly what they must do and by when they must do it in order to obtain a share of the [federal money]." (internal citation omitted)).

No case supports the Defendants' claim that the meaning of a statutory spending condition can be ambiguous so long as the existence of the condition is clear. For this point, the Defendants rely on a string of cases that afforded *Chevron* deference to an agency's implementation of a spending condition. [Defs.' Mot. at 29]. Yet not one of those cases holds that Congress can attach ambiguous conditions to a grant of federal funds so long as an agency comes along later and provides more clarity. *See Blum v. Bacon*, 457 U.S. 132, 141 (1982) (never discussing the Spending Clause); *Harris v. Olszewski*, 442 F.3d 456, 467–68 (6th Cir. 2006) (same); *Westside Mothers v. Olszewski*, 454 F.3d 532, 543–44 (6th Cir. 2006) (same); *City of Cleveland v. Ohio*, 508 F.3d 827, 850 (6th Cir. 2007) (applying *Pennhurst* to determine whether the statute— not the regulation—provided clear notice as to the conditions); *United States v. Miami Univ.*, 294 F.3d 797, 809, 814–15 (6th Cir. 2002) (explaining that *the statute* imposes certain conditions in "clear and unambiguous terms"); *Snider v. Creasy*, 728 F.2d 369, 371–73 (6th Cir. 1984) (never discussing the Spending Clause); *Irving Indep. Sch. Dist. v. Tatro*, 468 U.S. 883, 891–92 & n.8 (1984) (never discussing when statutory

18

ambiguity creates a constitutional problem under the Spending Clause); *Baptist Mem'l Hosp. - Golden Triangle, Inc. v. Azar*, 956 F.3d 689, 692–93 (5th Cir. 2020) (never discussing the Spending Clause); *Children's Hosp. Ass'n of Tex. v. Azar*, 933 F.3d 764, 770 (D.C. Cir. 2019) (same); *Petit v. U.S. Dep't of Educ.*, 675 F.3d 769, 778 (D.C. Cir. 2012) (same); *City of Los Angeles v. Barr*, 929 F.3d 1163, 1173–81 & n.6 (9th Cir. 2019) (never addressing whether agency regulations can cure the ambiguity of a statutory condition). And as the Plaintiff States noted in their motion, [Pls.' Mot. at 27], the only federal court of appeals that appears to have resolved this question held that an agency's interpretation of a statutorily ambiguous spending condition cannot cure the constitutional shortcoming. *See Va. Dep't of Educ. v. Riley*, 106 F.3d 559, 560–61, 567 (4th Cir. 1997) (en banc) (per curiam).

To be clear, the Plaintiff States do not contend that all spending conditions must contain no ambiguity whatsoever. Many statutory provisions might contain ambiguities at the margins, and perhaps *Chevron* deference is appropriate in those cases. But this is not a case about marginal ambiguity. "[W]hen Congress seeks to alter the constitutional design by delegating its powers to agencies on topics of . . . importance, Congress must do so clearly, especially when federalism concerns are at issue." *Ohio*, 2021 WL 271220, at *20 (citing *Carter v. Welles-Bowen Realty, Inc.*, 736 F.3d 722, 734 (6th Cir. 2013); *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2320, 2321 (2021) (Mem.) (Kavanaugh, J., concurring)). The ambiguity in the Tax Mandate gives no guidance to the States or the federal agency about the scope of the condition—effectively giving Treasury carte blanche to decide what does and

19

does not amount to an "indirect[] offset [of] a reduction in [the Plaintiff States'] net tax revenues." *Id.* at *15 (quoting 42 U.S.C. § 802(c)(2)(A)). The Defendants cite no case holding that such a broad and unintelligible delegation is a permissible way for Congress to unambiguously establish the conditions to which the States must agree before accepting federal funds. And such a proposition runs counter to basic delegation principles that prohibit Congress from granting discretion to executive agencies to decide major economic questions that bear on core issues of State sovereignty. *See Whitman v. Am. Trucking Ass'ns.*, 531 U.S. 457, 472 (2001); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159–60 (2000); *King v. Burwell*, 576 U.S. 473, 485–86 (2015); *Carter*, 736 F.3d at 734. No matter how one slices the issue, the statutory condition here is ambiguous, and any purported delegation to the Treasury Secretary to implement that condition cannot permissibly cure the constitutional deficiency.

One final point on this issue. The Defendants concede that the Interim Final Rule "should have no bearing on the Spending Clause analysis." [Defs.' Mot. at 30]. The Interim Final Rule itself lacks clarity, but the Defendants apparently agree that if the Tax Mandate is unconstitutionally ambiguous, the specific regulation Treasury promulgated cannot fix that problem. [*Id.*]. So the only question for this Court is whether the statute itself is clear enough to survive constitutional scrutiny.

### B. The Tax Mandate is not reasonably related to the federal interest in passing the Rescue Plan.

Even if the Tax Mandate were unambiguous, it is not reasonably related to the purpose of the Rescue Plan funds. That's because the Tax Mandate has nothing to do

with regulating how the States use their Rescue Plan funds, nor is it related to the overall purpose of the Rescue Plan. In fact, as the Plaintiff States explained in their motion, the Tax Mandate runs counter to the Rescue Plan's purpose, as it forbids exactly the kind of tax relief that the Rescue Plan itself provides. [Pls.' Mot. at 30].

The Defendants insist that the Tax Mandate must be "germane[]" because it "specif[ies] the uses to which a State may and may not devote the federal funds." [Defs.' Mot. at 20]. That is wrong. At least under a broad interpretation of the Tax Mandate's restriction on "indirect offset[s]," [*but see* Pls.' Mot. at 20–21], the Tax Mandate has nothing to do with how the States use the Rescue Plan funds.

Consider the following example to understand why. Suppose a State spends $1 million dollars in Rescue Plan funds for Covid-19 testing while raising the same amount of revenue as the year prior.[4] A State could add that $1 million to its existing healthcare budget (that is, spend $1 million more on healthcare than the year prior). Or a State could keep its healthcare budget constant and use the extra $1 million in its budget to build a golf course. Or a State could keep its healthcare budget constant and use the extra $1 million to provide a tax credit for families that incurred additional childcare expenses during the pandemic. In all three examples, the State "used" the money the same way—it spent $1 million on Covid-19 testing. But the Tax Mandate only penalizes the State in the last example. The State is allowed to build a

---

[4] Of course, the Tax Mandate does not specify a baseline for measuring a reduction in revenue. For ease, assume that the baseline is the prior fiscal year.

golf course with excess revenues freed up by the Rescue Plan funds, but it is not al-lowed to provide tax credits to individuals that suffered pandemic-imposed hardships. So in what sense does the Tax Mandate have anything to do with how the States "use" their Rescue Plan funds or pandemic relief in general?

The Defendants counter this by comparing the Tax Mandate to anti-supplant-ing conditions like the one at issue in *Bennett*. [Defs.' Mot. at 21–22]. But *Bennett* is a roadmap of what Congress chose not to do with the Tax Mandate. At issue in *Bennett* were federal funds aimed at increasing expenditures on "education programs for disadvantaged children." 470 U.S. at 659. To make sure that the federal funds were used to increase educational opportunities, rather than simply supplant state money that would have already been allocated to the same purpose, Congress provided money on the condition that the States would maintain their current level of spending on their own education programs for the same groups of children. *Id.* at 660. In other words, the law provided that the States could not use the federal money to replace State funds that would have otherwise been spent on education, because that would not achieve Congress's purpose of expanding education access. *Id.*

The Tax Mandate is not this kind of anti-supplanting condition. There is no requirement in the Tax Mandate that funding recipients maintain their pre-planned level of expenditures in the areas where Rescue Plan funds are spent. To go back to the prior example, under the Tax Mandate a State can use Rescue Plan funds to sup-plant its planned healthcare spending and then use the freed-up state revenue to build a golf course. The Tax Mandate does not prohibit supplanting, nor does it even

22

require States to use excess state revenue on other Covid-related expenditures. Rather, it prohibits the States from making certain tax-policy decisions—and it does so *even if* those tax-policy decisions (like a tax credit) are directly related to providing Covid relief.

On the issue of tax credits, the Defendants offer no response as to how the Tax Mandate is reasonably related to the Rescue Plan funds when it prohibits precisely the kind of tax relief that the Rescue Plan itself provides. [*See* Pls.' Mot. at 30]. Congress increased several federal tax credits and made some of those fully refundable in the Rescue Plan. [*Id.*]. Yet the States are prohibited from doing the same if the tax credits decrease their net revenue.

This problem only gets worse: The States could provide almost immaterially indistinguishable relief in the form of a direct payment to their citizens (*i.e.*, an expenditure), but the States are forbidden from doing so if they call it a tax credit (*i.e.*, a reduction in revenue). This puts the real aim of the Tax Mandate into proper focus. It does not control how the States use Rescue Plan funds or even how States use their own funds after spending federal dollars. The only thing that the Tax Mandate prevents the States from doing is lowering their taxes—a policy choice that has nothing to do with the purpose of the Rescue Plan.

### C.   The Tax Mandate is unconstitutionally coercive.

Congress cannot use the promise of significant federal funds to coerce the States into adopting particular policies. The Defendants contend that this rule does not apply here because the Tax Mandate is only a condition on how federal funds are used. For the reasons stated previously, that argument is wrong. The Tax Mandate,

23

broadly interpreted, says nothing about how federal funds are used, and so Congress must abide by the anti-coercion principle from *NFIB*.[5]

The Defendants' only other response is to narrowly read *NFIB* to apply *only* when Congress threatens to withdraw preexisting funds if the States do not comply with a new condition. [Defs.' Mot. at 24–25]. But the rule against coercion is not simply a rule against leveraging preexisting funds. True, that was one factor that made the offer in *NFIB* coercive. But it was just that: *one* factor that went into deciding whether, on balance, the offer was more like "relatively mild encouragement" or "a gun to the head." *NFIB*, 567 U.S. at 581 (op. of Roberts, C.J.) (cleaned up). If all nine Justices agreed that conditional spending is only coercive if it threatens preexisting funds—as the Defendants suggest—they could have said so. Instead, both the Chief Justice and the principal dissenting opinion considered whether the offer was nothing more than "a means for bringing federal economic might to bear on a State's own choices of public policy." *See Sabri v. United States*, 541 U.S. 600, 608 (2004); *NFIB*, 567 U.S. at 580–81 (op. of Roberts, C.J.); *id.* at 681–82 (dissenting op.). That is the question that this Court must answer. And to do so it must consider *all* the circumstances surrounding the Rescue Plan offer.

---

[5] The fact that the Tax Mandate is drafted to look like a restriction on the "use" of funds does not matter. Congress tried the same trick in *NFIB* when it "styled" the conditions attached to the Medicaid expansion as simply a restriction on how Medicaid dollars must be spent. *See NFIB*, 567 U.S. at 582–83 (op. of Roberts, C.J.). As Chief Justice Roberts explained, Congress's artful styling was "irrelevant" to deciding how the legislation worked in practice.

Notice what the Defendants never address in their response: They do not talk about the enormity of the federal funds at issue. Nor do they talk about how important these funds are to state governments trying to recover from the pandemic. The Defendants act as though deciding whether to accept *billions* in relief after a once-in-a-century pandemic is no different than deciding whether to accept additional highway funding. If the anti-coercion rule has any purpose, it is this: to prevent the federal government from taking advantage of extraordinary circumstances by leveraging the federal treasury to "pressure the States to accept policy changes." *NFIB*, 567 U.S. at 580 (op. of Roberts, C.J.) (cleaned up). Sometimes that pressure comes in the form of a threat, as was the case when Congress threatened to withhold other funds if the States would not accept the new terms of the Medicaid program. *See NFIB*, 567 U.S. at 580 (op. of Roberts, C.J.). But *NFIB* never said that was the only way Congress could unconstitutionally coerce the States into accepting policy changes. And the Defendants have no response as to why the "sheer size" of the Rescue Plan, offered during extraordinary circumstances, is not coercive. *See NFIB*, 567 U.S. at 681, 683 (dissenting op.) (explaining that spending conditions are coercive when Congress knows that "refusing to accede to the conditions set out in the [law] is not a realistic option").

The Defendants also argue that the Rescue Plan is not coercive because it only claws back the amount of money improperly spent. Essentially, the argument is that because the penalty is proportionate to the violation, Congress's offer itself is not coercive. But Chief Justice Roberts rejected that argument in *NFIB*: "[T]he size of the

new financial burden imposed on a State is irrelevant in analyzing whether the State has been coerced into accepting that burden. 'Your money or your life' is a coercive proposition, whether you have a single dollar in your pocket or $500." *NFIB*, 567 U.S. at 582 n.12 (op. of Roberts, C.J.). The coercion occurred the moment that Congress made billions of federal relief during a pandemic contingent on the States relinquishing their sovereign interest in controlling tax policy. The penalty the States face for misusing funds after being coerced into surrendering their sovereignty is irrelevant.

## III.   The Tax Mandate violates the anticommandeering doctrine.

The Defendants' response to the anticommandeering problem is to wave away the idea that the States have certain sovereign interests that the federal government cannot intrude on. According to the Defendants' view of the Tenth Amendment, so long as the States have a "legitimate choice" to accept or decline the Rescue Plan funds, *any* condition that Congress might attach is constitutional. [Defs.' Mot. at 26 (quoting *NFIB*, 567 U.S. at 578)]. That is not the law. Congress cannot use its spending power to circumvent the Constitution's protection of State sovereignty.

The Defendants argue that there are no limits on what Congress can demand of the States in exchange for federal money, including, for example, a demand that the States relocate their capitals in exchange for money. [Defs.' Mot. at 25–26]. But the Supreme Court has made clear that some aspects of a State's sovereignty are simply off limits. *See Coyle v. Smith*, 221 U.S. 559, 565–67 (1911). In *Coyle*, the Supreme Court prohibited Congress from conditioning a State's acceptance into the union on the State's agreement to relocate its capital. The Court explained: "The power to locate its own seat of government, and to determine when and how it shall be

changed from one place to another, and to appropriate its own public funds for that purpose, *are essentially and peculiarly state powers*." *Id.* at 565 (emphasis added). That is true even though, as the Defendants put it, "nothing" forced the State in *Coyle* to join the union and agree to Congress's terms. [Defs.' Mot. at 26]. Yet the Defendants argue, without even acknowledging *Coyle*, that Congress could in fact use its spending power to require a State to surrender its sovereign right to decide where its capital is located. [*Id.* at 26]. They are simply wrong. [*See* Amici Br., R. 34, at 19–20 ("Some matters are simply too close to the core of state sovereignty for the federal government to dictate their terms, even if those terms are framed as conditions.")].

The power to set tax policy—the choice to tax or not to tax its citizens—invokes the same kind of central sovereignty interest that Congress cannot regulate through conditional spending. *See Layne Cnty. v. Oregon*, 74 U.S. (7 Wall) 71, 76 (1868). Nor is this argument "novel," as the Defendants suggest. [Defs.' Mot. at 26]. The Supreme Court has described "the power of taxation" as an "indispensable" part of "the *existence* of the States." *Id.* at 76 (emphasis added). It is "the power to destroy." *M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 431 (1819). And that's why the Founders recognized that "individual States should possess an independent and uncontrollable authority to raise their own revenues for the supply of their own wants." The Federalist No. 32 (A. Hamilton).

## IV. The Court should permanently enjoin the Tax Mandate.

The Defendants contend that the Plaintiff States are not entitled to an injunction or declaratory relief. It's difficult to understand how that could be. If the Court

27

agrees that the Plaintiff States have standing and that the Tax Mandate is unconstitutional, the only question left is what kind of relief to award the Plaintiff States—an injunction, a declaratory judgment, or both. And it cannot be that the Plaintiff States have standing to challenge an unconstitutional funding condition but are not entitled—at a minimum—to an injunction. *See, e.g., Ohio*, 2021 WL 2712220, at *20–21 (declining to award declaratory relief because an injunction was sufficient).

The Defendants contend that an injunction is not appropriate because the Plaintiff States can obtain the same relief through a hypothetical future recoupment proceeding. [Defs.' Mot. at 31]. But that argument goes toward standing and whether this matter is ripe. [*See* Pls.' Mot. at 10–18; *supra* at 1–13]. If this Court has already determined that the Tax Mandate is unconstitutional, it makes no sense to require the States to assert that judgment as a res judicata defense to a future recoupment proceeding rather than to enjoin enforcement of the Tax Mandate altogether. The Defendants insistence that the Court not grant relief to the Plaintiff States *even if* it resolves the case in their favor is perplexing.

The Defendants also argue that "enjoining [the Tax Mandate] would unquestionably impose irreparable harm on the federal government and contravene the public interest." [Defs.' Mot. at 32]. But the federal government has no legitimate interest in enforcing an unconstitutional law. *See Martin-Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 568 (6th Cir. 1982). Meanwhile, subjecting the States to the unconstitutional Tax Mandate will require them to "necessarily defer, slow, or reconsider" leg-

islative initiatives and changes to tax policy. [Niknejad Decl., R. 25-2, ¶ 14]. This on-going intrusion on state sovereignty is precisely the kind of irreparable injury that warrants relief. *See Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018).

On the issue of whether declaratory relief is appropriate—it plainly is. The Defendants' argument otherwise merely rehashes their defenses on the merits. [*See* Defs.' Mot. at 32–33 ("As discussed above, the Rescue Plan—especially in combination with the unchallenged Rule—provides more than sufficient clarity.")]. The Defendants also contend that declaratory relief is unnecessary because the States could "assert their constitutional arguments as a defense to a recoupment action." [*Id.* at 33]. Per-haps they could, but that is *always* on option when declaratory relief is at stake. The law does not require the States to make such a gamble. *See Sch. Dist. of Pontiac*, 584 F.3d at 278 (Sutton, J., concurring) (explaining that a declaratory judgment is an appropriate remedy for a Spending Clause violation because it allows the plaintiff to avoid "the choice of abandoning their legal claim or risking sanctions"). The only au-thority the Defendants cite for support on this point is the interlocutory order a dis-trict court entered in similar litigation in Ohio. [*See* Defs.' Mot. at 33 (citing *Ohio v. Yellen*, No. 1:12-cv-181, 2021 WL 1903908, at *14 (S.D. Ohio May 12, 2021)]. Yet the Defendants fail to mention that the same district court granted a permanent injunc-tion weeks later, denying declaratory relief only because the injunction subsumed any declaratory relief it could order. *See Ohio*, 2021 WL 2712220, at *20–21.

## CONCLUSION

The Court should grant summary judgment to the Plaintiff States and deny the Defendants' motion to dismiss or for summary judgment.

Respectfully submitted by,

**DANIEL CAMERON**
**Attorney General of Kentucky**

/s/ Brett R. Nolan
Barry L. Dunn
Victor B. Maddox
Matthew F. Kuhn
Brett R. Nolan
Office of Kentucky Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
Phone: (502) 696-5300
Barry.Dunn@ky.gov
Victor.Maddox@ky.gov
Matt.Kuhn@ky.gov
Brett.Nolan@ky.gov

*Counsel for the Commonwealth*
*of Kentucky*

**HERBERT H. SLATERY III**
**Attorney General of Tennessee**

/s/ Andrée S. Blumstein (w/ permission)
Andrée S. Blumstein*
Sarah K. Campbell*
Brandon J. Smith*
Office of the Tennessee Attorney General and Reporter
PO Box 20207
Nashville, TN 37202-0207
Phone: (615) 741-3491
Andree.Blumstein@ag.tn.gov
Sarah.Campbell@ag.tn.gov
Brandon.Smith@ag.tn.gov
*admitted pro hac vice*

*Counsel for the State of Tennessee*

## CERTIFICATE OF SERVICE

I certify that I filed the above document using the Court's CM/ECF system on August 11, 2021, which electronically served a copy to all counsel of record.

/s/ Brett R. Nolan