UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

|  |  |
|---|---|
| COMMONWEALTH OF KENTUCKY, *et al.*,<br><br>　　　Plaintiffs,<br><br>V.<br><br>JANET YELLEN, *et al.*,<br><br>　　　Defendants. | Civil No. 3:21-cv-00017-GFVT-EBA<br><br>**OPINION**<br>**&**<br>**ORDER** |

\*\*\*  \*\*\*  \*\*\*  \*\*\*

　　　This case is informed by an old conversation between Thomas Jefferson and Alexander Hamilton.  The topic was one of trust.  Hamilton put his in a strong federal government with considerable power.[1]  Jefferson, the agrarian, fought against the expansion of federal power at the expense of the States.[2]  Here, the federal government wants to give Kentucky and Tennessee a lot of money.  These funds are desperately needed in the midst of a pandemic.  But, they come with a price—states must forego the exercise of important flexibility and power when it comes to making their own taxing decisions.

　　　As explained below, this is a coercive grant of federal money.  The spending power of the federal government does not go so far.  The price for accepting the funds is unconstitutional.

---

[1] *See* Alexander Hamilton, *Report on a National Bank*, in ALEXANDER HAMILTON: WRITINGS, 647, 575, 599 (Joanne B. Freeman ed., 2001) ("[A national] Bank is not a mere matter of private property, but a political machine of the greatest importance to the State").

[2] *See* Thomas Jefferson Letter to George Washington, Feb. 15, 1791, *Opinion on Bill for Establishing a National Bank* ("I consider the foundation of the Constitution as laid on this ground that 'all powers not delegated to the U.S. by the Constitution, not prohibited by it to the states, are reserved to the states or to the people' … To take a single step beyond the boundaries thus specially drawn around the powers of Congress, is to take possession of a boundless field of power, no longer susceptible of any definition").

Accordingly, summary judgment will be **GRANTED** in favor of the Commonwealth of Kentucky and the State of Tennessee.

# I

President Biden signed into law the American Rescue Plan Act on March 11, 2021. Pub. L. No. 117-2, § 9901(a) (codified at 42 U.S.C. §§ 802–805). The ARPA appropriates funds in order for the States to respond to pandemic-related expenses. *Id.* The ARPA provides that, through December 31, 2024, the States may use the recovery funds "to cover costs incurred":

> (A) to respond to the public health emergency with respect to the Coronavirus Disease 2019 (COVID–19) or its negative economic impacts, including assistance to households, small businesses, and nonprofits, or aid to impacted industries such as tourism, travel, and hospitality;
> (B) to respond to workers performing essential work during the COVID–19 public health emergency by providing premium pay to eligible workers of the State, territory, or Tribal government that are performing such essential work, or by providing grants to eligible employers that have eligible workers who perform essential work;
> (C) for the provision of government services to the extent of the reduction in revenue of such State, territory, or Tribal government due to the COVID–19 public health emergency relative to revenues collected in the most recent full fiscal year of the State, territory, or Tribal government prior to the emergency; or
> (D) to make necessary investments in water, sewer, or broadband infrastructure.

*Id.* § 802(c)(1). The ARPA also includes restrictions or conditions on the grant of federal funds. *Id.* § 802(c)(2). The condition of importance here (the "Tax Mandate") prohibits a State from using the federal funds to "directly or indirectly offset a reduction in net tax revenue of such State [] resulting from a change in law, regulation, or administrative interpretation during the covered period that reduces any tax (by providing for a reduction in a rate, a rebate, a deduction, a credit, or otherwise)." *Id.* § 802(c)(2)(A). If a State accepts the funds and fails to comply with the Tax Mandate, it "shall be required to repay the Secretary [of the Treasury] an amount equal to the amount of funds used in violation [thereof]." *Id.* § 802(e). In other words, the State will be required to repay either the amount of funds used to offset the "reduction to net tax revenue"

or "the amount of funds received," whichever is less. *Id.* Further, on May 17, 2021, the Treasury Department published an Interim Final Rule, seeking to clarify the Tax Mandate and the eligible uses of ARPA funds. *See* 86 Fed. Reg. 26,786 (May 17, 2021).

Plaintiffs Kentucky and Tennessee bring the present suit and move for summary judgment. [R. 25.] Plaintiffs seek both a declaratory judgment finding the Tax Mandate unconstitutional and a permanent injunction enjoining the Treasury Secretary's enforcement of the Tax Mandate. [*Id.*] Plaintiffs argue that they have standing on two grounds, arguing that the Tax Mandate: (1) unconstitutionally narrows the range of permissible tax policies States may enact, injuring the Plaintiffs; and (2) imposes administrative burdens, injuring Plaintiffs. [R. 25 at 23–24.] Plaintiffs then cite four different ways in which the Tax Mandate of the ARPA is unconstitutional. Plaintiffs believe that the Tax Mandate is unconstitutionally ambiguous and coercive in violation of the Spending Clause, that it is not reasonably related to the federal interest in passing the ARPA, and that it violates the anticommandeering doctrine. [R. 25.] Defendants, in response, argue: (1) that Plaintiffs are attempting to manufacture standing where it does not exist; (2) that this case is not ripe; and (3) that Congress has not exceeded the bounds of its authority for Spending Clause purposes. [R. 31.]

## II

### A

It is well-established that standing is a threshold inquiry in every federal case. *See, e.g., Warth v. Seldin*, 422 U.S. 490, 498 (1975); *Planned Parenthood Ass'n of Cincinnati, Inc. v. Cincinnati*, 822 F.2d 1390, 1394 (6th Cir. 1987). Each federal court is "under an independent obligation to examine their own jurisdiction, and standing is perhaps the most important of the

3

jurisdictional doctrines." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (internal quotations and citation omitted).

"To satisfy the 'case' or 'controversy requirement' of Article III, which is the 'irreducible constitutional minimum' of standing, a plaintiff must, generally speaking, demonstrate that he has suffered an 'injury in fact,' that the injury is 'fairly traceable' to the actions of the defendant, and that the injury will likely be redressed by a favorable decision." *Bennett v. Spear*, 520 U.S. 154, 162 (1997) (citations omitted). To show injury-in-fact, a plaintiff must show "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

In pre-enforcement challenges, like this one, the "Supreme Court has recognized that an allegation of future injury may satisfy the injury-in-fact requirement if the alleged threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *McKay v. Federspiel*, 823 F.3d 862, 867 (6th Cir. 2016) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (cleaned up)). More specifically, plaintiffs satisfy the injury-in-fact requirement where they allege: (1) "an intention to engage in a course of conduct arguably affected with a constitutional interest," (2) that is "proscribed by a [law]," and (3) "there exists a credible threat of prosecution thereunder." *Susan B. Anthony List*, 573 U.S. at 159, 134 S.Ct. 2334 (citation omitted). As sovereign entities, Kentucky and Tennessee also enjoy "special solitude in [the Court's] standing analysis. *Massachusetts v. E.P.A.*, 549 U.S. 497, 518–20 (2007). The Court will consider, in turn, whether Plaintiffs have met each element.

In order to satisfy the first *Dreihaus* factor in this context, the Court must, necessarily, look to the substance of the "constitutional interest" at issue in this case. Plaintiffs Kentucky and Tennessee are alleging that the Tax Mandate, a condition attached to the receipt of funds under

4

the ARPA, is unconstitutional on a variety of grounds. [R. 25.] The States contend that they wish to accept the funds—indeed, that they *need* the funds—but seek to enjoin the Treasury Department from enforcing the Tax Mandate. [*Id.*] There is *at least* one valid argument that the Tax Mandate is unconstitutional. *See generally Ohio v. Yellen*, 2021 WL 2712220, 1:21-cv-00181-DRC (S.D. Ohio July 1, 2021). Accordingly, the States have met the first factor. Next, the Tax Mandate may fairly be considered a guardrail as to how States may spend ARPA funds. Tennessee and Kentucky, however, interpret the Tax Mandate as proscribing use of the funds for their "preferred tax policies in the coming years." [R. 25 at 11.] The second factor is met. Finally, Treasury Secretary Yellen penned a letter to various attorneys general on March 23, 2021, indicating her intent to enforce the Tax Mandate. [*See* R. 1-2.] Thus, a credible threat of prosecution exists, Plaintiffs have met their burden, and this Court has standing to turn to the merits of the case.

B

Plaintiffs, in their summary judgment motion, cite four different ways in which the Tax Mandate of the ARPA is unconstitutional. [R. 25.] The Court will begin by addressing the Plaintiffs' contention that the Tax Mandate is unconstitutionally coercive and then turn to remaining arguments, as needed.

The Spending Clause gives Congress the power "to pay the Debts and provide for the ... general Welfare of the United States." U.S. Const., Art. I, § 8, cl. 1. As a part of its Spending Clause powers, Congress may offer conditioned funds to the States. *See South Dakota v. Dole*, 483 U.S. 203, 208 (1987) (threatening to withhold federal funds if South Dakota did not raise drinking age to twenty-one). To that end, Spending Clause legislation has often been characterized as "much in the nature of a *contract*" between two co-sovereigns. *Pennhurst State*

*School and Hospital v. Halderman*, 451 U.S. 1, 17 (1981). In exercising its spending power, however, Congress itself must abide by certain limitations. The limitation pertinent here holds that Congress may not enact Spending Clause legislation that uses "financial inducements to exert a 'power akin to undue influence.' " *National Federation of Independent Business v. Sebelius*, 567 U.S. 519, 577 (2012) (quoting *Steward Machine Co. v. Davis*, 301 U.S. 548, 590 (1937)). Although Congress may "encourage a State to regulate in a particular way, [and] influenc[e] a State's policy choices," *Id.* (quoting *New York v. United States*, 505 U.S. 144, 166 (1992)), Congress oversteps its powers when "pressure turns into compulsion." *Id.* at 576–77. (quoting *Steward Machine Co.*, 301 U.S. at 590).

Article III courts exercise restraint in second-guessing the policy judgments of Congress. Members of Congress are subject to the political whims of the American citizens; Article III courts are insulated from political processes and "possess neither the expertise nor the prerogative to make policy judgments." *NFIB*, 567 U.S. at 538. Courts must step in, however, where Congress's policy judgments threaten the independent sovereignty of the States. "Otherwise the two-government system established by the Framers would give way to a system that vests power in one central government, and individual liberty would suffer." *Id.* at 577. In keeping with the contract analogy, when a State alleges coercion, courts must consider whether the State is able to "voluntarily and knowingly accept[] the terms of the 'contract.' " *Pennhurst*, 451 U.S. at 17.

The Supreme Court, in *South Dakota v. Dole*, considered whether Congress overstepped its spending powers where it threatened to withhold five percent of South Dakota's federal highway funds if the State refused to raise the minimum-drinking age to twenty-one. 483 U.S., at 211. The Supreme Court determined that the conditional offer was not coercive because

6

"Congress ha[d] offered relatively mild encouragement to the States to enact higher minimum drinking ages than they would otherwise choose." *Id.* In other words, the State was not so reliant on the five percent of highway funds—"otherwise obtainable under specified highway grant programs"—to the point where they had no real choice; the decision to comply with the condition "remain[ed] the prerogative of the States not merely in theory but in fact." *Id.*, at 211–12.

*NFIB*, on the other hand, represents the sole example of the Supreme Court enforcing the anticoercion principle where Congress's spending legislation deprived the States of any meaningful choice. 567 U.S., at 519. In 2010, Congress passed the Patient Protection and Affordable Care Act ("ACA"), seeking to expand healthcare access for millions of Americans. The ACA contained a Medicaid expansion, which threatened the States with a complete loss of federal funding of Medicaid—funding equal to ten percent of a State's total budget—if any State refused to comply with the expansion. Chief Justice Roberts, delivering the opinion of the Court, found the Medicaid expansion provision to violate "the basic principle that the 'Federal Government may not compel the States to enact or administer a federal regulatory program.' " *NFIB*, 567 U.S., at 575 (quoting *New York*, 505 U.S., at 188)). In finding the Medicaid provisions of the ACA coercive, the Supreme Court considered: (1) the expanded obligations that States must comply with; (2) the fact that Congress threatened to withhold *both* new and existing funding for the States' Medicaid programs;[3] and (3) whether Congress's "financial inducement" was "mild encouragement" or "a gun to the head."[4] *Id.* at 581.

---

[3] While the issue of existing funds was a factor considered by the Supreme Court in *NFIB*, it was one of many factors weighed. Accordingly, the Court will not accept Defendants' argument that *NFIB* is factually distinct from the present case. [*See* R. 31.]

[4] *See Dole*, 483 U.S., at 211 ("all South Dakota would lose if she adheres to her chosen course as to a suitable minimum drinking age is 5% [of her highway funds]"). In fact, South Dakota was only poised to lose "less than half of one percent of South Dakota's budget at the time." *NFIB*, 567 U.S., at 581.

Similarly, in his concurring Opinion in *School Dist. of City of Pontiac v. Secretary of U.S. Dept. of Educ.*, Judge Sutton noted the coercive nature of the contract that States were offered at the onset of the No Child Left Behind Act. 584 F.3d 253, 284 (6th Cir. 2009) (Sutton, J, concurring). Stuck between Congress's funding conditions and "fiscally challenging times … [no State] would have the fortitude to turn down hundreds of millions of dollars in education funding." *Id.* The "choice-bending" nature of Congress' s contract of adhesion was underscored by the fact that "no State refused aid under the Act, notwithstanding the conditions that came with it." *Id.*

The States here know, as Kentucky and Tennessee show, that "refusing to accede to the conditions set out in the [law] is not a realistic option." *See NFIB*, 567 U.S., at 681 (Scalia, J., dissenting). Whereas roughly ten percent of a State's annual budget was at stake in *NFIB*, the ARPA offers States and the District of Columbia $195.3 billion dollars. *See* Jared Walczak, *Four Questions Treasury Must Answer About the State Tax Cut Prohibition in the American Rescue Plan Act*, Tax Found. (Mar. 18, 2021), https://bit.ly/3cYu0YB. For context, that is roughly *twenty percent* of the annual state tax collections brought in by state governments. *Id.* If both Kentucky and Tennessee choose to accept the ARPA funds—if it can be referred to as a choice—they will both receive amounts equal to roughly *one-fifth* of their general fund revenues for the preceding year.[5] *See How the COVID-19 Pandemic is Transforming State Budgets*, Urb. Inst. (last visited June 25, 2021), https://urbn.is/3jsU9ni; *see also* Jared Walczak, *State Aid in American Rescue Plan Act is 116 Times States' Revenue Losses*, Tax Foundation (Mar. 3, 2021),

---

[5] Kentucky will receive roughly $2.4 billion from the ARPA. [*See* R. 1 at 11] Relative to the $11.2 billion in revenue that Kentucky received from the General Fund during the last fiscal year, the ARPA aid package for Kentucky amounts to more than one-fifth of Kentucky's entire yearly General Fund revenue. [*Id.*] Tennessee will receive roughly $3. Billion from the ARPA. [*Id.*] Relative to the $17.8 billion in revenue that Tennessee received from the General Fund during the last fiscal year, the ARPA aid package for Kentucky amounts to more than one-fifth of Tennessee's annual general revenue. [*Id.*]

https://taxfoundation.org/state-and-local-aid-american-rescue-plan/. The amount of money at stake is especially pressing for Kentucky and Tennessee who, unlike the federal government, are constitutionally required to enact balanced budgets. See Ky. Const. §§ 49–50, 171; Tenn. Const. Art. II, § 24.

Putting aside the sheer size of the federal government's offering, the past year-and-a-half has presented anything but ordinary and stable conditions for the States. Not only have the States been forced to combat the health ramifications of the coronavirus, the pandemic has thrown many States and citizens into severe economic hardship. *Amici Curiae* Chamber of Commerce and National Federation of Independent Business Small Business Legal Center highlight some of the economic devastation the pandemic has brought:

> Small businesses, in particular, have faced unprecedented economic hardship. In surveys of small business owners, 81% of participants reported losing sales opportunities because of a labor shortage.[6] More than half had employees take pandemic-related sick leave or family leave; 87% of those businesses reported at least some of that leave was paid leave.[7] The hospitality industry was also ravaged: At the beginning of this year, foodservice sales were down $240 billion from expected levels in 2020.[8] Nearly a third of all restaurant and hospitality workers lost their jobs in the first few months of the pandemic,[9] and many have yet to return.[10] More than 100,000 businesses of all stripes have permanently shuttered

---

[6] *See* NFIB Res. Ctr., *Covid-19 Small Business Survey (18)* at 10 (June 30, 2021), https://bit.ly/3y Mg4KD.
[7] *See* NFIB Res. Ctr., *Covid-19 Small Business Survey (17)* at 8-9 (Apr. 28, 2021), https: //bit.ly/3ycOcyO.
[8] *See Nat'l Restaurant Ass'n, Restaurant Sales Fell to Their Lowest Level Since June* (Jan. 15, 2021), https://bit.ly/3d5gVwu; *see also* Alex Sherman, *Five Charts That Show How COVID-19 Stopped the U.S. Economy In Its Tracks*, CNBC (Mar. 11, 2021), https://cnb.cx/3cZ97O0.
[9] Erin Huffer & Aravind Boddupalli, *The Leisure & Hospitality Sector Has an Employment Crisis—and It Might Be Getting Worse*, Urb. Wire (July 20, 2020), https://urbn.is/397ptlz.
[10] *See Nat'l Restaurant Ass'n, 49 States and DC Added Restaurant Jobs in May 2021* (June 24, 2021), https://bit.ly/3hn5jHA (restaurant employment in all but four states remains below its prepandemic level); *Nat'l Restaurant Ass'n, Restaurant Employment Fell for the Third Consecutive Month* (Feb. 5, 2021), https://bit.ly/31b0pG3 (nearly 450,000 restaurant jobs lost in the three months preceding February 2021); *State-by-State Job Loss: COVID-19 Continues to Devastate Hotel Industry*, Am. Hotel & Lodging Ass'n (Feb. 2021), https://bit.ly/3uG0H47 (hospitality industry unemployment rate 300% higher than rest of economy); Michael Ettlinger & Jordan Hensley, *Covid-19 Economic Crisis: By State*, Univ. of N.H. Carsey Sch. of Pub. Pol'y (June 29, 2021), https://bit.ly/3dBzklI (nationwide employment in the accommodation and food services industry is down 13.9% since last year).

their doors,[11] and the country has lost more jobs since February 2020 than were lost during the Great Recession of December 2007 to June 2009.[12]

[R. 34 at 24–25.] Looking beyond the impacts on private businesses, state and local governments have likewise felt the economic brunt of the pandemic. Many state and local governments are grappling with "severe budget shortfalls." Anshu Siripurapu & Jonathan Masters, *How COVID-19 Is Harming State and City Budgets*, Council on Foreign Relations (Mar. 19, 2021), https://on.cfr.org/3f9vjqm. This, in part, can be explained by the necessary steps these governments have been forced to take in response to the pandemic, including: making budgetary cuts, freezing spending and hiring, laying off workers, and drawing down rainy day funds. *Id.* State and local officials have even remarked in the public sphere that the money available through the ARPA represents a life preserver thrown to drowning governmental bodies. *See* Manny Fernandez & Sabrina Tavernise, *Stimulus Bill Transforms Options for State and Local Governments*, N.Y. TIMES, Mar. 15, 2021, https://www.nytimes.com/2021/03/13/us/stimulus-biden-states-cities.html ("The American Rescue Plan – that's a proper term for the situation we're in … it's pretty amazing that we're still standing up"). Local governments have incurred "[t]hree quarters of the the more than 1.3 million jobs lost among state and local governments since February 2020 … the vast majority of them from school districts." *Id.* In fact, the full extent of the fiscal damage incurred by local governments may not yet be known, as many counties have "complained that funds from previous rounds of pandemic stimulus had not reached them because the funds were routed through states for smaller counties." *Id.*

---

[11] Anne Sraders & Lance Lambert, *Nearly 100,000 Establishments That Temporarily Shut Down Due to the Pandemic Are Now Out of Business*, Fortune (Sept. 28, 2020), https://bit.ly/3t6dpci; Paul Davidson, *Vaccines Could Help Steady Economy; Yet Pandemic Isn't Over, Effects Are Likely to Linger*, USA Today at 3B (Dec. 31, 2020).
[12] Michael Ettlinger & Jordan Hensley, supra n.8; *see also* Congressional Rsch. Serv., *Global Economic Effects of COVID-19* at Fig. 19 (June 17, 2021), https://bit.ly/3AitAqJ (in none of sixteen measured sectors has the number of jobs lost in April 2020 been fully recovered); U.S. Bureau of Labor Statistics, *All Employees, Total Nonfarm [PAYEMS]*, retrieved from FRED, Fed. Rsrv. Bank of St. Louis (July 8, 2021), https://bit.ly/3dPMhbQ (total nonfarm employment in the United States is still more than 6.7 million jobs below its February 2020 level).

At the risk of straining the analogy, the pandemic has many state and local governments treading water.  The federal government's rescue boat has arrived in the form of the ARPA, but instead of offering a hand to hoist up its sinking co-sovereigns, it has offered a pen and paper listing conditions of rescue.  The States have no voluntary or knowing choice in the matter, *Pennhurst*, 451 U.S. at 17, and face a "gun to the head" contract of adhesion.  *NFIB*, 567 U.S., at 575.  This is exemplified by the fact that all but thirteen States, to-date, have certified to receive ARPA funds, with more likely to follow.  *See, e.g., ARPA State Fiscal Recovery Fund Allocations*, National Conference of State Legislatures, https://www.ncsl.org/research/fiscal-policy/arpa-state-fiscal-recovery-fund-allocations.aspx (last visited Sept. 17, 2021).  Further, an untold number of local governments and cities will likewise receive funding directly from the Treasury Department.  *See, e.g. American Rescue Plan Act (ARPA)*, Lexington-Fayette Urban County Government, https://www.lexingtonky.gov/ARPA (last visited Sept. 17, 2021).  The numbers speak for themselves.  *See City of Pontiac*, 584 F.3d 253, at 284.  Given the "choice bending" nature of Congress's offer, *id.*, the Court finds the Tax Mandate of the ARPA coercive, and the condition cannot be sustained under the spending power.[13]

If you think about it, the coercion presented in the ARPA is exactly the kind of intrusion on state sovereignty that the Constitution prohibits.  Accordingly, the Court rests on the abovementioned considerations in finding the federal government's offer coercive, but feels compelled to mention the particularly injurious nature of the Tax Mandate.  The Constitution recognizes limitations on the States, but does not abolish the States' "residuary and inviolable sovereignty."  The Federalist No. 39, p. 245 (C. Rossiter ed. 1961).  Accordingly, our federalist

---

[13] As a note, whereas an Interim Final Rule from the Treasury Department has the potential to clarify an unconstitutionally ambiguous offer, *see Ohio*, 2021 WL 2712220, at *3–4, such a Rule has no bearing on whether Congress's offer is unconstitutionally coercive.  Accordingly, the Treasury Department's May 17, 2021 IFR, *see* 86 Fed. Reg. 26,786 (May 17, 2021), has no bearing on this Court's coercion analysis.

system is one of dual sovereignty. *See Murphy v. National Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1475 (2018). Out of all of the powers reserved to the States, there is no power more central to a state government's sovereignty than the power to tax, *Dep't of Revenue v. ACF Indus., Inc.*, 510 U.S. 332, 345 (1994), which the Supreme Court, long ago, recognized as "indispensable to [the States'] existence." *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 199 (1824). In fact, the "power of self-government … cannot exist distinct from the power of taxation." *Providence Bank v. Billings*, 29 U.S. (4 Pet.) 514, 546, 548 (1830). Thus, where the federal government unduly influences the States' power to set their own tax policies, the federal government oversteps its bounds. Not only does this threaten the dual nature of our federalist system, but such federal overreach threatens individual liberties that "derive[] from the diffusion of sovereign power." *Bond v. United States*, 564 U.S. 211, 221 (2011). As mentioned above, the Court draws no conclusion here as to whether, for instance, the Tax Mandate violates the anticommandeering doctrine. [*See* R. 25.] The Court simply notes that the federal government's condition implicates not only powers at the core of state sovereignty, but individual liberties reserved to citizens, as well. *See Bond*, 564 U.S. 211, at 222 ("When government acts in excess of its lawful powers, [individual] liberty is at stake").

### C

Beyond the anticoercion principle, Plaintiffs contend that the Tax Mandate is unconstitutional in three other respects. [R. 25.] Plaintiffs argue that the Tax Mandate: (1) violates the anticommandeering doctrine because it seizes powers reserved to the States, via the Tenth Amendment, to set their own tax policies [*id.* at 34]; (2) is not reasonably related to the federal interest in passing the ARPA, which Plaintiffs define as "providing relief to the States

12

(and their citizens) from hardships caused by Covid-19" [*id.* at 36]; and (3) is unconstitutionally ambiguous in violation of the Spending Clause where the plain language of the Tax Mandate is simply incomprehensible. [*Id.* at 27.]

Kentucky and Tennessee may very well be correct about these alternative grounds. But, having found the Tax Mandate unconstitutionally coercive, this Court will refrain from anticipating further questions of constitutional law "in advance of the necessity of deciding [them]." *Wash. St. Grange v. Wash. St. Republican Party*, 552 U.S. 442, 450–51 (2008) (quoting *Ashwander v. TVA*, 297 U.S. 288, 346–47 (1936)).[14]

**D**

Turning to the remedies, Plaintiffs pray for both declaratory relief and a permanent injunction enjoining the Treasury Secretary from enforcing the Tax Mandate provision of the ARPA. [R. 1 at 24.] To obtain a permanent injunction, a plaintiff "must first establish that [she has] suffered a constitutional violation." *Womens Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 602 (6th Cir. 2006). As explained above, Tennessee and Kentucky have clearly suffered violations of their constitutional rights as a result of the Tax Mandate's coercive nature. The four factors for courts to consider before granting a request for a permanent injunction also weigh in the Plaintiffs' favor. These factors require the Court to find (1) that the Plaintiffs have suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that an equitable remedy is warranted upon considering the balance of hardships between the parties; and (4) that the public interest would not be disserved

---

[14] Suffice it to say, for an excellent exposition on the question of the Tax Mandate's ambiguity, *see generally Ohio*, 2021 WL 2712220. Further, for additional opinions regarding the constitutionality of the Tax Mandate or district courts' standing to hear them, *cf. W. Va., et al. v. U.S. Dep't of Treasury, et al.*, 2021 WL 2952863 (N.D. Al. July 14, 2021) (denying preliminary injunction, citing lack of irreparable injury); *Ariz. v. Yellen*, 2021 WL 3089103 at *3–4 (D. Ariz. July 22, 2021) (denying ambiguity challenge where ARPA provides clear notice that conditions are attached to funds, whether or not conditions are largely indeterminate).

by a permanent injunction. *See eBay Inc. v. MercExchange*, LLC, 547 U.S. 388, 391, 126 (2006); *see also Wedgewood Ltd. Partnership I v. Twp. of Liberty*, 610 F.3d 340, 349 (6th Cir. 2010). First, the Plaintiffs' irreparable harm flows naturally from the constitutional violation. *See Overstreet v. Lexington–Fayette Urban Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002) (explaining that "a denial of an injunction will cause irreparable harm if the claim is based upon a violation of the plaintiff's constitutional rights"). Next, whereas monetary damages might otherwise be an adequate remedy if recoupment were to take place, Defendants enjoy sovereign immunity against such relief. *See F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994) ("Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit"). The balance of hardships also weighs in Plaintiffs' favor. As explained above, Plaintiffs will endure hardship if forced to accept this unconstitutional contract of adhesion that impedes on their sovereign powers. Defendants, on the other hand, will suffer no hardship if this Court enjoins them from enforcing the Tax Mandate. The Court sees no cognizable interest of the federal government in enforcing the Tax Mandate and, given the limited scope of the permanent injunction, the Defendants will be free to enforce every other provision of the ARPA as they see fit. Lastly, "it is always in the public interest to prevent the violation of a party's constitutional rights." *G & V Lounge, Inc. v. Mich. Liquor Control, Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994). The public interest is safeguarded with a decision in favor of the Plaintiffs; the States' ability to set their taxing policy as a co-sovereign enhances, rather than threatens, individual liberty. *Bond*, 564 U.S., at 221.

     A permanent injunction is proper in this case, as enjoining the enforcement of the Tax Mandate alleviates the constitutional harm. Because a permanent injunction fully rectifies the Plaintiffs' harm, the Court need not address the issue of a declaratory judgment.

Lastly, the Court must consider the scope of its injunction. The Sixth Circuit has held that a "district court should limit the scope of [an] injunction to the conduct 'which has been found to have been pursued or is related to the proven unlawful conduct.' " *Howe v. City of Akron*, 801 F.3d 718, 753 (6th Cir. 2015) (quoting *E.E.O.C. v. Wilson Metal Casket Co.*, 24 F.3d 836, 842 (6th Cir.1994)). The Defendant has made an unconstitutionally coercive offer to Plaintiffs Tennessee and Kentucky. Defendants have made identical offers, however, to every State in the country. While it is true that the evidence presented by the parties primarily relates to Kentucky and Tennessee, this Court's ruling rests on the coercive elements that are universally present in the federal government's offer to all of the States. Consequently, this Court must consider the breadth of its injunction: Should it enjoin the Treasury Secretary's enforcement of the Tax Mandate as it relates to (1) the Eastern District of Kentucky (this Court's District); (2) Tennessee and Kentucky (the entities before the Court); or (3) all of the States (both parties and non-parties).

In *Trump v. Hawaii*, —U.S.—, 138, S. Ct. 2392, 2424 (2018) (Thomas, J., concurring) Justice Thomas discussed the increasing frequency of "universal" or "nationwide injunctions." Justice Thomas expressed his skepticism of such injunctions, noting: (1) historical principles of equity in Article III courts; (2) the recency of nationwide injunctions; (3) and the properly limited role of district courts. *Id.* at 2425–2429 ("[In the past, as] a general rule, American courts did not provide relief beyond the parties to the case"). Justice Thomas found that the sweeping relief brought by nationwide injunctions likewise brings "forum shopping" and makes "every case a national emergency for the courts and the Executive Branch." *Id.* at 2425. Instead, district courts should allow legal questions to percolate through the federal court system. *Id.* Justice Gorsuch affirmed this notion in *Department of Homeland Sec. v. New York*, 140 S. Ct.

15

599, 600 (2020) (Gorsuch, J.J., concurring). Noting that "[e]quitable remedies, like remedies in general, are meant to redress the injuries sustained by a particular plaintiff in a particular lawsuit," Justice Gorsuch found that nationwide injunctions "raise serious questions about the scope of courts' equitable powers under Article III." *Id.* Not only are such injunctions impracticable, they "force judges into making rushed, high-stakes, low-information decisions." *Id.* Careful review by multiple district and circuit courts, on the other hand, allows the Supreme Court the benefit of thoughtful and, at times, competing outcomes. *Id.* The current state of affairs in the Sixth Circuit is a key example of this careful and deliberate process. One district court has answered a similar legal question regarding the Tax Mandate on dissimilar grounds. *see Ohio*, 2021 WL 2712220. The Sixth Circuit will likely consider both district court injunctions and issue its own opinion. Thereafter, the Supreme Court may choose to address the constitutionality of the Tax Mandate, with the added benefit of many competing views to inform its decision. Even if this Court were to consider relief beyond Tennessee and Kentucky, however, the Sixth Circuit has already defined the outer-bounds of this Court's powers. *See Gun Owners of America, Inc. v. Garland*, 992 F.3d 446, 474 (6th Cir. 2021) ("we do not decide the scope of the injunction, except to say that the scope may not exceed the bounds of the four states within the Sixth Circuit's jurisdiction and, of course, encompasses the parties themselves").

      Although the debate over the proper scope of injunctions is ongoing, this Court believes that redressability in the present case is properly limited to the parties before the Court. Consequently, the scope of the permanent injunction shall apply to both Tennessee and Kentucky, in equal force.

**III**

Some might view Hamilton as having gotten the better of Jefferson in terms of the balance between federal and state powers.[15]  Nevertheless, the balance exists.  And here, the federal action intrudes on state sovereignty.  Accordingly, and the Court being sufficiently advised, it is hereby **ORDERED** as follows:

1. The Plaintiffs' Motion for Summary Judgment [**R. 25**] is **GRANTED**;

2. The Treasury Secretary is **PERMANENTLY ENJOINED** from seeking enforcement of the Tax Mandate, 42 U.S.C. § 802(c)(2)(A), against Plaintiffs Tennessee and Kentucky;

3. The Plainitffs' request for declaratory relief, as argued in [R. 25], is **DENIED**; and

4. Defendant's Motion to Dismiss [**R. 32**] is **DENIED**;

5. Judgment shall enter promptly.

This the 24th day of September, 2021.

Gregory F. Van Tatenhove
United States District Judge

---

[15] *See McCulloch v. Maryland*, 4 Wheat. 316, 4 L.Ed. 579 (1819).